UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-108 (PAM/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S** |
| v. | ) | **CONSOLIDATED** |
| | ) | **RESPONSE TO DEFENDANTS'** |
| 2.    TOU THAO, | ) | **MOTIONS IN LIMINE** |
| 3.    J. ALEXANDER KUENG, and | ) | |
| 4.    THOMAS KIERNAN LANE, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the United States of America, by and through its undersigned attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota; Manda M. Sertich, Assistant U.S. Attorney; and Samantha Trepel, Special Litigation Counsel for the Civil Rights Division, and responds to the motions *in limine* filed by the defendants, Tou Thao, J. Alexander Kueng, and Thomas Kiernan Lane.

## I.   Introduction

In May 2021, a federal grand jury returned an Indictment charging Derek Chauvin, Tou Thao, J. Alexander Kueng, and Thomas Kiernan Lane, all former police officers at the Minneapolis Police Department ("MPD"), with violations of 18 U.S.C. § 242.   Count One charged defendant Chauvin with acting under color of law to willfully deprive George Floyd of the right, secured by the United States Constitution, to be free from the unreasonable force of a police officer.[1]   Count Two charges defendants Thao and Kueng

---

[1] Defendant Chauvin pleaded guilty to Count One on December 15, 2021.

with acting under color of law to willfully deprive George Floyd of the right, secured by the United States Constitution, to be free from the unreasonable force of a police officer, by failing to intervene to stop former Officer Derek Chauvin's use of unreasonable force. Count Three charges all three defendants with acting under color of law to willfully deprive Mr. Floyd of the right, secured by the United States Constitution, to be free from a police officer's deliberate indifference to his serious medical needs, by seeing Mr. Floyd lying on the ground in clear need of medical care, and willfully failing to aid him.   The Indictment further alleges that both offenses resulted in bodily injury to and the death of Mr. Floyd The defendants have filed motions *in limine*, which are addressed below.

## II.   <u>Response to Motions</u>

### A.   **Motions *in Limine* for Additional Peremptory Challenges: ECF Nos. 145 (Lane) and 157 (Thao).**

Defendants Thao and Lane seek additional peremptory challenges based on the amount of publicity associated with this case.   Thao seeks an unknown number of additional defense challenges and Lane seeks 10 additional challenges for *each* defendant. The government objects.

The Federal Rules of Criminal Procedure provide for a specific number of peremptory strikes in a multi-defendant criminal trial, namely that "[t]he government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges . . . ."   *See* Fed. R. Crim. P. 24(b)(2).   While the Rule provides that the Court may provide additional peremptory challenges to multiple defendants, there is no

constitutional right to peremptory challenges in the first instance. *See United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000).

First, neither defendant explains how pre-trial publicity requires additional peremptory strikes in this case. Simply because a juror has been exposed to pretrial publicity does not mean that the juror is automatically prejudiced or biased. "Prominence does not necessarily produce prejudice, and juror *impartiality*, [the Supreme Court] ha[s] reiterated, does not require *ignorance*." *Skilling v. United States*, 561 U.S. 358 (2010) (citing cases); *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (explaining that jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case"). Without specific justification, a grant of additional peremptory challenges would present an inappropriate opportunity to strike disproportionally those jurors who are generally unfavorable to one party, as opposed to those who are unfit for some reason to serve on this particular jury.

Second, defendants do not explain why the extensive juror questionnaire agreed upon by the parties and disseminated by the Court was insufficient—when combined with the Court's review of "for cause" strikes, voir dire, and the exercise of the 10 peremptory strikes contemplated by the rules—to ensure that those unfit to serve by virtue of pre-trial publicity are removed from the panel. One of the primary purposes of the extensive juror questionnaire was to inquire about jurors' preconceived notions and exposure to media related to the case, and allow for additional voir dire to follow up about any issues. In fact, many potential jurors have expressly stated that they do not feel that they can be fair—

including some based on pre-trial publicity—and have already been struck from the potential pool of jurors for cause. Further, defendants do not explain why the Court's process for reviewing "for cause" challenges would not address any juror who has been so tainted by pre-trial publicity as to be unfit to serve on this jury. Given that there is no reason why this case would necessitate additional peremptory challenges and in light of the delay that would be caused, the Court should deny defendant's motions.

Third, the risk of rendering the jury unrepresentative by expanding the number of peremptory challenges is even more significant where a single party has the ability to exercise a large—and disproportionate—number of peremptory challenges. Should the Court grant defendants' motions and give each defendant 10 challenges, three times the number contemplated by the Rule, the government would request a proportional number of additional challenges in order to ensure the selection of a jury that is fair to all parties. If the government were not provided these additional challenges, as well, the jury would be selected disproportionately by one party. To accommodate such an expansion of the number of challenges would require the Court to have an unusually large panel from which the parties would exercise their strikes.

In sum, neither defendant addresses why it is insufficient for the Court to use an extensive jury questionnaire, combined with voir dire, the opportunity to make "for cause" challenges, and 10 peremptory challenges. These extensive procedures already in place should sufficiently allow the parties to identify and strike any juror who has been so tainted by pre-trial publicity that they are unfit to serve on this jury. The defendants' requested

additional peremptory challenges are unnecessary and would result in a longer jury selection process.   Defendants' motions should be denied.

### B.   Notice of Intent To Offer Pertinent Trait Character Evidence: ECF No. 146 (Lane).

Defendant Lane provides notice of intent to offer, pursuant to Federal Rules of Evidence 404(a)(2)(A), 405(b), and 406, body-worn camera footage (with a corresponding transcript) of him helping a homeless Black man in a wheelchair.   Defendant Lane argues this evidence is admissible as evidence of "his pertinent trait of character for empathy, compassion, and being a good Samaritan police officer" in order to demonstrate "that Lane did not with criminal intent assist in the murder of George Floyd."[2]

The government objects.   The proffered evidence does not relate to a pertinent trait and is offered in an inadmissible form.   First, the wheelchair-incident evidence is not relevant to a "pertinent trait," as Rule 404(a)(2)(A) requires.   That Lane helped push a man in a wheelchair on January 23, 2020, makes it no more or less likely that he willfully failed to provide medical aid to Mr. Floyd on May 25, 2020, as charged in the Indictment. *See, e.g.*, *United States v. Navedo-Ramirez*, 781 F.3d 563, 569 (1st Cir. 2015) (affirming district court's exclusion of evidence of defendant-officer's general competence as an

---

[2] The government notes that it is not required to prove that any defendant had "criminal intent [to] assist in the murder of George Floyd."   Instead, the government must prove that the defendant knew that Mr. Floyd had a serious medical need and that failing to provide medical aid to Mr. Floyd was wrong, and that he failed to do it anyway.   *See* 18 U.S.C. § 242; *United States v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006) (setting out the elements of a § 242 deliberate indifference charge); *United States v. Cowden*, 882 F.3d 464, 474 (4th Cir. 2018) (discussing willfulness in a § 242 case).

officer and citing cases holding that evidence of a defendant's general competence, dedication, or commendations received as a police officer is not admissible because it is not evidence of a "pertinent" character trait).   Such evidence "is of slight probative value and may be very prejudicial" because it "tends to distract the trier of fact from the main question of what actually happened on the particular occasion."   Fed. R. Evid. 404 Advisory Comm. Note (internal quotation marks omitted).

Even if the wheelchair-incident evidence were relevant to a pertinent character trait, it is inadmissible because it does not take the form of "testimony about the person's reputation" or "testimony in the form of an opinion" as Rule 405(a) requires.   Fed. R. Evid. 405(a).   Because a defendant's character is not an essential element to a charge or defense under 18 U.S.C. § 242, it may not be proved by specific instances of conduct under Rule 405(b).   As defendant Lane notes, he seeks to offer the wheelchair incident as "circumstantial evidence."   ECF No. 146 at 1.   However, "[w]hen character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion."   Fed. R. Evid. 405 Advisory Comm. Note; *see also United States v. Koessel*, 706 F.2d 271, 275 (8th Cir. 1983) ("Character testimony is limited to the reputation of a defendant, not to specific instances of behavior.").   Likewise, because the wheelchair incident is evidence of a single specific instance, it does not constitute evidence of defendant Lane's "habit" and is thus not admissible under Federal Rule of Evidence 406.[3]   The Court should not admit the evidence noticed by the defendants.

---

[3] Photographs of the defendant volunteering and a video clip of him receiving an award—

### C.   Motions *in Limine* To Strike Surplusage: ECF Nos. 148 (Lane) and 155 (Kueng).

Defendant Lane moves the Court for an order striking the second sentence of paragraph 4 of the Indictment, *see* ECF No. 148, which reads, "[defendant Lane] began working as an MPD officer in December 2019."   ECF No. 1.   Similarly, defendant Kueng moves the Court for an order striking the corresponding language relevant to him in Paragraph 3.   These motions were previously filed as pretrial motions (*see* ECF Nos. 70, 87, 88-89, 124), and were denied without prejudice by the Magistrate Court.   *See* ECF No. 130.   The Magistrate Court denied the defendants' motions because:

> (a) the allegations are not false and the language is not inflammatory; (b) the allegations are relevant to the counts charged; and (c) any potential prejudice by the inclusion of this language is outweighed by the allegations' relevance.

ECF No. 130 at 4-5.   Defendants provide no new facts or law that would support a different result.

Defendant Kueng relies on arguments made in his previous filings, s*ee* ECF No. 155 at 1, and argues that while paragraph 3 of the Indictment may be "technically accurate," it is "misleading and prejudicial because in reality Mr. Kueng had not yet completed his 3rd shift following his field training as a Minneapolis Police Officer." ECF No. 87 at 1. According to defendant Kueng, officers in field training, which defendant Kueng began in

---

potential exhibits emailed by defense counsel to the government on January 6, 2022—are also inadmissible for the same reasons: they are not relevant to a pertinent character trait, as Rule 404(a)(2)(A) requires; they do not take the form of opinion or reputation testimony, as Rule 405(a) requires; and they are not proper Rule 406 evidence.   The government will address these photographs and video more specifically in a separate motion to exclude.

December 2019, are not "considered" to be officers by "the rank and file of the Minneapolis Police Department."   ECF No. 87 at 1-2.   Rather, they are referred to by "rank and file" officers as "recruits" or "boots." *Id.* at 2.   Defendant Kueng argues that the statement in the Indictment regarding the length of his employment with the Minneapolis Police Department is misleading and prejudicial and will be unfairly prejudicial if it is presented to the jury in an "official court document."   *Id.*

Defendant Lane argues that the language of the second sentence of paragraph 4 of the Indictment "gives a false portrayal" of defendant Lane's employment because the "true whole story is Thomas Lane was sworn in as a police officer RECRUIT on December 10, 2020, however not until May 21, 2020, was he not a RECRUIT."   ECF No. 148.

Pursuant to Fed. R. Crim. P. 7(d), "upon the defendant's motion, the [C]ourt may strike surplusage from the indictment or information."   However, the Eighth Circuit has held that such motions should be granted in limited circumstances and "only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter."   *United States v. Michel-Galaviz*, 415 F.3d 946, 948 (8th Cir. 2005) (quoting *Dranow v. United States*, 307 F.2d 545, 558 (8th Cir. 1962)). Other courts have concluded that "if the language in the Indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be."   *United States v. Lov-It Creamery*, 704 F. Supp. 1532, 1550-51 (E.D. Wis. 1989) (citing *United States v. Climatemp, Inc.*, 482 F. Supp. 376, 391 (N.D. Ill. 1979), *aff'd*, 705 F.2d 461 (7th Cir.1983)).

The government intends to prove at trial that defendants Kueng and Lane were sworn officers as of December 2019, and thereafter carried service weapons and went on hundreds of calls for service during the first several months of 2020.[4]   Defendant Kueng himself admits that the language used in the Indictment is "technically accurate." Regardless of the colloquial language used by MPD officers to refer to their newest colleagues, it does not change the fact that former officers Kueng and Lane were, in fact, officers of the Minneapolis Police Department beginning in December 2019.

To the extent that defendants Kueng and Lane contest the accuracy of the statements made in paragraphs 3 and 4 of the Indictment, that objection is insufficient to justify the relief they seek.   "[W]hether the allegations in an indictment are 'accurate or truthful' is a matter for the jury to decide" and a court "cannot determine, on a motion to strike, 'whether the [allegations] in the indictment are true.'"   *United States v. Ledbetter*, No. 2:14-CR-127, 2015 WL 5029249, at *1 (S.D. Ohio Aug. 26, 2015) (citing *United States v. Tomero*, 496 F. Supp. 2d 253, 255 (S.D.N.Y. 2007)).

The challenged statements regarding the duration of defendants' employment with the Minneapolis Police Department are relevant to the charges against defendant Kueng in Counts 2 and 3 and against defendant Lane in Count 3.   The government will be required to prove at trial that the defendants acted willfully—that is, that they intentionally committed the constitutional violations alleged in the Indictment, knowing that a

---

[4] This evidence will include employment records from the Minneapolis Police Department summarizing each former officer's rank history.   *See* ECF No. 127 Exs. A, B.   These records show that defendants Kueng and Lane began in the role of "Police Recruit" on August 14, 2019, and as "Police Officer" on December 10, 2019.

reasonable officer would not have done so.  *See United States v. Harrison*, 671 F.2d 1159, 1161-62 (8th Cir. 1982).  The fact that defendants Kueng and Lane were actively employed as officers with the Minneapolis Police Department—whether they were referred to by other officers as "recruits" or "officers"—for approximately five months before the events alleged in the Indictment, is relevant to an element of the charged offense and to their state of mind regarding the defendants' acts and omissions in this case.

Finally, it is difficult to imagine how a concededly accurate statement of the defendants' dates of employment could be considered "inflammatory" or unfairly "prejudicial."  *See United States v. Bou*, No. 85 CR. 1165 (LLS), 1986 WL 4081, at *3 (S.D.N.Y. Mar. 28, 1986) (denying motion to strike statement from indictment that defendant, a member of the Federal Protective Service, was a "police officer," where defendant argued the characterization was inaccurate, because such a statement is "not unduly inflammatory and prejudicial").

For all of these reasons, defendants Kueng and Lane's motions *in limine* to strike surplusage should be denied.

### D. Motion *in Limine* Regarding Speculative Testimony: ECF No. 150 (Kueng).

Defendant Kueng moves the Court to prohibit government lay witnesses from offering speculative testimony about how they would have acted had they been in the place of the defendant officers.  *See* ECF No. 150.  The government objects insofar as defendant Kueng's motion suggests that only a witness with personal knowledge may offer an opinion as to or based on what he or she perceives on the video.   The government agrees

insofar as defendant Kueng's motion suggests that no expert or lay witness may testify about whether they would or would not personally have used such force, intervened in the use of force, or rendered medical aid.

### E.   Motion *in Limine* To Limit Testimony of Medical Personnel: ECF No. 151 (Kueng).

Defendant Kueng moves the Court for an order preventing paramedics from Hennepin County EMS from testifying about whether Mr. Floyd was dead or alive when they arrived on scene.   ECF No. 151 at 1.   Defendant Kueng appears to argue: (1) such evidence will be admitted as opinion testimony rather than as testimony based on personal knowledge, and therefore is impermissible (citing Fed. R. Evid. 602, 702); and (2) such evidence is not relevant and, therefore, the prejudicial value outweighs the probative value of the evidence (citing Fed. R. Evid. 403).   ECF No. 156 at 2-3.

Defendant Kueng's motion should be denied.   The paramedic witnesses in this case will not provide expert opinions regarding Mr. Floyd's medical status.   They will testify regarding the events of May 25, 2020, including but not limited to their recollections of Mr. Floyd's condition, their interactions with law enforcement officers and others on scene and after departing the scene, and the treatment they provided to Mr. Floyd.   The paramedics' observations that Mr. Floyd was "dead" are based on personal knowledge— knowledge, as the government anticipates they will testify, that upon their arrival Mr. Floyd did not have a pulse, was not breathing, and had dilated pupils, all of which led to the conclusion that Mr. Floyd was deceased.   Defendant Kueng argues that the "paramedics' efforts after removing Mr. Floyd contradict their impression that Mr. Floyd was dead at the

scene." *Id.*   The government expects that evidence at trial will establish that the resuscitative efforts undertaken or directed by the paramedics, including CPR and the use of a LUCAS device, are often performed on patients who are, in the paramedics' estimation, "dead" —meaning that they are not breathing and have no pulse—in an effort to resuscitate them.   To be clear, that a person is "dead," in the parlance of paramedics, does not mean that they cannot be resuscitated. [5]   It means that, absent medical intervention, that person cannot survive; with medical intervention, that person may be resuscitated.

The United States must prove beyond a reasonable doubt that the charged offenses resulted in Mr. Floyd's death.   Consequently, the fact and timing of Mr. Floyd's death is highly relevant to the elements to be proven at trial.   Any prejudice that could arise from a paramedic's testimony regarding Mr. Floyd's status of being dead or alive is greatly outweighed by the probative value of such evidence.   *See* Fed. R. Evid. 403.   Indeed, defendant Kueng has not even attempted to explain how such testimony would be *unfairly* prejudicial.   *United States v. Farrington*, 499 F.3d 854, 859 (8th Cir. 2007) ("Evidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning. Whether there was unfair prejudice depends on whether there was an undue tendency to suggest decision on an improper basis.").

For all of these reasons, defendant Kueng's motion should be denied.

---

[5] The government anticipates presenting evidence that, as the defendants in this case were trained, when a person is no longer breathing and does not have a pulse, one must act quickly to provide potentially life-saving aid because a person's chances of survival drop significantly over minutes.

### F. Motions *in Limine* To Limit Police Witness Testimony: ECF No. 152 (Kueng) and 158 (Thao).

1. <u>Motion *in Limine* To Prohibit Improper Testimony Regarding Reasonableness and Willfulness: ECF Nos. 152 (Kueng) and 158 (Thao).</u>

Defendants Thao and Kueng move the Court for an order precluding witnesses from testifying that the force used against Mr. Floyd was "lawful," "reasonable," or "appropriate," or from offering opinions about what force would be appropriate.   ECF No. 152 at 1; ECF No. 158 at 1, 4-6.   Defendant Kueng's motion is limited to "non-expert police witnesses;" defendant Thao's motion is not so limited.   *Id.*   Defendant Thao also moves for an order precluding testimony regarding the defendants' mental state, including whether any defendant, or former defendant Chauvin, acted willfully.   ECF No. 158 at 1, 3-4.

The Court exercising its critical gatekeeping function to determine the admissibility of expert testimony requires a fact-specific inquiry.   *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).   As a general matter, the government agrees that opinion testimony—whether offered by a noticed expert under Federal Rule of Evidence 702, or a lay witness under Federal Rule of Evidence 701—that a particular use of force was lawful, reasonable, or appropriate (or that it was *un*lawful, *un*reasonable, or *in*appropriate) under the Fourth Amendment; that a defendant did or did not willfully fail to intervene; or that a defendant was or was not deliberately indifferent to Mr. Floyd's

serious medical needs, would constitute impermissible legal conclusions that would invade the province of the jury.   *See, e.g.*, *Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995).   Likewise, the government agrees that no witness may opine as to whether a defendant committed acts or omissions willfully.[6]   Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged. . . .   Those matters are for the trier of fact alone.").

The government respectfully requests that any order limiting the witnesses from offering impermissible legal conclusions apply to both government and defense witnesses. After the deadline for filing motions *in limine*, the government received reports containing the opinions of expert witnesses retained by defendants Kueng and Lane.   Both reports contain impermissible legal conclusions of precisely the sort that the defendants have moved here to exclude.[7]   *See, e.g.*, Report of Steve Ijames at 2, 10 (opining that defendant Kueng "did not willfully deprive Mr. Floyd of the right to be free from an unreasonable seizure," and that his "failure to provide medical aid to Mr. George Floyd was not the result of deliberate indifference"); Report of Greg Meyer at 14 (opining that defendant Lane "was not deliberately indifferent to Mr. Floyd's serious medical needs").   These opinions

---

[6] The government notes that former defendant Chauvin's willfulness is no longer at issue, because, unlike the reasonableness of his use of force, Chauvin's willfulness is not an element the government must establish to prove the remaining charges.

[7] The government anticipates separately filing a motion to exclude certain opinions contained in these reports.

constitute conclusions regarding elements of the crimes charged, and therefore the defense witnesses should be precluded from testifying to these opinions, as such testimony would invade the province of and would not be helpful to the jury.

Witnesses instead may offer opinions regarding specific factual building blocks that support ultimate legal conclusions such as reasonableness and willfulness. *Cf., e.g.*, *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006). This may include testimony as to whether a defendant's conduct was consistent or inconsistent with MPD policy and training and generally accepted police practices. *See, e.g.*, *S. Pine Helicopters, Inc. v. Phoenix Aviation Mgrs, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (expert testimony on "industry practice or standards may often be relevant"); *K.W.P. v. Kansas City Pub. Sch.*, 296 F. Supp. 3d 1121, 1127 (W.D. Mo. 2017) (permitting expert testimony "about the appropriateness of the handcuffing under the circumstances in light of his law enforcement training experience"); *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014) (explaining that an expert "can testify to his opinion about whether a certain action by [a defendant-officer] in a certain circumstance, assuming that those are the facts, would be consistent with police practices").

2. Motion *in Limine* To Preclude Expert Witnesses from Referencing Otherwise Inadmissible Evidence: ECF No. 158 (Thao).

Defendant Thao moves this Court for an order precluding the government's expert witnesses from testifying about the content of otherwise inadmissible evidence the witnesses relied on in forming their opinions. The government does not object to this motion with respect to out-of-court statements and testimony, and respectfully requests that

the Court prohibit *all* witnesses, including witnesses for the defense, from testifying about statements by witnesses and parties that would otherwise be inadmissible.[8]

Expert witnesses, as defendant Thao points out, may present a special danger in this regard, as they frequently rely on hearsay statements in order to form their opinions. The government agrees. The use of expert testimony does not permit a party to make an end-run around the Rules of Evidence. In particular, the government notes that in the expert reports submitted by defendants Kueng and Lane, both experts discussed statements made by the defendants. *See, e.g.*, Report of Steve Ijames at 9, 11 (Jan. 3, 2022) and Report of Steve Ijames at 11-12 (Feb. 22, 2021) (both discussing statements defendant Kueng made to Mr. Ijames to aid in the preparation of the reports); Report of Greg Meyer at 11-12 (citing defendant Lane's voluntary BCA interview). At trial, Federal Rule of Evidence 801(d)(2)(A) permits the *government* to offer such statements into evidence, but prohibits the defendant from doing so. If the defendants wish to elicit this evidence, they must take the stand, testify under oath, and subject themselves to cross-examination. *See United*

---

[8] Experts should, however, consistent with Federal Rule of Evidence 703, be permitted to disclose the bases of their opinions where the facts or data they rely on are otherwise admissible, or consist of facts and data an expert in the field would reasonably rely on in forming an opinion, where their probative value in helping the jury evaluate that opinion substantially outweighs any prejudicial effect the evidence may have. Thus, for example, a medical examiner or medical expert should be permitted to testify regarding medical histories and results of medical tests where they have reasonably relied on such medical records in forming their opinions. *See, e.g.*, Fed. R. Evid. 703 & Advisory Committee Note (explaining that a "source contemplated by the rule consists of presentation of data to the expert outside of court and other than his own perception"; providing as an example "a physician" who bases his or her "diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, . . . hospital records, and X rays").

16

*States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (prohibiting the defendant from eliciting his own statements through another witness because to do so would allow him to "effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury").

> 3.   Motion *in Limine* To Prohibit Expert Witnesses from Instructing the Jury on the Legal Standard Governing Uses of Force: ECF No. 158 (Thao).

Defendant Thao moves this Court for an order prohibiting government witnesses from instructing the jury on the law.   ECF No. 158 at 7-8.   The government has no objection to this motion, and respectfully requests that any such order apply to all parties' witnesses.   Only the Court can instruct the jury on the law.   Further, defendant Thao asserts, and the government agrees, that "[w]hether or not the defendants violated or adhered to Minnesota law is irrelevant" to the charges at issue, *see* ECF No. 158 at 7, because the defendants are charged with violating Mr. Floyd's federal rights, specifically his Fourth and Fourteenth Amendment rights.

That said, the MPD use of force policy and training on that policy specifically incorporate Fourth Amendment standards.   The policy reads, "[b]ased on the Fourth Amendment's 'reasonableness' standard, sworn MPD employees shall only use the amount of force that is objectively reasonable in light of the facts and circumstances known to that employee at the time force is used.   The force used shall be consistent with current MPD training."   *See* MPD Code of Conduct and Use of Force, 5-301.01 Policy (10/16/2002) (08/17/07).   Although no witness should instruct the jury on the legal standard that applies

to the charges in this case, nor opine on whether or not the defendants acted consistently or inconsistently with the law, witnesses should be permitted to testify about the relevant MPD policies governing the defendants' conduct and the content of the training they received.

This information is relevant and admissible as it will demonstrate that the defendants had the knowledge and training to recognize that, in kneeling on Mr. Floyd's neck for more than nine minutes, former officer Chauvin used force that was far outside of the bounds of what was permitted by MPD policy and training.   This in turn is relevant to proving that their failure to protect Mr. Floyd from that force was willful, an element of the charged offense.   *See, e.g.*, *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("We have before recognized that evidence of departmental policies can be relevant to show intent in § 242 cases.   Other circuit courts have as well.   Those decisions, expressly or impliedly, acknowledge that an officer's training can help inform his state of mind in certain circumstances. . . .   If, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully.") (citations omitted); *United States v. Brown*, 654 F. App'x 896, 904 (10th Cir. 2016) ("The fact that Defendants were present during . . . training sessions . . . shows that Defendants were aware that official protocol limited the use of force to instances when an inmate was acting in a threatening manner. That Defendants disregarded their training on the appropriate use of force is admissible to show that Defendants acted willfully [under § 242].").

18

4.  Motion To Exclude Expert Testimony Purporting To Resolve a Disputed Factual Issue: ECF No. 158 (Thao).

Defendant Thao moves the Court to preclude experts from testifying in a manner that "purport[s] to resolve a disputed factual issue."  ECF No. 158 at 8.  Again, the government has no objection and respectfully requests that any such order apply equally to expert witnesses called by the defendants.   The jury is the fact finder and will determine any disputed facts based on the evidence received by the Court.   In this case, in part due to the sheer volume of video evidence available, there are likely to be fewer issues of disputed fact than in many cases.   Instead, disputes will likely center around whether the tactics used and decisions made by the defendants were consistent with MPD policies and training.

In order to offer meaningful opinions that assist the jury, use of force experts for the parties should be permitted to testify that, based on the facts as an expert understands or assumes them to be, a particular action, tactic, or decision was consistent or inconsistent with MPD policies and training or generally accepted police practices—but not what those underlying facts *are*.   *See Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014) ("[T]here is a critical distinction between an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine.   The former is manifestly improper, the latter is not.") (internal quotations omitted) (quoting *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006)).

5.  <u>Motion To Prohibit Witnesses from Offering Opinions as to the Physiological Effects of Prone Positioning: ECF No. 152 (Kueng).</u>

Finally, defendant Kueng moves this Court to prohibit "non-expert police witnesses . . . from offering opinions" regarding the "physiological effects of prone positioning." ECF No. 152 at 1.  The government objects, in part, to this motion.  The government agrees that non-medical witnesses may not be qualified to testify about the precise effects that being restrained in the prone position has on a person's ability to breathe, such as the effects of preventing the diaphragm's ability to move, and the effects that the resulting shallow or insufficient breathing may have on a person's level of oxygenation and vital organs over time.  However, that MPD trains its officers to immediately move a person out of the prone position after handcuffing and gaining control of them, and that MPD trains its officers that leaving a person in the prone position increases the risk that a person will have difficulty breathing, is relevant to proving that the defendants (who, it will be established, also received this training) acted willfully in failing to move Mr. Floyd out of the prone position and into a position in which he could breathe sufficiently.[9]  MPD officers should be permitted to testify about the extent and content of their training.   This will however, take the form of fact and not opinion testimony.

---

[9] The government has noticed the officer who provides medical training to MPD officers and recruits as an expert witness.   She is qualified and should be permitted to testify about the effects of prone positioning in detail, including by offering opinion testimony when appropriate.

### G. Motion *in Limine* To Limit Expert Medical Testimony: ECF No. 153 (Kueng).

Defendant Kueng moves the Court for an order prohibiting the government from calling multiple physician experts during its case in chief.   He argues that such evidence will be cumulative and a waste of time, which will distract jurors from the actions of the defendants.   ECF No. 156 at 3-4.   But as defendant Kueng himself noted in a separate motion *in limine*, "The issue before the jury is whether Mr. Floyd died as a result of the actions of the defendants while acting under color of law[.]"   ECF No. 156 at 3 (defendant Kueng Memorandum in Support of *in limine* motions).   Defendants Thao, Kueng, and Lane have not stipulated to Mr. Floyd's cause and manner of death.   Nor have defendants Thao, Kueng, and Lane stipulated that their actions and inactions contributed to or caused Mr. Floyd's death.   Despite the absence of such stipulations regarding this central issue of fact, defendant Kueng moves this Court to limit the government's presentation of its medical experts to a single witness—Dr. Andrew Baker, the Hennepin County Medical Examiner.   In his legally bare motion, defendant Kueng argues that the government will use "multiple physicians whose testimony will be cumulative," which will "cause delay and be a waste of time."   ECF No. 156 at 3-4.   Additionally—and contrary to his acknowledgement that whether Officer Chauvin's actions and the defendants' actions and inactions resulted in Mr. Floyd's death is an issue that must be proved at trial—defendant Kueng argues that such "evidence will mislead the jury by over emphasizing issues surrounding Mr. Floyd's death."   *Id.* at 4.   The government does not intend to provide impermissible cumulative testimony in its case-in-chief, and believes that testimony from

its medical experts will aid the jury in reaching a well-reasoned conclusion.   Even in the presence of a series of stipulations, the government is entitled to attempt to meet its burden of proof through the presentation of its own evidence.   *See Old Chief v. U.S.*, 519 U.S. 172, 189 (1997).   As defendant Kueng provides the Court no aid or argument to detail how testimony from the government's medical experts would be unnecessarily cumulative or irrelevant, the government asks this Court to deny the motion.

Elements of a crime must be charged in an indictment and proved to a jury beyond a reasonable doubt.   *Hamling v. United States*, 418 U.S. 87, 117 (1974).   The government bears the heavy burden of proving each element of a count beyond a reasonable doubt, and the failure to prove any element beyond a reasonable doubt requires acquittal.   *United States v. O'Brien*, 560 U.S 218 (2010).   Here, *inter alia*, the government must prove that Chauvin's unreasonable force resulted in Mr. Floyd's bodily injury and death (Count 2), and that defendants Thao, Kueng, and Lane were deliberately indifferent to Mr. Floyd's serious medical needs, which resulted in Mr. Floyd's bodily injury and death (Count 3). Bodily injury or death "results from" a defendant's conduct where, but for the defendant's conduct, it would not have happened.   *See Burrage v. United States*, 571 U.S. 204, 211, 216 (2014).   The government does not need to prove that a defendant *intended* for Mr. Floyd to suffer injury or to die.   *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Nor does the government need to prove that a defendant's conduct was the *only* cause of Mr. Floyd's bodily injury or death.   Rather, their conduct is a but-for cause of bodily injury or death if it played an indispensable, even if "incremental," role in causing the injury or death — "if, so to speak, it was the straw that broke the camel's back."   *Burrage*, 571 U.S.

at 211; *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) (explaining that "[o]ften, events have multiple but-for causes," and thus "a defendant cannot avoid liability just by citing some *other* factor").

To carry its burden and prove but-for causation beyond a reasonable doubt, the government intends to call expert medical witnesses who specialize in the following fields: (1) pulmonology and critical care; (2) emergency medicine; (3) toxicology; and (4) cardiology. This does not mean that the government anticipates it will need to call separate expert medical witnesses in each field. For example, the government's emergency medical expert also holds a board certification in medical toxicology from the American Board of Emergency Medicine; the pulmonologist and critical care doctor will explain that he commonly encounters and evaluates cardiac issues. [10] These expert witnesses will explain how Mr. Floyd died due to low oxygen from the restraint; how and why, if Mr. Floyd been placed in the side recovery position before he was rendered unconscious, he would have regained a sufficient level of oxygen and would not have died; how and why, once he no longer had a pulse, Mr. Floyd's chances at resuscitation would have significantly improved had the officers performed CPR when Mr. Floyd lay on the ground; how and why Mr. Floyd's coronary artery disease was not the primary cause of his death; and how and why Mr. Floyd's substance use was not the primary cause of his death.

---

[10] Although the government does not currently intend to call separate medical experts in each specialty, the specific witnesses the government intends to call cannot be determined at this juncture, as it remains unclear exactly how and to what extent the defense plans to challenge the cause and manner of death determination.

Defendant Kueng suggests—without evidence—that Dr. Baker "can properly testify to the manner and cause of death."   ECF No. 156 at 4.   Dr. Baker's expertise lies in forensic and clinical pathology, which focuses on determining the cause of death through the examination of the body of the deceased.   During the state trial of defendant Chauvin, Dr. Baker testified as to the limitations of his expert knowledge[11]:

| | |
|---|---|
| Attorney: | As a forensic pathologist, it's not part of what you do within the four corners of your job to try to calculate what Mr. Floyd's either lung volumes or oxygen reserves, or that sort of thing would have been, is it— |
| Dr. Baker: | I think what you're getting at, counselor, is the sort of thing that I would defer to a pulmonologist.   Those are obviously things we can't measure postmortem.   In living people, clearly, those things are the purview of pulmonologists. |

    ….

| | |
|---|---|
| Attorney: | If the conduction system is impaired, what happens? |
| Dr. Baker: | I'd have to defer to a cardiologist on that […] |

    ….

| | |
|---|---|
| Attorney: | When someone is hypoxic, does that cause that person to breathe faster? |
| Dr. Baker: | I honestly don't know, again, it probably depends on the nature of the asphyxia.   I would defer any further questions to a pulmonologist because they're the experts in breathing. |

    ….

| | |
|---|---|
| Attorney: | You'd agree that fentanyl is a respiratory depressant? |
| Dr. Baker: | That's my understanding, yes. |
| Attorney: | And it slows breathing, resulting in lower oxygen levels? |
| Dr. Baker: | It can, yes. |

---

[11] The following are excerpts from Dr. Baker's trial testimony in *State of Minnesota v. Derek Michael Chauvin*, File No. 27-CR-20-12646.

| | |
|---|---|
| Attorney: | And similarly increasing the carbon dioxide; correct? |
| Dr. Baker: | What it would do to carbon dioxide would be outside the scope of my expertise.  I would defer that to a pulmonologist or maybe a toxicologist. |

….

| | |
|---|---|
| Attorney: | All right.  The first time you testified in connection with the death of Mr. Floyd, at any point do you recall saying that I have to defer to some other specialty? |
| Dr. Baker: | […]So the short answer to that is, yes.  The long answer is, I believe I deferred to a pulmonologist repeatedly because there were so many questions about things like radiations of chest wall movement and would this, that or the other thing impair a person's ability to breathe.  And at some point I clearly said, look, this is outside the scope of my expertise as a forensic pathologist.  I think a pulmonologist would be better equipped to answer that question.  I'm going to say I said the word "pulmonologist" at least a half a dozen times in that testimony. |
| Attorney: | Do you recall also deferring to emergency medical doctors? |
| Dr. Baker: | Again, it would depend on the context of the question.  But I know I did reference emergency medicine doctors for some of the questions for, like, when do you think Mr. Floyd really died? |

….

| | |
|---|---|
| Attorney: | Well, generally, regardless of the mechanism, would you generally see symptoms consistent with hypoxia?  Would a person exhibit certain symptoms? |
| Dr. Baker: | So symptoms is a little outside by bailiwick because we're talking about living people, and I don't treat living people who are suffering from hypoxia with any cause. |

Since Dr. Baker's medical expertise is understandably limited, the government must present testimony from other medical experts to fill certain gaps necessary to the theory of its case.  Here, Dr. Baker has previously testified that not all deaths by asphyxiation—

including asphyxiation due to compression—leave physical signs on the body.   Testimony by other medical experts to *supplement* Dr. Baker's knowledge is not cumulative.   Expert testimony is unnecessarily cumulative when "there is 'substantial overlap' between the areas on which two experts will testify."   *Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-21511-CV, 2010 WL 4225947 at *2 (S.D. Fla. Oct. 21, 2010) (internal citation omitted).

Moreover, the opinions of multiple experts are not cumulative where their expertise and experience are different.   *See e.g.*, *Michuda v. United States,* No. 8:02CV85, 2003 WL 26111554 at *2 (D. Neb. Jun. 20, 2003).   Courts in similar cases have allowed as many as four experts, even where specialties overlap.   *See e.g.*, *Garlick v. Cty. of Kern*, Case No. 1:13-CV-01051-LJO-JLT, 2016 WL 1461841 at *4 (E.D. Cal. Apr. 14, 2016) (in civil rights deliberate indifferent case, defendants permitted to present testimony from four pathologists who had "overlapping opinions concerning the cause of death, [but] each ha[d] a different background […] and arrive[d] at conclusions from the formation of different processes."); *accord A.B. v. Cty. of San Diego*, No. 18cv1541-MMA-LL, 2020 WL 4430971, at *9 (S.D. Cal. Jul. 31, 2020); *see also, Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 2010 WL 4225947, at *2 (S.D. Fla. Oct. 21, 2010) ("[t]estimony on the same topic by different experts . . . is not needlessly cumulative where the experts will testify from different perspectives.").   Here, the government's medical experts have distinct specialties and will testify from different perspectives.   Given this, the Court can be assured such testimony will not be cumulative.

Finally, the government's expert medical testimony will not mislead, confuse, or distract the jury.   This case involves complex medical facts and processes—where even expert forensic pathologist Dr. Baker defers to others.   The government's expert medical testimony will fully educate the jury about these medical facts and processes and bridge the gaps necessary to prove its case.   Here, the task is more arduous, as the government must not only prove how Mr. Floyd died, but also how he could have lived.   To accomplish such a task, and meet its heavy burden, the government's medical experts outlined herein are necessary.   The government respectfully requests that the Court deny defendant Kueng's motion.

### H.   Motion *in Limine* Regarding Presentation of Video Evidence: ECF No. 154 (Kueng).

Defendant Kueng moves the Court for an order prohibiting the government from entering into evidence or relying on videos that combine officer body worn cameras (BWC) with any bystander video.   He also requests that the audio portion of any "combined videos" be restricted to the audio from the BWC recordings.

The events of May 25, 2020, were documented in police, bystander, and business video recordings.   Defendants have already agreed in principle that several original recordings should be admitted at trial.[12]   While relevant, each of those recordings has its

---

[12] During pretrial discussions on December 27, 2021, counsel for each of the defendants conferred with the government (either by phone or in person) and agreed to the pre-admission of several original recordings made on May 25, 2020. This includes several separate BWC and bystander recordings, security video from two nearby businesses, as well as video from a Minneapolis city security camera.

own unique limitations and perspectives.   For example, a video showing Mr. Floyd's face takes on greater significance when a juror can see the positions of the defendants and their actions (or inactions) at the same time.   As part of its obligation to demonstrate various facts and circumstances to the jury, the government has generated synchronized exhibits. These exhibits consist of two original videos synched up to the same moment in time, that play side-by-side, with the audio from one of them.   This is the modern equivalent to playing each exhibit on two TVs set up next to each other and muting one TV while playing the audio on the other.   Other than a caption indicating the source of the video, these exhibits contain no enhancements, manipulations, or alterations of the original media.[13] They are simply two videos playing at the same time.

These synchronized exhibits show the same events, but from different camera (and at times audio) perspectives at the same time, like any security system in a home, bank, or business.   These exhibits will facilitate the jury's understanding of the events at issue while avoiding undue delay and cumulative presentment of evidence.   They will be particularly helpful to the jury here, as they will make the relevance of statements and actions immediately apparent without flipping back and forth between video clips or remembering multiple timestamps.

Media exhibits of various types have long been a part of trial presentment in federal court.   *See e.g.*, *United States v. Ruiz*, 446 F.3d 762, 771 (8th Cir. 2006) (finding video

---

[13] If necessary, the government will begin its presentment with a foundational witness who will demonstrate that the combined exhibits are merely shorter, synchronized versions of the video exhibits to which defendants are stipulating.

compilations from drug sting "more helpful to the jury by making it easier for them to see the government's evidence against each defendant individually"); *United States v. Logwood*, 853 Fed. App'x 47, 48 (8th Cir. 2021) (affirming use of two sets of "asynchronous" video recordings during drug conspiracy and distribution trial); *Gibbs v. Borona*, No. 3:16-cv-00635 (JAM), 2021 WL 4726519, *3-4 (D. Conn. Oct. 11, 2021) (denying motion to preclude admission of separate 911 call that was synchronized to three-camera video during excessive force trial).

Nonetheless, defendant Kueng moves the Court for an order preventing the jury from considering synchronized exhibits, particularly any bystander recordings playing alongside body worn camera (BWC) recordings.   Doc. 156 at 4.   First, although he describes the videos as "spliced and manipulated," they are neither, and Kueng provides no explanation for his characterization.   The exhibits merely play video and audio recordings simultaneously.   They will significantly reduce the amount of time it will take to describe these events to the jury.   Moreover, they will permit the jury to see what happened at certain crucial moments, as well as events over the course of time.

Second, Kueng claims that playing the audio from only one of the videos while playing two videos side-by-side is unfairly prejudicial.   This argument is unavailing because the exhibits identify which of the two side-by-side videos is the source of the audio. These concerns should be further assuaged by the government's proposed exhibits themselves:   the government will also introduce each of the original video recordings contained in the synchronized exhibits as separate exhibits, and containing their original audio, if any.   Citing Federal Rule of Evidence 403, Kueng contends such exhibits would

"unfairly lead[] the jury to conclude that officers were able to perceive facts, sounds, and events that were not available to the officers at the scene[]" and therefore are impermissibly suggestive. *Id.* Kueng's contention would artificially limit the government from presenting its case. The jury's challenge is determining what occurred, not merely what was seen or heard from the perspective of any defendant alone. Providing the jury with two contemporaneous perspectives (both audio and video) will help with that determination. Additionally, since the exhibit itself identifies the audio source, there is little likelihood the jurors, based on their own life experience, will mistakenly believe that the audio from one video demonstrates that a defendant standing a few feet away would necessarily have heard the exact same sounds. Defendant's claims go at best to the weight of certain video/audio combinations, and are appropriate fodder for cross-examination— not for the exclusion of relevant and helpful evidence.

Relevant evidence should be excluded under Rule 403 only if the challenged exhibit's probative value is *substantially* outweighed by *unfair* prejudice. *Farrington*, 499 F.3d 854, 859 ("Evidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning. Whether there was *unfair* prejudice depends on whether there was an undue tendency to suggest decision on an improper basis.") (emphasis added). Here, the synchronized video will not be unfairly prejudicial because the government will not argue that defendant Kueng could hear or see every circumstance from the perspective of every video, and counsel for defendant Kueng will be able to argue that he could not. Instead, the proposed

30

synchronized exhibits will substantially facilitate presentment of this case, likely for all parties.

Finally, any concern regarding the content of any synchronized media exhibits may readily be addressed through a limiting instruction.   *United States v. Clark*, 668 F.3d 568, 575 (8th Cir. 2012) (finding that trial court "further reduced any potential for unfair prejudice by giving an appropriate limiting instruction")*; see also United States v. Oaks*, 606 F.3d 530, 539 n. 2 (8th Cir. 2010) (noting reluctance to find evidence was unfairly prejudicial when the trial court gave an appropriate limiting instruction).

Accordingly, the government respectfully requests the Court deny defendant Kueng's fifth *in limine* motion to preclude combined video exhibits.

## I.   Motion *in Limine* To Limit Expert Testimony to Area of Expertise: ECF No. 159 (Thao).

Defendant Thao moves the Court for an order limiting the testimony of expert witnesses to their areas of expertise.   The government has no objection to this motion, and does not intend to elicit testimony from expert witnesses outside their areas of expertise. Although the government has no objection to this motion, the government respectfully requests that any order the Court issues on this subject apply to both government and defense witnesses.

## J.   Motion *in Limine* To Admit Impeachment Evidence: ECF No. 160 (Thao).

Defendant Thao moves to admit certain impeachment evidence against Minneapolis Police Department Lieutenant Johnny Mercil.   Without conceding that the proposed

impeachment would be relevant, let alone proper, the motion is moot because the government does not intend to call Lieutenant Mercil as a witness.

**K.  Motion *in Limine* To Prohibit Asking Witnesses Questions Regarding Their Emotional Response: ECF No. 161 (Thao).**

Defendant Thao moves the Court *in limine* for an order preventing the government from asking witnesses questions "regarding their emotional response to watching the incident—or videos of the incident."   ECF No. 161 at 1.   Defendant Thao claims "[s]uch evidence is irrelevant and is designed to mislead and confuse the jury."   The government objects to this motion as it is overly broad and contrary to the Federal Rules of Evidence.

Although the government anticipates narrowly tailoring its questioning to avoid improperly inflaming juror passions, this case involves the observed and recorded death of a human being while in police custody.   The allegations involve claims that the defendants willfully deprived Mr. Floyd of certain basic rights.   Determinations regarding police conduct, reasonableness (under color of law), and willfulness, as well as assessing physical evidence (itself laden with emotion-evoking content) will all be tasks before this jury.

Regarding willfulness alone, the jury will be asked to determine the state of mind of each of the defendants at the time of the alleged offenses.   While final instructions are not settled, the jury will most likely be instructed that willfulness, like other states of mind, is often proved through circumstantial evidence and indirectly—*i.e.*, through surrounding circumstances, including any facts or circumstances that shed light on what was going on in each of their minds.   *See, e.g.*, *Screws v. United States*, 325 U.S. 91, 107 (1945) ("[I]n determining whether [willfulness] was present the jury would be entitled to consider all the

attendant circumstance—the malice of petitioners, the weapons used in the assault, is character and duration, the provocation, if any, and the like."); *Williams v. United States*, 341 U.S. 97, 102 n.* (1951) (reciting with approval the court's instructions that in determining willfulness, the jury was "'entitled to consider all the attendant circumstances'").    Witness observations and assessments of what a defendant did or failed to do, and the manner and duration of each of the defendant's acts or omissions, are entirely relevant to the jury's determination of the state of mind of each the defendants.    *See id.* That civilian eyewitnesses recognized the wrongfulness of the force and the serious medical need of Mr. Floyd sheds light on whether trained police officers recognized the same.    Furthermore, those observations and assessments may inherently include emotion—particularly as some of the witnesses watched a man die in front of them over the course of minutes.

The Federal Rules of Evidence are rules of inclusion.    The Rules specifically permit the inclusion of relevant evidence, namely any information that "has any tendency to make a fact more or less probable than it would be without the evidence."    *See* Fed. R. Evid. 402, 401.    While defendant Thao may prefer that such evidence not be before the jury, an eyewitness's response to watching the recorded events of May 25, 2020—emotional or otherwise—is entirely relevant to the jury's obligation to ascertain the defendant's state of mind, as described above.    In particular, that bystanders watched the events and had an emotional reaction to what they saw is relevant circumstantial evidence of both the obviousness of Mr. Floyd's serious medical need and the defendants' willfulness in

choosing not to reposition or otherwise aid Mr. Floyd.   Such evidence could not mislead or confuse the jury.   To the contrary, such evidence is highly probative.

Finally, defendant Thao may assert as a theory of defense that he was dealing with a "hostile crowd."   By filing this motion, defendant Thao would characterize the bystander witnesses as "hostile" without allowing them to testify about why they acted as they did, including their emotional response to his acts and omissions.   It would remove basic facts from the jury's consideration, damaging the jury's ability to assess the circumstances. While the government will narrow its questioning as necessary, this evidence is relevant and probative, and it is not unfairly prejudicial given the facts of this case.   Defendant Thao's blanket demand, if granted, would undermine the jury's fact-finding process. Accordingly, this motion should be denied.

### L.   Motion *in Limine* To Prohibit Wearing Clothing Designed To Confuse the Jury: ECF No. 162 (Thao).

Defendant Thao moves the Court for an order prohibiting witnesses from wearing an outfit or garment that improperly persuades, confuses, or biases the jury.   In support of the argument, defendant Thao refers to two witnesses from the trial in *State of Minnesota v. Derek Chauvin*, No. 27-CR-20-12646—G.H., who wore her firefighter uniform, and D.W., who wore an undershirt with the words "Black Excellence" partially visible. Citing no rule or case law, defendant Thao argues that G.H.'s clothing could confuse the jury because she was testifying as a lay/eyewitness and that D.W.'s shirt could "improperly confuse the jury as to the issues of the case."   ECF No. 162 at 1-2.

The government located one case reviewing a district order's order regarding witness apparel at trial.   In *United States v. Perkins*, 287 F. App'x 342, 345 (5th Cir. 2008), the defendants participated in a scheme to steal personal information and apply for auto loans in the names of soldiers at Fort Polk, Louisiana.   One of the defendants called a witness who had been stationed at Fort Polk at the time of the offense to testify about interactions between some of the conspirators; at the time of the trial, the witness was a law enforcement officer.   *Id.* at 350.   The district court did not allow the witness to testify in his uniform, "characterizing it as an impermissible enhancement of his credibility" in violation of Federal Rule of Evidence 608.   *Id.*   The Fifth Circuit held that the district court did not abuse its discretion because defense counsel did not ask the witness about his employment as a police officer and the defendant could point to no prejudice.   *Id.*

The distinctions between *Perkins* and this case are clear.   In that case, it does not appear that the witness was a police officer *at the time of the events he was testifying about*, and the subject of him being a police officer was never raised at trial; consequently, there was no connection at all between the witness's testimony and his status as a police officer. Here, G.H. clearly identified herself as a firefighter on the scene when offering to provide medical assistance to Mr. Floyd, and those statements will be played for the jury at trial before G.H. testifies.   The jury will know she is a firefighter, and any credibility enhancement based on her status as a firefighter will exist whether or not she wears her uniform.   Additionally, unlike the witness in *Perkins*, she will be testifying about her training and experience as a firefighter on direct examination to explain her perception of the events of May 25, 2020.   Defendant Thao's motion as to G.H. should be denied.

35

With respect to Defendant Thao's concern regarding a witness wearing a "Black Excellence" shirt underneath another shirt in *State of Minnesota v. Derek Chauvin*, No. 27-CR-20-12646, the government will ask lay witnesses to wear attire that does not contain slogans or messages.

**M.  Motion *in Limine* To Extend Time to File Additional Motions *in Limine*: ECF No. 163 (Thao).**

Defendant Thao moves the Court for an extension of time to file *in limine* motions after the government's exhibit disclosure.[14]   The government does not object to defendant Thao's request so long as any subsequently filed *in limine* motion is narrowly tailored to the government's proposed exhibits.   Additionally, the government similarly requests that this Court allow the government to file potential *in limine* motions after its receipt of defendants Thao, Kueng, and Lane's proposed exhibit and witness lists.

**N.  Motion *in Limine* To Prohibit the Government from Calling J.R.: ECF No. 168 (Lane).**

Defendant Lane moves to exclude the testimony of 10-year-old J.R., arguing she "adds nothing to the United States' case but will be called merely to invoke sympathy and is cumulative evidence and a waste of time."   ECF No. 168 at 1 (citing Fed. R. Evid. 403). J.R., who was 9 years old at the time of the incident giving rise to this case, was standing on the curb in front of Cup Foods and witnessed the events leading up to Mr. Floyd's death while he was restrained by law enforcement officers.   Defendant Lane cites no case law

---

[14] The current deadline for filing *in limine* motions passed on December 30, 2021.   *See* ECF No. 137.

for the proposition that the testimony of a minor eyewitness should be excluded because of the inherently prejudicial nature of such testimony.

To prove Count 3, the government will be required to prove beyond a reasonable doubt at trial that Mr. Floyd had an objectively serious medical need, meaning one that is so obvious that even people with no formal medical training would recognize that care is required.   *See Jones v. Minn. Dep't. of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008) ("An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize" it) (internal quotation marks omitted).   The government anticipates J.R. will testify, as she did during the trial of *State of Minnesota v. Derek Chauvin*, No. 27-CR-20-12646, that she could see Chauvin was stopping Mr. Floyd's breathing and hurting Mr. Floyd.   *See* ECF No. 168-1 at 7.   Certainly the fact that a 9-year-old child could recognize Mr. Floyd's serious medical need is relevant and convincing evidence to prove the objectively serious medical need required by Count 3.   The probative value of this evidence outweighs any prejudicial value.   *See* Fed. R. Evid. 403.

Additionally, the government anticipates one of the defenses advanced at trial (if not by defendant Lane, by other defendants) will be that the defendants were unable to intervene in Chauvin's unreasonable use of force or to provide medical aid because of a "hostile" group of people gathered on the curb.   J.R. was one of those individuals gathered on the curb.   The government anticipates J.R. will testify she was not scared of the other people standing on the curb with her.

As noted in the Government's Trial Brief, the government intends to call some, but not all, of the "bystander witnesses."   ECF. No. 180 at 16.   At least six minors witnessed Mr. Floyd's restraint and the events that led up to his death, and the government does not intend to call all of them as witnesses at trial.   The fact that the defendants committed this offense in front of minors should not prevent the government from calling eyewitnesses to the offense at trial.

### III.   Conclusion

WHEREFORE, the government respectfully asks this Honorable Court to enter Orders consistent with the government's responses.

Dated: January 10, 2022                         Respectfully submitted,


CHARLES J. KOVATS, JR.                  KRISTEN CLARKE
Acting United States Attorney             Assistant Attorney General
                                                            Civil Rights Division

*/s/ Manda M. Sertich*
BY:   MANDA M. SERTICH               */s/ Samantha Trepel*
Assistant U.S. Attorney                     BY:   SAMANTHA TREPEL
Attorney ID No. 4289039 NY            Special Litigation Counsel
                                                            Attorney ID No. 992377 DC