1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2

------------------------------------------------------------

3                                    )
United States of America,   )  File No. 21-cr-108

4                                    )              (PAM/TNL)
          Plaintiff,         )

5                                    )
v.                           )

6                                    )
Tou Thao(2),                 )  Courtroom 7D

7   J. Alexander Kueng(3), and )  St. Paul, Minnesota
Thomas Kiernan Lane(4),      )  Friday, January 28, 2022

8                                    )  9:31 a.m.
          Defendants.        )

9                                    )
------------------------------------------------------------

10

11

12                BEFORE THE HONORABLE PAUL A. MAGNUSON
          UNITED STATES DISTRICT COURT SENIOR JUDGE

13

**(JURY TRIAL PROCEEDINGS - VOLUME VII)**

14

15

16

17

18

19

20

21

22

23

24

          Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

RENEE A. ROGGE, RMR-CRR
(612)664-5107

```
 1    APPEARANCES:

 2     For Plaintiff:           UNITED STATES ATTORNEY'S OFFICE
                                BY:  ALLEN A. SLAUGHTER, JR.
 3                                   LEEANN K. BELL
                                     MANDA M. SERTICH
 4                              300 South 4th Street, #600
                                Minneapolis, MN 55415
 5
                                DEPARTMENT OF JUSTICE
 6                              CIVIL RIGHTS DIVISION
                                BY:  SAMANTHA TREPEL
 7                              150 M Street NE
                                Washington, D.C. 20530
 8
       For Defendant            ROBERT M. PAULE, PA
 9     Tou Thao:                BY:  ROBERT M. PAULE
                                920 2nd Avenue South, #975
10                              Minneapolis, MN 55402

11                              PAULE LAW PLLC
                                BY:  NATALIE PAULE
12                              5100 West 36th Street
                                P.O. Box 16589
13                              Minneapolis, MN 55416

14     For Defendant            LAW OFFICE OF THOMAS C. PLUNKETT
       J. Alexander Kueng:      BY:  THOMAS C. PLUNKETT
15                              101 East 5th Street, #1500
                                St. Paul, MN 55101
16
       For Defendant            EARL GRAY DEFENSE
17     Thomas Kiernan Lane:     BY:  EARL P. GRAY
                                332 Minnesota Street, #W1610
18                              St Paul, MN 55101

19     Court Reporter:          RENEE A. ROGGE, RMR-CRR
                                United States District Courthouse
20                              300 South 4th Street, Box 1005
                                Minneapolis, MN 55415
21

22

23

24

25
```

1

### I N D E X

PAGE

2

**KATIE BLACKWELL**

3    Direct Examination Resumed by Ms. Bell          1004
     Cross-Examination by Mr. Plunkett               1128

4

5

6

DEFENDANT KUENG EXHIBITS                             REC'D

7    K-A                                             1145
     K-F                                             1172
8    K-I                                             1156
     K-J                                             1182
9    K-K                                             1191

10   GOVERNMENT EXHIBITS                             REC'D
     17B                                             1098
11   73                                              1008
     130                                             1048

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Blackwell - Direct Resumed

```
 1    (9:31 a.m.)
 2                           IN OPEN COURT
 3                          (JURY PRESENT)
 4              THE COURT:  Good morning, everyone.
 5              Members of the jury, I welcome you back and,
 6    Ms. Bell, if you want to proceed.
 7              Ms. Blackwell, if it possible for you to kind of
 8    slow down as you speak, please do.  It's a little hard on
 9    the court reporter to keep up with you.
10              THE WITNESS:  Yes, Your Honor.
11              THE COURT:  Okay.  Proceed please.
12              MS. BELL:  It probably doesn't help, Your Honor,
13    that it's -- I talk a little fast too, so I will also try to
14    slow down.
15              THE COURT:  Well --
16                        KATIE BLACKWELL,
17    called on behalf of the government, was previously duly
18    sworn, was examined and testified as follows:
19                  DIRECT EXAMINATION RESUMED
20    BY MS. BELL:
21    Q.  For the record we are back with Inspector Blackwell.
22              Good morning.
23    A.  Good morning.
24    Q.  So yesterday we were looking at that work force record,
25    so I believe it was Exhibit 59, and I believe we were on
```

SEE PROFILE All rights reserved

```
 1    page 3.
 2              And this is the work force record of Tou Thao, is
 3    that right, that we were going through?
 4    A.  Yes, it is.
 5    Q.  All right.  And I believe where we left off yesterday
 6    was, we were talking about the 2016 crisis intervention
 7    training.  Do you recall that?
 8    A.  I do.
 9    Q.  All right.  And so I want to just continue through this
10    document and then turn to some of the content of some of the
11    various trainings.  Okay?
12              All right.  So we are going to go to page 2 of
13    this document, and I want to ask you about the very bottom
14    line.  It starts out 2017, in-service program super.  Do you
15    see that?
16    A.  I do.
17    Q.  And then I'm going to go to the next page, page 3, and
18    finish that line.  Do you see where it says, Bowl, phase one
19    patrol ten hours?
20    A.  I do.
21    Q.  What was that training?
22    A.  So that in-service training was around the Super Bowl
23    that we were having.  It was a refresher on medical, some
24    defensive tactics and just some other things that were
25    related to the Super Bowl.
```

Redirect - Anderson Resumed

1   Q.  Okay.  And so Officer Thao would have had that Super

2   Bowl training then?

3   A.  Correct.

4   Q.  All right.  Now again I'm not going to go through all

5   1014 hours of training here, but I want to move up here to

6   another procedural justice training in 2018.  Do you see

7   that?

8   A.  I do.

9   Q.  It also says, Narcan training.  Do you see that?

10  A.  Yes.

11  Q.  Just very broadly what is the Narcan training,

12  understanding you are not the medical person.

13  A.  So it's Narcan training is related to medical.  It's

14  dealing with people that are overdosing on opioids and how

15  to effectively use those, use the Narcan on somebody.

16  Q.  And in order to be able to be authorized to use Narcan,

17  do you have to have training to do that at the MPD?

18  A.  Correct.

19  Q.  And are all officers trained in Narcan now at the MPD?

20  A.  Yes.

21  Q.  And then just to kind of go through this a little bit,

22  at the top do you see where it says, 2018 in-service program

23  multiple dates?

24  A.  I do.

25  Q.  Talked about the in-service.  I'm not going to repeat

Redirect - Redacted Resumed

1    that, but would that be the 2018 training attended by

2    Mr. Thao?

3    A.  Yes.

4    Q.  Okay.  And then again we see some annual in-service

5    training phase one for 2019.  Do you see that?

6    A.  I do.

7    Q.  And then later on in the document we see the manual

8    in-service training phase two and phase three.  Do you see

9    those?

10   A.  Correct.

11   Q.  Just for interest, I also see some 2019 Final Four

12   training.  What was that?

13   A.  Final Four was the basketball event.  We have a lot of

14   events in Minneapolis.  So from Super Bowl, MLB which is

15   baseball.  This Final Four, we had basketball, big

16   basketball tournament for college.

17   Q.  And so do you have training around those special events

18   then?

19   A.  We do.

20   Q.  And that would be additional training that's not

21   required by the POST board; is that right?

22   A.  Correct.

23   Q.  All right.  So I actually want to turn to some of the

24   specific training, not just the list of the training, but

25   the training itself.  And so as I understand it, that

All rights reserved

1   training, I think you explained in terms of the classroom

2   portion comes in the form of PowerPoints; is that right?

3   A.  Yes.

4           MS. BELL:  And so several PowerPoints are already

5   offered into evidence, but at this time I'd offer Government

6   Exhibit 73, which is the PowerPoint taught during the

7   academy for Officers Lane and Kueng.

8           MR. PLUNKETT:  No objection.

9           THE COURT:  Exhibit 73 is received.

10          MS. BELL:  Thank you, Your Honor.

11  BY MS. BELL:

12  Q.  All right.  So I want to go through these.  We've been

13  talking about Officer Thao's training over the years, and I

14  wanted to specifically look at the training in more detail

15  with respect to the defensive tactics in 2018 and 2019 to

16  get a sense of those trainings, if that's all right.

17  A.  Yes.

18  Q.  Okay.  So let's start with 2018 in-service.  Would

19  defensive tactics have been part of the in-service training

20  in 2018?

21  A.  Yes, it would have been.

22  Q.  And some of the materials used might include PowerPoint?

23  A.  Yes.

24  Q.  Okay.  And as you explained earlier and just to refresh

25  today, have you yourself attended the in-service trainings

1    that have gone on throughout these years?

2    A.  Yes.  And as a command staff member, I always pull out

3    the training to all of command staff and up to the chief's

4    office first so that they could approve the training and

5    give any feedback to make sure it was within what, what the

6    chief wanted.

7    Q.  Okay.  So I'd like to start with the annual refresher

8    defensive tactics PowerPoint for 2018 from that in-service

9    training.  That is Government Exhibit 61.

10             Do you see that on your screen?

11   A.  I do.

12   Q.  Okay.  And I'm not going to go through every page of

13   this PowerPoint, but I do want to go through a number of

14   them if that's okay with you?

15   A.  Yes.

16   Q.  So I want to start on Page No. 4 or slide No. 4 of this

17   PowerPoint.

18             THE COURT:  Counsel, I'm confused.  You just

19   introduced 73 and now you flipped to 61; is that right?

20             MS. BELL:  Yes, Your Honor.  63 was the -- excuse

21   me.  73 had not been admitted.  It was the only PowerPoint

22   that hadn't been admitted, so I wanted to get all the

23   PowerPoints in admission, and then I'm going to go through

24   them with respect to the training of each defendant.

25             So right now I'm looking at Exhibit 61, which is

1    the 2018 refresher training that Officer Thao had that we

2    just looked at on his work force record.

3               THE COURT:  Go ahead.

4               MS. BELL:  All right.

5    BY MS. BELL:

6    Q.  So we're looking at Exhibit 61, which is, I've got that

7    right, the in-service training for 2018 correct?

8    A.  Correct.

9    Q.  All right.  And so what is the purpose of -- what was

10   the purpose of this training?

11   A.  It was to refresh people on the use of force and then

12   remind them of the sanctity of life, and protecting people

13   was a big part of it and reasonableness standard, the Fourth

14   Amendment, making sure that people are free from

15   unreasonable searches and seizures.

16   Q.  Okay.  All right.  So what page 5 of the PowerPoint

17   talks about the state requirements.  What are the state

18   requirements?

19   A.  So we're required to establish and enforce the written

20   use of force policies and then deliver this new training to

21   the whole department, whether they're in the academy or

22   sworn regular training.

23   Q.  Okay.  And so that's what that refers to when it says

24   "state requirements"?

25   A.  Correct.

1    Q.  All right.  So I know we talked about this with respect

2    to the policy, but looking at Government Exhibit 61 at

3    page 6, entitled Authorized Use of Force, what is that

4    telling officers at the training?

5    A.  It's just basically telling them when they're authorized

6    to use force to effect lawful arrests or in the legal

7    portions of their duties.  These are them executing legal

8    process, enforcing court orders, executing any duty imposed

9    by law.

10   Q.  Okay.  And then I want to talk about the use of force

11   definitions.  Was that also included in the refresher on

12   2018 that Officer Thao attended?

13   A.  It was.

14   Q.  And did that include that restraint is a form of force?

15   A.  Yes.

16   Q.  And then taking a look at page 8 of Exhibit 61 entitled

17   Proportional Force, you've talked about that earlier, but

18   what was the purpose of the training in 2018 about

19   proportional force?

20   A.  It's basically officers need to use the lowest level of

21   force, and if they're going to use a higher level of force,

22   they would have to articulate why they would use that,

23   meaning if it was ineffective or it was too unsafe to try a

24   lower level force.

25   Q.  Why do officers need to be able to articulate their use

1    of force?

2    A.  Because everything that the officer does is based upon

3    what the subjects doing.  So if the subject's being

4    submissive or they go up to basically, you know, aggressive

5    or combative type behavior, then go up and back down the use

6    of force continuum depending what that subject is doing.

7    Q.  And so if an officer uses force that is not

8    proportional, is it then disproportional force?

9    A.  Correct.

10   Q.  All right.  I'm going to move ahead to some of these

11   definitions, but I wanted to stop and talk about slide

12   number 11, which is entitled Use of Force Definitions.  Do

13   you see that?

14   A.  I do.

15   Q.  And are these the definitions we talked about for some

16   of those different types of behavior that you might see by a

17   subject?

18   A.  Correct.

19   Q.  And so what was the purpose of including this in the

20   refresher training in 2018?

21   A.  It's really important for the officers to have this

22   refresher and showing the different levels that people might

23   display.  So passive.  Were they actively resisting the

24   officer's arrest.  Were they activity combative, and this is

25   more of a definition for them and a reminder of what level

1    of force they can start using when people are displaying

2    these types of force.

3    Q.  Looking at Exhibit 12, it references a Minnesota

4    statute.  Do you see that?

5    A.  Yeah, I do.

6           MS. BELL:  Your Honor, for the record I would like

7    to make clear that although the training involves the

8    Minnesota statutes, obviously those are not applicable

9    directly in this case.

10   BY MS. BELL:

11   Q.  So can you read the first line of the second bullet

12   point?

13   A.  A peace officer making an arrest may not subject the

14   person arrested to any more restraint than is necessary for

15   the arrest and detention.

16   Q.  And so is that really sort of a different way of

17   defining proportional force?

18   A.  Yes.

19   Q.  And according to MPD policy and training, can you use,

20   would it be a violation of the policy and training to use

21   more force than is necessary?

22   A.  Yes.

23   Q.  All right.  I'm going to turn to page 15 of Exhibit 61

24   from the 2018 refresher training.  What's that slide

25   entitled?

1    A.   Duty to Intervene.

2    Q.   And what is that referring to?

3    A.   That we have an obligation to protect any member of the

4    public and other employees to stop any inappropriate force

5    that's being applied or is no longer needed.  So it's our

6    obligation as police officers to intervene if we see that

7    happening.

8    Q.   This appears to mirror the policy that we talked about,

9    and there's a reference I think to the policy number there

10   at the top of the slide; is that right?

11   A.   Yes.

12   Q.   Why restate it here in the 2018 refresher training if

13   the officers already have it in their MPD policy manual?

14   A.   It's critical, especially in use of force, that the

15   officers know everything that relates to that use of force

16   policy to include this duty to intervene, especially because

17   it's their obligation to do so.

18   Q.   Turning to page 16, it talks about *Graham versus Connor*.

19   Generally what is the point of this slide?

20   A.   Generally it's for officers on scene to consider some

21   factors, severity of the crime, is there an immediate threat

22   to themselves or the public, or are they, is the person

23   actively resisting the officer.

24   Q.   And so these are considerations that you train officers

25   to take into account when deciding how much force to use?

```
 1    A.  Yes.
 2    Q.  I want to jump ahead to, well just generally, let's take
 3    a look at page 17 and then that goes, that same header goes
 4    through page 20, which refers to threatening force and
 5    deescalation.
 6             Do you see that?
 7    A.  I do.
 8    Q.  And what is the purpose of doing some deescalation
 9    refresher?
10    A.  Deescalation is important because we might use force,
11    but we also had the deescalation tactics available to us to
12    try to slow things down when possible.
13    Q.  And at the bottom of this slide the last bullet point
14    says, Avoiding physical force unless immediately necessary.
15    What does that mean?
16    A.  It means if you can de-escalate and avoid going hands on
17    with somebody, if it's safe and feasible to do so, to try
18    deescalation first before using that amount of force.
19    Q.  Now I'm going to jump ahead in this PowerPoint because
20    there's 60 or 70 some pages and move ahead to page 49.
21             On page 49 the slide is entitled Striking Zones,
22    Probability of Injury.  Do you see that?
23    A.  I do.
24    Q.  And what is this slide about?  What is this explaining?
25    A.  This slide is explaining to officers that there's danger
```

1    zones on a person's body that are more prone to have serious

2    injuries, and that's the head, the neck, the sternum, the

3    spine and kidneys.

4    Q.  And why do you train officers about the striking zones?

5    A.  If an officer has to use force on somebody, they have to

6    be very mindful of the sensitive parts of the body and the

7    green zones is what they should be going for, but to avoid

8    the red zones.

9    Q.  All right.  And then if we walk through the rest of

10   these striking zones --

11              MR. ROBERT PAULE:  Your Honor, I object at this

12   point on relevance.

13              THE COURT:  I don't see the relevance.

14              MS. BELL:  Your Honor, may we have a sidebar?

15              THE COURT:  No, I don't see it's relevant.

16   BY MS. BELL:

17   Q.  Okay.  All right.  Looking at page 52, do you see that?

18   A.  I do.

19   Q.  And that references neck restraints.  Do you see that?

20   A.  I do.

21   Q.  And what was the purpose of including information about

22   the neck restraints in the 2018 refresher?

23   A.  Just to refresh the officers on how to use neck

24   restraints, the proper application of them.

25   Q.  I wanted to ask you about, separate from the concept of

Eidxxxxxxr00108-PAM-Resumed

1   striking particular zones, does MPD train people about the

2   dangers generally of touching or using force related to

3   particular zones of the body?

4   A.  Yes.

5   Q.  And how do those, how does that training or what does

6   that training explain to them?

7   A.  Just that the same thing, that the dangers of certain

8   areas on the body, the head, neck, sternum, spine, kidney

9   areas are dangerous.

10  Q.  Now, with respect to neck restraints, again, I think

11  we've talked about the conscious and unconscious neck

12  restraints already?

13  A.  Yes.

14  Q.  Why have a slide, or as we're going to see a few slides

15  here, about neck restraints?

16  A.  In particular if you apply a neck restraint, there could

17  be somebody that experiences some medical issue right after,

18  especially with breathing and circulation.  So there's a

19  medical component that generally follows the dangers of

20  using them or the follow-up care afterwards.

21  Q.  Okay.  And so let's look at page 53.  Does that explain

22  when you can use the neck restraints?

23  A.  Yes.

24  Q.  And for conscious neck restraints, when is it okay to

25  use a conscious neck restraint?

1    A.  When someone is actively resisting.

2    Q.  And what unconscious neck restraint?

3    A.  When someone is displaying active aggression, combative

4    type behavior.

5    Q.  And it says there at the bottom, do you see what the

6    sort of the red word Note?

7    A.  Yes.

8    Q.  What does it say after that?

9    A.  It says, Neck restraints shall not be used against

10   subjects who are demonstrating passive resistance as defined

11   by policy.

12   Q.  And can you remind us what passive resistance is?

13   A.  Passive resistance is somebody that the officer is

14   trying to take into control that's not trying to defeat the

15   officer, but they are not complying with the officer's

16   orders.

17   Q.  Okay.  All right.  And you mentioned the medical issues

18   about neck restraints.  What is being trained in slide 54 in

19   2018?

20   A.  Basically keep the person under close observation if you

21   were to apply a neck restraint, as well as anybody receiving

22   the person in custody after.  So if I applied a neck

23   restrain on somebody and I'm transferring them to a

24   paramedic or somebody else to bring to jail or the jail

25   intake themselves, you have to let them know that you

 1    applied this neck restraint and any other injury alleged or

 2    real.

 3    Q.  And why do you have to do that?

 4    A.  So they continue to monitor their medical status.

 5    Q.  I want to move forward here to slide 58.  And I

 6    specifically wanted to ask you about the side recovery

 7    position.

 8         Do you see that right below the prone position?

 9    A.  I do.

10    Q.  And why are officers, why is there training included in

11    2018 about the side recovery position?

12    A.  So when you use the maximum restraint technique,

13    generally the person is in the prone position, and then

14    they're, basically used hobble device, that tethered rope we

15    talked about earlier, that's tied to their ankles and around

16    their waist and tied up the front.

17         So if they're on their chest, they would have

18    difficulty breathing.  So here it's talking about the

19    importance of putting the person in the side recovery

20    position to help with their breathing.

21    Q.  And is the side recovery position, I think we've seen

22    something that comes up sort of in different contexts?

23    A.  Side recovery are usually upright.

24    Q.  All right.  Just make sure we get to the right one.  And

25    then on exhibit or page 60, do you see where it says side

1    recovery position ASAP and then no prone transport?

2    A.  I do.

3    Q.  Why was there training on the side recovery position

4    ASAP and no prone transport?

5    A.  Still concerns about breathing if they are not in the

6    side recovery position due to their position of their body.

7    So the side recovery helps them breathe better, and then it

8    says no prone transport, which means when they're

9    transporting somebody don't transport them in the back of

10   the squad laying on their chest while they have the hobble

11   on them with the maximal restraint technique.

12   Q.  And then I want to jump forward to transports in

13   general, the prisoner control safety and transport slide at

14   page 63.

15           MR. ROBERT PAULE:  Your Honor, I'd object on

16   relevance grounds.

17           THE COURT:  Counsel, I don't see where there's any

18   police transport involved in this matter.

19           MS. BELL:  Your Honor, the information is provided

20   not that it's with respect to police transport but that in

21   multiple aspects of the training the prone position is

22   specifically identified.

23           THE COURT:  Well, we covered that about 15 times

24   already.

25           MS. BELL:  Well, I think, Your Honor, can we have

1    a sidebar and I can explain further?

2              THE COURT:  No.

3              MS. BELL:  Well, counsel has -- there has been

4    argument in this case that the training with respect to

5    these topics was insufficient, and so it is repeated and

6    that is important.  That's why I'm offering it.

7              THE COURT:  Well, here we are.  Go ahead.

8    Overrule the objection.

9    BY MS. BELL:

10   Q.  All right.  And so with respect to transport, it

11   specifically talks about no prone transports in general.

12   Why is that?

13   A.  Still because of the breathing issues that they could

14   have while transporting in the prone.

15   Q.  All right.  Let's move forward again, all right, to

16   page 66.

17              Do you see the slide entitled Reporting and Post

18   Incident Requirements?

19   A.  I do.

20   Q.  And what, can you read the first line please?

21   A.  Medical assistance and as soon as reasonably practical,

22   Code 4, which means the scene is safe.

23   Q.  And so can you explain what that means, generally?

24              MR. ROBERT PAULE:  Object.  Beyond the scope of

25   this exhibit, Your Honor.

```
 1                THE COURT:  Well, the witness may answer.

 2                THE WITNESS:  So it means basically as soon as

 3      possible get medical assistance once the scene is safe.

 4      BY MS. BELL:

 5      Q.  Okay.  All right.  I want to turn now to the annual

 6      refresher training that Officer Thao received in phase one,

 7      so Exhibit 62.

 8                MR. GRAY:  Excuse me, Your Honor.  Your Honor, for

 9      the record, she offered Exhibit 73, I believe, against my

10      client and Mr. Kueng.  Then she moved into 61.  I'd like the

11      record to show that in 2018 my client Thomas Lane was not a

12      police officer.

13                THE COURT:  The record shows that.

14                Proceed.

15      BY MS. BELL:

16      Q.  So I want to talk about the 2019 annual refresher

17      training, phase one, defensive tactics lesson plans that is

18      Exhibit 62.

19                Do you see that on the screen?

20      A.  I do.

21      Q.  And to be clear, this is training that was part of the

22      annual refresher in 2019, and so this would have only been

23      given to officers who were sworn in as of 2019?

24      A.  Correct.

25      Q.  Okay.  What is a lesson plan?  We haven't seen one of
```

1     these.

2     A.  So a lesson plan, anytime that there's training, we

3     require lesson plans to go with that training.  So if

4     there's a PowerPoint or any handouts, that instructor, we

5     can refer back to the training that was given.  So it really

6     is a brief synopsis of what was trained that day.

7     Q.  Okay.  And so I think we saw on Officer Thao's work

8     force records that he attended that phase one of 2019 annual

9     refresher; is that right?

10    A.  Correct.

11    Q.  All right.  So let's talk about the lesson plan in

12    Exhibit 62.  What is the title of the course?

13    A.  2019, Phase One, Defensive Tactics.

14    Q.  And then what is generally, what is the description of

15    the course?

16    A.  Generally the description is a refresher of the critical

17    decision-making model.  That's the constantly reassessing,

18    deescalation, along with when to use appropriate use of

19    force.  And it's a refresher on the many things that we

20    talked about, prone handcuffing, chokes, restraints, neck

21    restraints.

22    Q.  Okay.  And then last, again, we see a reference to that

23    sanctity of life that you've been talking about?

24    A.  Correct.

25    Q.  All right.  So it's another document.  I'm not going to

1    look at every page with you, but just to understand sort of

2    what's going on here, the lesson plan on page 3, see where

3    it says 09:30 warmup at the very top?

4    A.  Correct.

5    Q.  What is that talking about?

6    A.  So generally when we do defensive tactics, we'll get a

7    refresher on PowerPoint, this is saying at 09:30 we are

8    going to warm up.  We will have all the officers jog around,

9    warm up a little before we go hands on these defensive

10   tactics techniques so they don't get injured.

11   Q.  Okay.  And so then after the warmup, it says, the next

12   page it says, Drill.  Do you see that?

13   A.  Yes.

14   Q.  What does drilling mean?

15   A.  So they have different drills, whether it's just, you

16   know, shadow boxing, it's moving in place, getting the

17   muscles warmed up and practicing different strikes or

18   stretching techniques.

19   Q.  All right.  And then on page 5 at the top, do you see

20   where it says, Neck Brace Principle?

21   A.  I do.

22   Q.  What is being trained with respect to the principles

23   about using a neck brace?

24   A.  This is the neck restraint, the conscious neck

25   restraint.

1   Q.  Okay.  And this explains kind of what you explained

2   earlier about how they work.  Is that fair to say?

3   A.  Yes.

4   Q.  All right.  I'm not going to repeat.  Let's look at

5   page 6.  It looks like it says at 10:25.  What is it

6   referring to 10:25 on page 6?

7   A.  So it's an instructor demonstration.  An instructor will

8   usually get in front of the class, show people what right

9   looks like and then we generally do it, but they're doing a

10   breakdown of the neck restraint, how you lower somebody to

11   the ground after you successfully put them in a neck

12   restraint.

13           After you lower them to the ground, they're doing

14   prone handcuffing, sit them up, meaning sitting them up in

15   the upright position right after and then bringing them up

16   to the standing position.

17   Q.  Okay.  And then it says, Drill by bullet point.  What

18   does that mean that they were doing in that 2019 annual

19   refresher training?

20   A.  So this is another example of where they would have us

21   do after they showed us the training technique.  It's just

22   supporting how to bring somebody upright, so supporting the

23   subject's neck with a C grip, usually on the back, and

24   grabbing one arm of the subject, rolling them into a seated

25   position.

```
 1                So it's really talking about when they're on the
 2      ground how you can roll them upright, and if they, you do an
 3      unconscious neck restraint, it's talking about the Gerber
 4      slap.  So if somebody hasn't regained consciousness right
 5      away, that Gerber slap in the back generally brings them to
 6      consciousness and then have the subject tuck their leg
 7      underneath them and really help them to get up.
 8      Q.  And so officers are --  what does the Gerber slap refer
 9      to?
10      A.  I think it refers to back in the babies, Gerber baby,
11      but when someone's choking or you slap them, kinds of gets
12      them going again.
13      Q.  Okay.
14      A.  Breathing and awake.
15      Q.  Okay.  And why are officers trained that if someone has
16      not regained consciousness they should try to use this
17      Gerber slap to get them back conscious?
18      A.  It's shown it's been effective to try that first before.
19      If they don't regain consciousness, then you would continue
20      with probably CPR if they are not breathing.
21      Q.  All right.  And so you see another drill where it says,
22      Prone to standing.  Do you see that?
23      A.  Yes.
24      Q.  And what's that training officers to do?
25      A.  We do a lot of drills.  When someone's in the prone,
```

1   it's immediate, as soon as safe and feasible, to go from

2   prone and get them into upright to standing as soon as

3   possible.

4   Q.  Why is that?

5   A.  It's important for their breathing and make sure they

6   don't have positional asphyxia.

7   Q.  All right.  So now I want to look at Exhibit 63, which

8   has been admitted as the 2019 Defensive Tactics in Service,

9   Phase Three.

10          Do you see that?

11  A.  I do.

12  Q.  Okay.  And so I take it there was defensive tactics

13  taught during phase three of in-service?

14  A.  Correct.

15  Q.  And again this is training that Officer Tou Thao would

16  have attended, correct?

17  A.  Correct.

18  Q.  So I think you've explained, but how would Exhibit 63 be

19  used in the in-service training?

20  A.  Similar as the other ones were.  We do the PowerPoint,

21  give a refresher of the use of force policy, important

22  factors regarding people safety, whether it's the cop or the

23  person, and then we would go hands on.

24  Q.  Okay.  And again this exhibit is about 70 pages, so

25  we're not going to look at every one of them, but we will go

1    through some of that.

2              All right.  You talked about sort of doing things

3    hands on and in the classroom.  What is page 2 of this

4    exhibit explaining happened with respect to the training in

5    2019?

6    A.  So it's showing day one of in-service.  There's

7    defensive tactics in the morning and then a lunch break.

8    Hennepin County EMS did an overview on what their services

9    were.  Hennepin County Behavioral Health came in and

10   discussed some additional resources and services available

11   if we needed them and then procedural justice in the

12   afternoon.

13             Day two was self-realization, which was a health

14   and wellness, it was meditation, how to calm down in high

15   stress situations and different techniques that we could use

16   to de-stress ourselves.  Then we had courtroom testifying

17   procedure.  Then a lunch break.

18             And then that day the, you know, each day the

19   classes, you take a group of about 60 officers, and you cut

20   them in half and you are group A and you are group B.  They

21   flip flop at lunchtime.  So they will have the morning and

22   afternoon and then, you know, group A would have the second

23   afternoon and then group B would switch with them.

24   Q.  Okay.

25   A.  Does that make sense?

1    Q.  I think so.  All right.  So moving ahead to slide number

2    3, what does DT mean?

3    A.  Defensive tactics.

4    Q.  And what is this slide telling us was taught in 2019

5    with respect to defensive tactics?

6    A.  It's going back over Minnesota POST mandates, MPD policy

7    on defensive tactics, Taser, fire drills, weapon

8    familiarization, weapon retention and transition drills.

9    Q.  What's a transition drill?

10   A.  Transition drills are we transition from lethal to

11   nonlethal or lethal vice versa.  So I might have a situation

12   that involves me pulling out my handgun, but then you have a

13   partner that can pull out a taser, and you have to learn how

14   to communicate with one another or transition depending on

15   the level of force.

16        So for instance if I had somebody with a knife

17   that was far enough away, I might pull out my handgun.  They

18   may drop the knife.  I might, if they drop the knife, I

19   might pull out my taser and transition to my taser because

20   the knife is still dangerous around them and give them

21   commands to take them into custody, so it is just

22   transitioning between lethal and nonlethal.

23   Q.  Okay.  So is this actually practicing that?

24   A.  Yes.

25   Q.  Okay.  Slide No. 4 looks like the same state

1    requirements we saw in the 2018 PowerPoint; is that right?

2    A.  Yes.

3    Q.  Slide No. 19, the purpose of the MPD policy, do you see

4    that?

5    A.  I do.

6    Q.  Looks very similar to what we saw in the 2018; is that

7    right?

8    A.  Yes.

9    Q.  Okay.  Why do you keep repeating these principles in

10   training, the sanctity of life and the protection of the

11   public?

12   A.  Really because it's so important for everything that we

13   do, and we want to make sure the officers try to retain this

14   as muscle memory.

15   Q.  Again, page 6 refers to that reasonableness standard you

16   talked about?

17   A.  Yes.

18   Q.  And again here we're looking at the Minnesota statute

19   that you read before that officers making an arrest may not

20   subject the person arrested to any more restraint than is

21   necessary for the arrest and detention?

22   A.  Correct.

23   Q.  I'm going to jump ahead to page 9.  What's that talking

24   about?

25   A.  It's the proportional force, using the lowest level of

1    force necessary.

2    Q.  Again, page 10.

3    A.  It's talking about authorized use of force, again within

4    the legal scope of our duties and as a refresher.

5    Q.  And then page 11 talks about use of force definitions;

6    is that right?

7    A.  Correct.

8    Q.  And again a restraint could be a use of force; is that

9    right?

10   A.  Yes.

11   Q.  All right.  I'm not going to go through every page, as I

12   said.  I'm going to jump ahead here to page 20 -- 12.

13   Sorry.

14           Again is this slide talking about what we've

15   talked about before with respect to *Graham versus Connor*?

16   A.  Yes.

17   Q.  And then taking a look at page 13, what is this

18   refreshing the officers who attended the phase three 2019

19   training about?

20   A.  Their obligation to duty to intervene.

21   Q.  Why do you keep doing these refreshers on these topics?

22   A.  Because it's so critical to their job to make sure they

23   fully understand they have to do this.  It is policy, and

24   everybody is, any sworn officer has to do this.

25   Q.  Page 14 starts several slides through 15, 16 and 17

1    entitled Threatening Force and Deescalation.  Do you see

2    that?

3    A.  I do.

4    Q.  And again this is very similar to what was refreshed in

5    2018?

6    A.  Correct.

7    Q.  And again the last bullet is avoiding physical force

8    unless immediately necessary?

9    A.  Yes.

10   Q.  All right.  And then were officers in 2019 phase three

11   given a refresher on when they could use a various number of

12   items but including neck restraints?

13   A.  Yes.

14   Q.  And why do you remind officers in these refresher

15   trainings when they can use certain techniques?

16          MR. ROBERT PAULE:  Asked and answered, Your Honor.

17   I'd object.

18          THE COURT:  I'm sorry, but I did not hear the

19   objection.

20          MR. ROBERT PAULE:  Excuse me, Your Honor.  Asked

21   and answered.

22          THE COURT:  Sustained.  It has been.  We've gone

23   over it.

24   BY MS. BELL:

25   Q.  All right.  So looking at 2019 training on page 52 of

1    Exhibit 63, again I want to move forward to page 53, and

2    again during the training in 2019 in phase three was the

3    side recovery position and no prone transport discussed?

4    A.  Yes.

5    Q.  I do want to ask you in looking at page 54, there's a

6    reference to supervisor force review.  Can you explain

7    generally at MPD, are there requirements of any sort with

8    respect to reporting to supervisors about force?

9    A.  Yes.

10   Q.  What are those generally?

11   A.  Generally, it's basically if there's any alleged injury

12   or injury that occurs, you must report it to the supervisor.

13   And then there's certain techniques in the use of force

14   spectrum that have to be, that are required for a supervisor

15   to come and document that.

16            So in this case it's talking about the use of

17   maximal restraint techniques, and the supervisor must come

18   to the scene to do a force review.

19   Q.  Okay.  And then turning to page 56, a slide about

20   reporting and post incident requirements, again, what does

21   it say about medical assistance in the 2019 phase three

22   refresher training?

23   A.  It's basically saying call for medical assistance as

24   soon as the scene is safe.

25   Q.  And in addition to calling for medical assistance, are

1   officers trained to do anything else?

2   A.  Notify supervisor and then transfer the custody of the

3   type of force used.

4   Q.  Are officers required under MPD policy to themselves

5   render aid while EMS is on its way?

6   A.  Yes.

7   Q.  And why is that?

8   A.  To make sure that we do everything we can to save the

9   person's life.

10   Q.  All right.  Moving forward to slide 68, another slide on

11   prisoner control safety and transport, but this in 2019

12   phase three.

13           Do you see that?

14   A.  I do.

15           MR. ROBERT PAULE:  Your Honor, I object to this.

16   There was no transport involved.

17           THE COURT:  Sustained.  There was not.

18   BY MS. BELL:

19   Q.  Are the -- why, well if they are, first let me ask this:

20   Why are the subjects of prone position and placing someone

21   on their side repeated so often in various contexts in the

22   MPD training?

23   A.  To make sure officers know how to do it properly and

24   identify the dangers involved in transporting somebody in

25   the prone due to positional asphyxia.

1    Q.  Now, we've seen some training that came in the form of,

2    that annual in-service training, but I believe yesterday you

3    testified that training can also come in the form of, I

4    think you said, the sergeants putting out training to the

5    various shifts.

6           Is that what you said?

7    A.  Yes.  It's generally the training unit will put together

8    a video or guidelines of a new policy.  They'll put it out

9    to the, all officers on the department so that they can

10   review it at roll calls if we can't get them into training

11   right away.

12   Q.  And what's a roll call?

13   A.  Roll calls are, every shift the supervisor takes roll

14   call of every officer that's working, and they basically

15   give out any information or training that they need and

16   updates in their call signs before they go out on patrol.

17   Q.  Okay.  I want to show you what's been admitted as

18   Government Exhibit 75 and ask if you've ever seen a document

19   like this.

20   A.  Yes.

21   Q.  Generally, what is this?

22   A.  So this is an administrative announcement that will come

23   out from the training division that goes out to all officers

24   on the department.  They'll get an email form and then this

25   one has a video on it.  And so then that's the one where

1   supervisors will play at roll call.

2   Q.  And this particular announcement, what is the subject of

3   the announcement?

4   A.  It's regarding positional asphyxiation.

5   Q.  And when was the date of that administrative

6   announcement?

7   A.  April 23rd, 2012.

8   Q.  And I just want to jump back quickly.  So this is

9   April 23rd, 2012.  I'm going to jump back quickly to

10  Exhibit 55, and this is Tou Thao's work force history, and

11  just confirm with you that Officer Thao would have been a

12  police officer as of January 17th, 2012?

13  A.  Correct.

14  Q.  All right.  All right.  So going back to Exhibit 75,

15  with respect to this particular administrative announcement,

16  it looks like it pushed out a video; is that right?

17  A.  Yes.

18  Q.  And that would be something that would have been pushed

19  out at that roll call you talked about; is that right?

20  A.  Correct.

21  Q.  And then can you read the second sentence here in the

22  announcement?

23  A.  It says, This video serves as a reminder that whenever a

24  subject is restrained there's a direct correlation between

25  their ability to breathe and the position their body is in.

 1              MS. BELL:  At this time, Your Honor, I'm going to

 2       play Government's Exhibit 76, which has been already

 3       admitted.

 4              MR. GRAY:  Excuse me, Your Honor.  In the

 5       beginning of this, it was said all officers saw this.  I'd

 6       like the record to show that this is 2012, and not all

 7       officers saw it that are in the courtroom.

 8              THE COURT:  The record shows, and it is not

 9       applicable to Officers Kueng or Lane.

10       BY MS. BELL:

11       Q.  All right.

12          (Video recording played)

13       Q.  All right.  I'm going to switch now and talk about, stop

14       talking about Officer Thao's in-service training and instead

15       talk about Officers Kueng and Officers Lane.

16       A.  Okay.

17       Q.  All right.  So let's start out by looking at Exhibit 64.

18       This is another of those work force histories.  Can you see

19       that?

20       A.  I can.

21       Q.  And whose work force history or rank history is this for

22       Exhibit 64?

23       A.  This is Officer Kueng's.

24       Q.  And I think you talked about yesterday with respect to

25       this document, you read it sort of from the bottom up; is

1    that right?

2    A.  Correct.

3    Q.  And so what does this tell us about Officer Kueng's

4    history at the MPD?

5    A.  So he was a community service officer from

6    December 18th, 2017, to February 18, 2019.  And then he

7    became a police cadet, which would have been the start of

8    police academy February 19, 2019, through August 13, 2019.

9            And then he becomes a police recruit August 14,

10   2019, to December 9, 2019, which means generally when a

11   police officer joins as a cadet, they're still getting their

12   skills and some requirements done for their POST licensing,

13   and at some point they will switch to recruit when they

14   complete their POST requirements, and then he became a

15   police officer on December 10th, 2019.

16   Q.  And so when you say he became a police officer, is that

17   when he would have graduated or had that graduation ceremony

18   from the academy?

19   A.  Correct.

20   Q.  And with respect to Officer Kueng, he stayed a police

21   officer in terms of his rank through May 25th, 2020?

22   A.  Correct.

23   Q.  And then Exhibit 65, is this the unit assignment history

24   for Mr. Kueng?

25   A.  Correct.

1    Q.  And generally what does this show?

2    A.  It's showing his assignments that he's had throughout

3    his career, the last one being assigned to Third Precinct

4    middle watch on March 1st, 2020.

5    Q.  Now did Officer Kueng sign off on having read the MPD

6    policies and that he was accountable for abiding by those

7    policies and procedures?

8    A.  Yes.

9    Q.  First I'll show you Government Exhibit 67.  What is

10   this?

11   A.  That he signed off on the receiving the electronic

12   version of the policy and procedural manual on November 26,

13   2017.

14   Q.  And would that have been when he was a CSO?

15   A.  Correct.

16   Q.  Okay.  And then looking at Exhibit 66, what's that?

17   A.  It's the same signature he signed off on receiving the

18   updated policy and procedure manual on February 7, 2019.

19   Q.  All right.  Now with respect to Mr. Kueng, sorry, would

20   he in order to be hired be POST licensed, would he have had

21   to have gone through the requirements we talked about

22   yesterday with the -- that the POST board requires?

23   A.  Correct.

24   Q.  And so he would have needed to have at least that

25   two-year degree?

1    A.  Yes.

2              MS. BELL:  Your Honor, I would put up Government

3    Exhibit 103.

4    BY MS. BELL:

5    Q.  And does this appear to be the Hennepin Technical

6    College record for Mr. Kueng?

7    A.  Yes.

8    Q.  Are you familiar generally with Hennepin Technical

9    College?

10   A.  I am.

11   Q.  Are they one of the places in Minnesota that you can get

12   your law enforcement and skills certificate?

13   A.  Yes.

14   Q.  All right.  And in order to be POST certified, would

15   Officer Kueng need to have his EMR or emergency responder

16   medical certificate?

17   A.  So POST requires different things, but the colleges

18   generally require the medical.

19   Q.  All right.  And then did Officer Kueng also have one of

20   those work force records that had his training listed on it?

21   A.  Yes.

22   Q.  Let's look at Exhibit 68.  It looks like this is the

23   training record for Officer Kueng?

24   A.  Correct.

25   Q.  And it looks like there's some different classes that he

1   would have been part of; is that right?

2   A.  Yes.

3   Q.  Okay.  I'm not going to go through all of them.  All

4   right.  So let's talk about --

5           And let me ask you this:  Are you familiar with

6   Mr. Kueng yourself?

7   A.  I am.

8   Q.  And how is that?

9   A.  Mr. Kueng was a community service officer.  Saw him a

10  lot at the training facility, and then he was part of the

11  police academy.

12  Q.  Do you see Officer Kueng here in the courtroom?

13  A.  I do.

14  Q.  And can you tell us where he's sitting and what he's

15  wearing?

16  A.  Right back here in the navy blue suit.

17          MS. BELL:  Your Honor, I would just ask the record

18  to reflect the witness has identified Officer Kueng?

19          THE COURT:  Noted.

20  BY MS. BELL:

21  Q.  All right.  Same question:  Are you familiar with

22  someone by the name of Thomas Lane?

23  A.  I am.

24  Q.  How are you familiar with him?

25  A.  Police academy, I was a training division commander when

1    he went through.

2    Q.  And do you see the person that you know as Thomas Lane

3    here in the courtroom?

4    A.  I do, in the gray suit here.

5              MS. BELL:  Your Honor, I would ask the record

6    reflect that the witness has identified Mr. Lane.

7              THE COURT:  Noted.

8    BY MS. BELL:

9    Q.  All right.  So let's look quickly at Mr. Lane's work

10   force history, and again reading from the bottom up, it

11   looks like he was a cadet and then a recruit and then became

12   sworn in on December 10th, 2019; is that right?

13   A.  Yes.

14   Q.  And would Officer Lane have gone through all those same

15   POST requirements that Officer Kueng would have had to go

16   through?

17   A.  Correct.

18   Q.  Okay.  And again looking at Government Exhibit 104,

19   which has been admitted, again the Hennepin Technical

20   College documents related to Mr. Lane; is that right?

21   A.  Yes.

22   Q.  And then just to be complete, the unit assignment

23   history for Mr. Lane, would that describe, as you said, the

24   various assignments that he had?

25   A.  Correct.

1    Q.   Okay.  And did Officer Lane also certify that he had

2    reviewed the policies and procedures?

3    A.   He did on February 7, 2019.

4    Q.   And did Officer Lane have a work force training record

5    as well?

6    A.   Yes, he did.

7    Q.   Showing you Government Exhibit 72, would that be Officer

8    Lane's work force training record?

9    A.   Yes.

10   Q.   Now, with respect to these work force training

11   records -- I should have asked this earlier.  If any of

12   these individuals had prior relevant job experience, would

13   that be included in their work force training?

14   A.   No.  Human resources, generally.

15   Q.  All right.  All right.  So I want to talk about the

16   academy and specifically the academy that would have been

17   attended by officers Kueng and Lane.

18             Did they attend the same academy?

19   A.   Yes, they did.

20   Q.   And generally when was that?

21   A.   It started in February.  They do like a week generally,

22   and then the cadets will go off to college, and then they

23   get the required classes.  They come back to the Minneapolis

24   Police Academy where they will continue out their training

25   there for approximately -- they go off for about 24 to

1   26 weeks generally to the college, and then they come back

2   to the academy and do another 18 or 19 weeks.

3   Q.  And so in this case, were they doing their academy

4   largely at the end of 2019, the actual in classroom part

5   back at MPD?

6   A.  Correct.

7   Q.  Okay.  All right.  So I want to talk about the academy

8   that they attended in particular.  When they attended the

9   academy in 2019, how was it structured?

10  A.  So it was structured, they had -- so we had training

11  division commander, myself, had a lieutenant that oversaw

12  that academy, a sergeant and then three cadre officers that

13  oversaw that class.

14  Q.  Okay.  And where did that training take place?

15  A.  A special operations center, that small elementary

16  school on the north side.

17  Q.  And for this particular academy, were things taught both

18  in the classroom and hands on?

19  A.  They were.

20  Q.  How much time would you say was in the classroom versus

21  hands on?

22  A.  Oftentimes less time in the classroom, more hands on

23  scenarios.

24  Q.  So can you describe what a typical day might look like

25  at the academy, understanding that they're different every

Eldred - Cross - Redirect

1045

1    day in the training?

2    A.  So generally when the recruits come into the academy,

3    they will have uniform inspection when they come in.

4    Sometimes every other day, generally, or couple days a week

5    they will do physical fitness.  That uniform inspection is

6    done to make sure that they are looking professional.

7              And then they go to the classroom, and they will

8    get generally an itinerary for the day, and each day is a

9    little different on what they are getting, whether it's

10   investigative, report writing, defensive tactics, scenarios,

11   pretty much everything they need to do on this job.  It's

12   including like the policy procedures from the Minneapolis

13   Police Department.

14   Q.  Okay.  And about how many hours is this academy?

15   A.  It's eight hours a day with a lunch break.

16   Q.  So in total do you know how many hours this particular

17   one was?

18   A.  Probably they're generally over 700 hours.

19   Q.  Okay.  And of that how many hours are spent teaching

20   that defensive tactics or the use of force, deescalation,

21   duty to intervene, all the things in that policy?

22   A.  Each topic is about 55 to 65 hours, depending on the

23   topic.  The defensive tactics is generally a little more,

24   about a week and a half.  And same with deescalation is

25   generally about a week or a little over.

```
 1    Q.  How much time, if you know, was spent on scenarios?

 2    A.  We try to push for 55 to 60 hours of scenarios

 3    throughout the academy, and then also if they're not doing

 4    scenarios, this class we had once a month go back and do

 5    ride-alongs on the street so they could see on the street

 6    with a field training officer.

 7              They weren't getting graded or evaluated, but they

 8    would ride with the police officer to see out in the field

 9    what they learn in the academy and then bring back within

10    the academy to help with scenarios, try to click the dots

11    faster, if you will.

12              MS. BELL:  Your Honor, could I have a minute?

13              THE COURT:  Certainly.

14    BY MS. BELL:

15    Q.  All right.  So when recruits go to the academy, are they

16    given a manual?

17    A.  Correct.

18    Q.  And what kind of information is in that manual?

19    A.  Generally it's the rules of the academy, the guidelines

20    that help them through that police academy, the structure of

21    it.

22              MS. BELL:  Your Honor, may I approach?

23              THE COURT:  You may.

24    BY MS. BELL:

25    Q.  I'm showing you what's been marked for identification as
```

1   Government Exhibit 130.  Do you generally recognize that?

2   A.  I do.

3   Q.  What do you recognize it to be?

4   A.  It's the Minneapolis Police Department academy manual.

5   Q.  And would that have been the academy manual for Officers

6   Kueng and Lane?

7   A.  Yes.

8           MS. BELL:  I would offer Government Exhibit 130.

9           MR. ROBERT PAULE:  Your Honor, I do not object,

10   but I'd like the jury for the record to note that this has

11   nothing to do with my client.

12           THE COURT:  That would be sustained as to your

13   client.  It has nothing to do with Mr. Thao.

14           MR. GRAY:  Your Honor, because my client was in

15   the same class, I don't object, but it's Mr. Kueng's

16   exhibit, but my client was in the class.

17           THE COURT:  Oh, okay.

18           MR. PLUNKETT:  Could I have a moment with counsel,

19   Your Honor?

20           THE COURT:  Well you can because I'm struggling

21   with another thing.  The exhibit list that I'm holding goes

22   to 128.

23           (Counsel confer)

24           MR. PLUNKETT:  Thank you, Your Honor.  No

25   objection.

1    MS. BELL:  Your Honor, if you'd like I can provide

2    the court with a copy.  I have one handy.

3    THE COURT:  Well it would be a little handy.  I'm

4    a little -- well I'll let it go.  I'll make my comments

5    later.  As far as I know, as to Mr. Kueng and Mr. Lane,

6    there's no objection, and the court will then receive 130.

7    MS. BELL:  Thank you, Your Honor.

8    BY MS. BELL:

9    Q.  All right.

10   MR. PLUNKETT:  Your Honor, before I proceed I was

11   just going to note for the courts, for the record, that what

12   is being received as Exhibit 130, the Government

13   Exhibit 130, would also be reflective of Kueng Exhibit K, as

14   in kilo, A as in alpha, K-A, K alpha.

15   THE COURT:  Oh, okay.

16   MS. BELL:  Yes.

17   THE COURT:  Thank you.

18   MS. BELL:  They are the same, Government

19   Exhibits 130 and Defendant's Exhibit K-A.

20   THE COURT:  Okay.  Thank you for the

21   clarification.

22   MS. BELL:  Sorry for any confusion Your Honor.

23   THE COURT:  Okay.  Proceed.

24   BY MS. BELL:

25   Q.  All right.  So I just want to pull up Exhibit 130 and

1    it's like 250 pages, right?

2    A.  Yes.

3    Q.  We're not going to go through 250 pages, but let's go

4    through some of them.

5            All right.  It looks like there's some information

6    for the folks in the academy about who to call if they have

7    issues, right?

8    A.  Correct.

9    Q.  Okay.  Now I'm going to turn to page 3, which has the

10   critical decision-making model.  What is that?

11   A.  So the critical decision-making model is what we were

12   teaching recruits and cadets in the academy, as well as at

13   in-service training, and it's to help them on calls when

14   they do scenarios by just basically what information did

15   they have in front of them, identifying any threats or risks

16   that they are facing, what's their authority to act and then

17   what's the ultimate goal and actions that they are trying to

18   do and accomplish.

19           And when they get to that point, they need to

20   review and assess each situation, and then the pillars of

21   procedural justice are in the middle, the voice neutrality,

22   respect and trust, to constantly use them while they're

23   going through this decision-making model.

24           So basically on a police call, they just keep

25   going through this wheel because scenes can change.

1    Q.  I see.  So as things are, if there are changes in the

2    scene, they should reassess and then start this wheel all

3    over again?

4    A.  Correct.

5    Q.  This is just a visual way to explain that idea?

6    A.  It is and it helps them articulate in their police

7    report or what they are doing on the scene as well.

8    Q.  Okay.  It looks like page 4 is sort of a table of

9    contents.  Fair to say?

10   A.  Yes.

11   Q.  Now obviously this particular book wouldn't encompass

12   all the training and every single ting they did during the

13   70 hours or whatever?

14   A.  Correct.

15   Q.  So this is kind of the highlights.  Fair to say?

16   A.  Yes.

17   Q.  All right.  So can you looking at page 5, can you say

18   what the over -- read from where it says, The overall goal

19   of the Minneapolis Police Academy is to?

20   A.  Assist in the development of peace officers who

21   recognize their roles in the protection of constitutional

22   guarantees, the maintenance of public order, crime

23   prevention and suppression in responding to the needs of the

24   community.

25   Q.  What do you mean by "the protection of constitutional

1   guarantees"?

2   A.  Making sure that they understand all the scope of the

3   law and their duties that they're about to uphold as a

4   police officer.

5   Q.  Okay.  And then on page 7 it looks like a whole page of

6   the objectives of the academy.  Fair to say?

7   A.  Yes.

8   Q.  I'm not going to go through all of that.  I do want to

9   talk about some of the -- there we go -- academy terms and

10  titles.  Do you see that?

11  A.  I do.

12  Q.  Okay.  And so it defines the recruit academy itself.

13  How does it define the academy?

14  A.  It's preparing the recruits to become police officers

15  through classroom scenarios, demonstrations.

16  Q.  And then it also defines what a recruit is.  Fair to

17  say?

18  A.  Yes.

19  Q.  On page 13.  Do you see that?

20  A.  I do.

21  Q.  And who is a recruit?

22  A.  So a person in the law enforcement field that's

23  attending the police academy.

24  Q.  And then the last definition I want to talk about was

25  where it says FTO on the bottom of page 13.  Do you see

1    that?

2    A.  I do.

3    Q.  And so what does that say?

4    A.  So upon them graduating and completing the police

5    academy, they will go out to the field training program

6    where they have to demonstrate all their skills, knowledge

7    and abilities that they learned as an independent police

8    officer before they can complete that program.

9    Q.  Okay.  And why is it that the goal is to get them to the

10   point that they can operate independently?

11   A.  At this time on the job, sometimes you are working by

12   yourself or with a two-person car, and you have to show that

13   you can work independently as an officer and apply all those

14   city ordinances, policies, state law and really show that

15   you can do this job and take control of the scenes and

16   handle your calls.

17   Q.  Now, I want to turn to page 25.  You mentioned that the

18   training takes place at the special operations center; is

19   that right generally?

20   A.  Yes.

21   Q.  I'd like you to read the bolded portion that ends that

22   page?

23   A.  As a police officer, you will be responsible not only

24   for your actions, but also for the actions of your partners

25   and others.  The training staff expects the recruits to

1    police each other on matters of dress, behavior and

2    adherence to rules and regulations.

3              When it becomes necessary for the training staff

4    to address these issues with an individual, it would become

5    a matter of record, and the consequences are generally more

6    severe.  You will be held responsible for your actions and

7    inactions.

8    Q.  And so I want to start with the first sentence where it

9    says, As a police officer you will be responsible not only

10   for your actions, but also for the actions of your partner.

11             MR. PLUNKETT:  Your Honor, I'm going to object to

12   this.

13             THE COURT:  I sustained the objection.  We just

14   read it.  We don't need to read it again.

15   BY MS. BELL:

16   Q.  All right.  I'd like to ask you about the first

17   sentence.  What does that mean?

18   A.  You are responsible for maintaining your own actions and

19   then your fellow partners' that you are working with

20   throughout the academy.

21   Q.  And why do you tell them this starting in the academy?

22   A.  So police officers are held to a much higher standard,

23   and we want to instill that level of professionalism in

24   them, as well as when they are out on the field they are

25   expected to do the same thing.  So in the academy, we try to

 1    get them comfortable correcting one another or at least

 2    pointing out inappropriate type of actions to their cadre

 3    staff or superiors in the event that something would happen.

 4    Q.  And what does the last sentence mean?

 5    A.  So it's just basically saying you are accountable for

 6    yourself and not only for what you do, but if you don't do

 7    anything at all.

 8    Q.  Now you talked about -- let me ask you this:  Are there

 9    rules at the academy?

10    A.  Yes.

11    Q.  How many rules?

12    A.  A lot.

13    Q.  And why do you have rules?

14    A.  It's a guiding principle for them when they're in the

15    academy, we want to teach them that level of

16    professionalism, and really we want to also teach them that

17    you're about to go out and enforce rules that you should be

18    able to adhere to the rules and standards.

19    Q.  And so let's look at Exhibit 130 at page 15.  Is that

20    where the rules and regulations start?

21    A.  Yes.

22    Q.  All right.  It looks like there's a rule about attitude;

23    is that right?

24    A.  Yes.

25    Q.  Why do you have a rule about attitude?

1    A.  Because attitude affects everything we do.  You can

2    control your attitude, and as a police officer we expect the

3    highest level of professionalism out of you.  Even on the

4    street if you are having a bad day, you are not supposed to

5    treat anybody differently, and you have to persevere through

6    that and in this case have a cheerful attitude, but

7    professional.

8    Q.  Are there rules about attendance?

9    A.  Yes.

10   Q.  Why are there rules about attendance?

11   A.  Being on time is an important thing.

12   Q.  So I guess there's a rule about being tardy as we see on

13   No. 3?

14   A.  Correct.

15   Q.  There are also rules about what to do when you are sick?

16   A.  Yes.

17   Q.  And then Item No. 5 on page 16, are there rules about

18   orders given by staff members?

19   A.  There is.

20   Q.  And what is that talking about?

21   A.  It's says, Recruits will immediately carry out orders

22   given to them by the academy staff.  They have to comply

23   with department orders and academy rules and regulations.

24   Q.  And why do you put that in the manual?

25   A.  To make sure that the recruits are not falling out of

1  line with -- well, insubordination or that they need to be

2  guided on a daily basis.  They're not quite police officers

3  out in the field yet, so the academy staff is giving them

4  direction and guidance, so where to be, when to be or to

5  that duty officer of the week.

6  Q.  What's the duty officer of the week?

7  A.  So a duty officer of the week is, one of the cadets will

8  be in charge of the class for the week, where they're

9  supposed to be, their itinerary, making sure that they're

10  following everything for that week, and they're

11  communicating with the cadre officer, the staff academy, of

12  what they're supposed to be doing, trying to empower them,

13  put more confidence in them to get in front of the class to

14  be that leader and take charge.

15  Q.  Are there rules, let me turn to the next page, page 17,

16  are there rules about how you address officers and

17  instructors?

18  A.  Yes.

19  Q.  And why are there rules about that?

20  A.  A lot of times this profession is police officers' first

21  profession, right, so first job, and we want to make sure

22  that they understand to be respectful, in the academy, to

23  other people, but out in the street.  We're preparing them

24  to go out to the street and not use slang terms and really

25  use the proper customs and courtesies.

1    Q.  Now, are there within -- I know you talked about there's

2    a lot of MPD policies, but within the, this academy manual

3    are certain of the policies included in the manual itself?

4    A.  Yes.

5    Q.  And why are certain of the policies included in the

6    manual itself?

7    A.  Some are really important that the officers really hone

8    in on and memorize.  Sometimes on this job you have time to

9    look policies up; and oftentimes if it's something big, we

10   want them to know it verbatim or at least have a very good

11   working knowledge of that.

12   Q.  Okay.  And so if we take a look at page 36 of

13   Exhibit 130, it looks like starts the use of force policy

14   that we talked about?

15   A.  Yes.

16   Q.  And it literally copies that section and we talked about

17   earlier --

18   A.  Yes.

19   Q.  -- including, for example, defining -- sorry.  Let me go

20   back a page -- defining what use of force is, correct?

21   A.  Yes.

22   Q.  When you can use force, correct?

23   A.  Yes.

24   Q.  Does it also include the duty to intervene policy?

25   A.  It does.

1   Q.  Does it also include the threatening the use of force

2   and deescalation policy?

3   A.  Yes.

4   Q.  Let me go down a few more pages.  Does it also include

5   the neck restraints policy on page 43?

6   A.  Yes.

7   Q.  All right.  And then just looking at page 34, do you see

8   where it says course objectives?

9   A.  I do.

10  Q.  What are the course objectives?

11  A.  So they're a list of objectives here, the MPD policies

12  and procedures pertaining to the use of force, deadly force,

13  medical aid, Fourth Amendment of U.S. Constitution, state

14  statutes, case laws, MPD defense and control response,

15  defense and controlling tactics involving empty hand and

16  weapons and then it goes on.

17  Q.  Oh, yes, go ahead.

18  A.  Just to physically demonstrate through practice and

19  scenarios, this is a guideline for recruits and cadets they

20  can go through on the proper, proper steps to do that.

21  Q.  And so it looks like it says, To correctly answer

22  questions verbally and/or written.  Is that the testing

23  component?

24  A.  Correct.

25  Q.  All right.  All right.  So now I want to turn to some of

1    the particular training in the academy.

2              And now I will pull up Government Exhibit 73, Your

3    Honor.

4              THE COURT:  Counsel, as you are changing the

5    subject, let's take a morning break.

6              Members of the jury, we're going to stand in

7    recess for morning break at this time.  Please don't discuss

8    the case during the recess.  We are in recess.

9              The jury may be excused.

10   (10:55 a.m.)

11                        **IN OPEN COURT**

12                     **(JURY NOT PRESENT)**

13             THE COURT:  Mr. Paule, I received a bunch of stuff

14   from you this morning.  I haven't looked at it, but I just

15   want to remind you, don't forget to put an exhibit sticker

16   on it.

17             MR. ROBERT PAULE:  I will not.  Thank you, Your

18   Honor.

19             THE COURT:  Okay.  With that, we're in recess.

20   (Recess taken at 10:56 a.m.)

21                          *  *  *  *  *

22

23

24

25

1    (11:16 a.m.)

2                              **IN OPEN COURT**

3                              **(JURY PRESENT)**

4              THE COURT:  You may be seated.

5              Proceed, counsel.

6              MS. BELL:  Thank you, Your Honor.

7    BY MS. BELL:

8    Q.  All right.  I was just turning to Government Exhibit 73,

9    which was the academy use of force PowerPoint that was

10   admitted earlier today.

11             Do you remember that?

12   A.  Yes.

13   Q.  Okay.  And so this is the first page of the PowerPoint?

14   A.  It is.

15   Q.  All right.  And again it's a lengthy PowerPoint.  I'm

16   not going to go through every page, but we will cover the

17   highlights.  All right?

18   A.  Sounds good.

19   Q.  All right.  What were the goals of this training at the

20   academy attended by Mr. Kueng and Mr. Lane?

21   A.  To give them the knowledge of the MPD policy, the

22   guidelines and the principles of the use of force.

23   Q.  And it says, Be able to apply knowledge to the street.

24   What does that mean?

25   A.  So taking the knowledge they applied in the academy and

1   then making sure that they can apply it in the street.

2   Q.  Looking at page 3, and then moving on to page 4 of

3   Exhibit 73, what are the recruits in the academy trained

4   about what force is?

5   A.  They are trained that pretty much the same as an

6   in-service, but intentional police contact involving any

7   strikes, restraints, weapons, tools on their tool belt.

8   Q.  And why are they trained about what force is?

9   A.  They need to know what force is so they know how to

10  apply it if they need to use it.

11  Q.  And I'm turning to pages 5 and 6.  It talks about the

12  levels of resistance.  Do you see that?

13  A.  I do.

14  Q.  What is trained about the levels of resistance at the

15  academy?

16  A.  So they're trained on the passive resistance, the lowest

17  level, the active resistance and then active aggression that

18  subjects will generally display and then the use of force

19  continuum.

20  Q.  And so why are they trained on these different levels of

21  resistance?

22  A.  So the different levels is if, like for instance,

23  passive resistance, when somebody is not complying with the

24  police officer but they are not combative, they need to know

25  some steps on the lowest level of force that they need to

1    use and the different levels that they can go up and down

2    on.

3    Q.  All right.  And so you mentioned that each of the levels

4    was taught.  So page 6 is passive resistance.  Page 7, we

5    see active resistance; is that right?

6    A.  Correct.

7    Q.  Page 8, we see active aggression?

8    A.  Yes.

9    Q.  What's active aggression?

10   A.  It's somebody that is physically combative with the

11   officer or trying to assault them when they're trying to

12   take them into custody or in their control.

13   Q.  All right.  And then are officers trained in the academy

14   about when they're authorized to use force?

15   A.  Yes.

16   Q.  And looking at slides 9 and 10, what are they trained in

17   the academy about when they're authorized to use force?

18   A.  Under the same conditions, effecting a lawful arrest,

19   enforcing a court order, execution of legal process or

20   executing any other duty imposed by the, upon the public

21   officer by law.

22   Q.  And how would you compare what's trained about when

23   they're able to use force in the academy to how the training

24   was for the in-service?

25   A.  Very similar.

1   Q.  All right.  Going on to page 11, we see a reference to

2   *Graham versus Connor.*  Do you see that?

3   A.  I do.

4   Q.  And then going on to page 12, what is that teaching the

5   recruits in the academy about *Graham versus Connor*?

6   A.  It's the circumstances and facts they need to consider

7   when they're taking somebody into custody.

8   Q.  And what fact and circumstances are they trained to

9   consider in the academy?

10  A.  So the severity of the crime, what is the immediate

11  threat to the safety of the officers or others, and then are

12  they actively resisting arrest, or are they trying to evade

13  or escape.

14  Q.  And so what are they trained about how these factors

15  interact?

16  A.  They are just trained to fully think about all these

17  factors when you're taking somebody into custody and the

18  level of force that you might use on somebody, just take

19  into consideration like would it be reasonable with these

20  factors to do what you are trying to do and accomplish.

21  Q.  Can you give us an example of the severity of crime at

22  issue and how, how that would factor into the consideration?

23  A.  So you might have a, number one, you know, many police

24  calls.  All right.  So if you're going to a scene where

25  maybe it's a misdemeanor, so lower level crime and like a

```
1    traffic stop, and the person is, you know, not maybe, maybe

2    they're being passive resistance or they're not really

3    complying with you but not really being overly aggressive,

4    am I going to try to escalate the situation if it really,

5    I'm probably not going to arrest the person.

6            I might ticket them.  Can I ticket them through

7    the mail?  There's many different things you need to

8    consider, and then the immediate threat, you know, is that

9    person causing an immediate threat to me or are they trying

10   to escape?  In other words, do I need to think about more

11   tools, more resources available to me, if I want to go

12   further if the severity of the crime is higher.

13           And then the person, if they are actively

14   resisting or attempting to escape, do I have other tools or

15   resources that I can use to help effect the, you know, to

16   take someone into custody.

17   Q.  My number 13 says, Duty to intervene.  What does this

18   mean?  Do you see that?

19   A.  I do.

20   Q.  What are the recruits at the academy taught about the

21   duty to intervene?

22   A.  They are thought they have an obligation to intervene

23   through verbal or physical means, that they have an

24   obligation as an employee, especially when they see

25   unreasonable force being used.
```

1  Q.  And is that contained in the policies itself?

2  A.  Correct.

3  Q.  And was that duty to intervene one of the policies we

4  actually saw that had been pulled out and put in the academy

5  handbook?

6  A.  Yes.

7  Q.  And when you say they have a duty to intervene, you said

8  verbal or physical.  Let's start with verbal.  What do you

9  mean by that?

10  A.  Verbal is just trying to tell another officer, hey, I

11  got this or get off or, you know, you're not right, or

12  you're not using the appropriate amount of force, just say

13  something, just verbally say something.

14  Q.  And what do you mean by "physical"?

15  A.  Physical means actually physically grabbing the officer

16  or just taking control of the suspect that you're trying to

17  take into custody and just physically intervening, getting

18  in between them or taking, taking charge.

19  Q.  The next page after duty to intervene, what does it

20  mean?  Then there's a YouTube, I'll call it a link.  Do you

21  see that?

22  A.  I do.

23  Q.  Do you remember what that linked to?

24  A.  I do not.  Usually it's YouTube videos that are embedded

25  that relate to the previous slide.

1  Q.  But in this case you don't know what it is?

2  A.  I do not.

3  Q.  All right.  All right.  Looking at slide number 15, it

4  says, Threatening the use of force.  What are folks at the

5  academy taught about that idea of threatening the use of

6  force and then moving on to deescalation on page 16?

7  A.  So still part of our policy.  When you can you should

8  try to at least threaten the use of force before you use the

9  use of force to see if that works.  And then deescalation is

10  just attempting to slow that, everything, down again.

11  Q.  Okay.  Now looking at Government Exhibit 73 at page 17,

12  I want to ask you about a particular, the last item there.

13  Do you see that?

14  A.  I do.

15  Q.  And what does that say?

16  A.  The number of officers on scene may make more force

17  options available and may help reduce overly force used.

18  Q.  Can you explain what that means?

19  A.  Sometimes if you have more officers on scene, the person

20  might be more willing to comply instead of fighting with an

21  officer when they see that they're just more officers, that

22  they outnumber you.

23  Q.  All right.  I'm going to jump ahead to page 28 to a

24  slide entitled Transfer of Custody.  Do you see that?

25  A.  I do.

1    Q.  And what are recruits in the academy taught about the

2    transfer of custody?

3              MR. PLUNKETT:  Objection.  Relevance.

4              THE COURT:  I'm going to overrule.  You may

5    answer.

6              THE WITNESS:  I didn't hear your question.  I'm

7    sorry.

8    BY MS. BELL:

9    Q.  I'm sorry.  What are recruits in the academy taught

10   about the transfer of custody?

11   A.  Just that if you use any force to make sure that you

12   verbalize it to the person that you are transferring to.  So

13   if you have somebody in custody, you use force, you let that

14   person you are transferring them over to knowing that the

15   force that you used, if they sustain any injuries or allege

16   any injuries and if you apply any medical.

17   Q.  And why are recruits taught this?

18   A.  So they can continue to monitor them when you transfer

19   them into somebody else's custody.

20   Q.  All right.  I want to jump ahead a little bit to slide

21   number 38, which talks about in the case strains and choke

22   holds.  Do you see that?

23   A.  I do.

24   Q.  What are recruits in the academy taught about the

25   difference between a choke hold and a neck restraint?

1    A.  They are taught choke holds are deadly force.  It's a

2    deadly force option, and neck restraints, depending on what

3    they're taught, unconscious and conscious neck restraints.

4    Q.  And what are they taught about with respect to being

5    careful of when applying neck restraints?

6    A.  Just being careful of the throat.

7    Q.  And why is that?

8    A.  Because you can compress someone's breathing, the airway

9    more or less, or break their trachea.  It's a very sensitive

10   spot, dangerous spot.

11   Q.  All right.  And so the next slide, at slide 39, the

12   conscious neck restraint, it says, What is it?  What is

13   taught at the academy at this when they're talking about

14   what these types of restraints are?

15   A.  So conscious you can use when somebody is actively

16   resisting, and it's a control technique and applying

17   pressure on both sides of the neck, and then you can render

18   them unconscious using the unconscious neck restraint when

19   they start to be combative and go into active aggression.

20   Q.  Okay.  And so on slide number 40, what does the subject

21   have to be doing in order for an officer to be able to use a

22   conscious neck restraint as trained by the MPD at the

23   academy?

24   A.  The conscious is the active resisting.

25   Q.  And what is the unconscious?  When can that be used

1   according to the training at the academy?

2   A.  For lifesaving purposes and somebody displaying active

3   aggression.

4   Q.  So if someone's not displaying active aggression or for

5   lifesaving purposes, it would not be appropriate to use an

6   unconscious neck restraint?

7           MR. GRAY:  Judge, object to that as leading and

8   asked and answered twice.

9           THE COURT:  It is.  It is multiple.  I sustain.

10  BY MS. BELL:

11  Q.  All right.  Slide 41 has just one sentence on it about

12  unconscious neck restraint.  What does it say?

13  A.  Shall not be used against subject, subjects who are

14  passively resisting as defined by policy.

15  Q.  Why is that trained to folks at the academy?

16  A.  Because it's important to not use a neck restraint when

17  you try to use the lowest level of force but specifically

18  somebody that is not really fighting with us as police

19  officers and not really complying, they are just passive, so

20  it would be inappropriate to use a neck restraint.

21  Q.  And then looking at slides number 42, this one, and 43.

22  What are individuals at the academy trained about what they

23  should do if a neck restraint has been applied?

24  A.  Just employees shall keep them under close observation

25  till they are released to medical or other law enforcement

```
 1    personnel.  And then same thing, inform whoever is accepting
 2    them into custody the technique that was used on them.
 3    Q.  How, if at all, does this training that we've been
 4    talking about, about the aftercare, relate to this concept
 5    of in your custody and in your care, if at all?
 6    A.  Well closely relates.  They're always in your -- well,
 7    when you have somebody and you are dealing with them, we're
 8    caring for them.  So even if we pass them to the next
 9    person, we got to make sure they continue that care because
10    we're transferring custody to them.
11    Q.  I probably should have asked this earlier when we were
12    talking about this, but let's say someone was involved, you
13    know, in a struggle with law enforcement officers initially
14    and then that struggle ends.
15            Are officers still required to care for someone
16    who might have been aggressive at them initially?
17    A.  Absolutely.
18            MR. ROBERT PAULE:  I would object.
19            THE COURT:  I can't hear you.
20            MR. ROBERT PAULE:  Pardon me.  I would object,
21    Your Honor.  I don't know that this is phrased as going to
22    the training at the academy.  It's simply repetitive.
23            MR. GRAY:  I join in that objection.
24            THE COURT:  You are going to have to repeat it
25    again.  I'm sorry.
```

```
 1              MR. ROBERT PAULE:  Pardon me, Your Honor.  I would
 2    object to this testimony as it's not indicating that it's
 3    strictly what is trained at the academy, and it is simply
 4    repetitive.  Pardon me.
 5              THE COURT:  Well I think it is repetitive, but I'm
 6    going to overrule because it is being stated and the
 7    foundation is that it is taught at the academy.  So proceed.
 8    BY MS. BELL:
 9    Q.  Let me make clear:  At the academy, which is what we're
10    tubing about right now, but also in general according to MPD
11    policy and training, if someone is, let's say, exhibiting
12    active aggression with officers or some kind of aggression
13    with officers and then things get under control, are
14    officers still required to do these aftercare type
15    procedures even though the subject might have been
16    aggressive towards those officers?
17    A.  Yes.
18    Q.  Why is that?
19    A.  Just because it happened, you still -- the training our
20    policies require, you know, our policies require us to make
21    that sure we're caring for them.  Our training also ensures
22    that we have the right training to follow up and monitoring
23    them or get first aid if necessary.
24              So they're still in our custody, so we still have
25    to care for them, their well-being, regardless of what
```

1   happened.

2   Q.  Now does the idea, we've talked a little bit about this

3   side recovery position, does this idea come up at the

4   academy?

5   A.  Yes.

6   Q.  And so I'd like to go to Exhibit 73, page 56.  It says

7   in the context of a slide about the maximal restraint

8   technique, but I'd like to talk about the side recovery

9   position.

10          How is it that that comes up at the academy?

11  A.  So this is part of our use of force maximum restraint

12  technique.  In the side recovery position when we put a

13  hobble on somebody, when they're strained, we need to put

14  them on their side to reduce pressure on their chest.

15  Q.  And so does the side recovery position come up outside

16  of the context of that MRT?

17  A.  Yes.

18  Q.  At the academy is what I'm talking about.

19  A.  Yes.

20  Q.  What context would that come up in?

21  A.  Generally use of force, patrol operations, medical.

22  Q.  Okay.  Now I want to turn to some of the lesson plans

23  that were used at the academy.  I'm going to pull up

24  Exhibit 74, and is this a selection of lesson plans from the

25  academy that was attended by Officers Kueng and Lane?

1   A.  Yes.

2   Q.  All right.  And just looking at the first one so we can

3   get oriented, what was the title of this particular lesson

4   plan?

5   A.  Academy Defensive Tactics.

6   Q.  And what was the date that this lesson was taught?

7   A.  On September 13, 2019, or excuse me, September 12th,

8   2019.

9   Q.  And so let's go back to the beginning.  What is the

10  course description for this particular lesson plan?

11  A.  We're training basically police officers how to identify

12  and act in high stress, rapidly evolving situations by using

13  the critical decision-making model.  Talks about

14  deescalation, appropriate use of force, also just different

15  techniques such as kicks, restraints and then the unit's

16  goal to teach respect, professionalism and again the

17  sanctity of life.

18  Q.  And why is that the goal of the defensive tactic unit as

19  they teach folks at the academy?

20  A.  That's the goal so that they understand it completely,

21  that we never forget what our goal is and we're using use of

22  force and to continue that critical decision-making model of

23  reassessing and then different tools and techniques you can

24  use while you are using it.

25  Q.  Okay.  And so for this particular lesson plan on

1   September 12th, 2019, what are the goals of that course?

2   A.  At the completion of session nine, cadets will be

3   introduced to the front push kick and long knee kick.  The

4   purpose of these two techniques is to create space.  Cadets

5   will drill the two types of neck restraints, and they will

6   finish with a fight simulation drill, which combines several

7   control techniques, and then the cadets will finish the

8   drill with a neck restraint.

9   Q.  So is this this on-the-mat sort of thing you were

10  talking about?

11  A.  Correct.

12  Q.  And so is this that circumstance where the instructors

13  are going to talk about it, maybe do the demonstration and

14  then the mat practice?

15  A.  Yes.

16  Q.  Okay.  And then does the lesson plan explain how or the

17  method of course evaluation?

18  A.  Yes.  They're going to do multiple defense tactic

19  scenarios, and then they will determine the amount of force,

20  "they" meaning the cadets will have to, determine the amount

21  of force, if any, to be applied during those scenarios.

22  Q.  And so why are cadets trained to evaluate if any force

23  is needed?

24  A.  It's very important that they take independent action on

25  their own, that they fully understand the use of force

1    continuum and when to use that amount of force appropriately

2    so when they're out in the field they can make those

3    independent decisions as well.

4    Q.  Now, with this particular lesson plan I'm going to go to

5    the third page.  All right.  And just briefly if I'm reading

6    this right, it looks like neck restraints were talked about

7    and worked on from 9:30 to 10:15.

8              Is that what I'm reading?

9    A.  Correct.

10   Q.  And do you see where it says, Compressing one or both

11   sides of a person's neck with an arm or a leg?

12   A.  I do.

13   Q.  Are cadets taught how to do a neck restraint with a leg?

14   A.  No.

15   Q.  Are they taught how to do it with an arm?

16   A.  Yes.

17   Q.  Why are they not taught how to do it with a leg if that

18   is one of the options?

19   A.  We found that the arm, using the neck restraint with the

20   arms is more logical.  They discuss sometimes when a leg

21   could be used, and that's like pretty much an all out final

22   thing, but we don't teach it just because it can be

23   dangerous, and the arms are more, it works better.

24   Q.  Now I want to look at page 4.  This is something that

25   says it's flow number three.  What's a flow?  What is this?

1    A.  This is just a flow chart.  So it's starting where they

2    start with what an instructor will start with, and they will

3    work their way around for the cadets to follow.

4    Q.  Okay.  And so in this particular chart I want to ask you

5    to look at this middle box.  Do you see that?

6    A.  I do.

7    Q.  All right.  And so I want to ask you -- well, why don't

8    you just read it because I can't count sentences?

9    A.  Mindset minute vascular neck restraint.  When you apply

10   the vascular neck restraint, remember to breathe and make

11   sure you hold the pressure long enough to allow the

12   technique to work.  It will take anywhere from 6 to

13   15 seconds to render your opponent unconscious.

14           However, be aware that if you release their neck

15   immediately that they may wake up spontaneously within a few

16   seconds.  It's important to be able to recognize when they

17   are unconscious so that you can immediately transfer to

18   another form of control, such as handcuffing.

19           To avoid exposure to unnecessary injury, do not

20   continue to apply the vascular restraint after you are aware

21   that they have completely passed out.

22   Q.  So does this particular mindset minute contemplate that

23   you would be using that unconscious neck restraint that we

24   talked about?

25   A.  Correct.

1   Q.  And does it contemplate that you would be using that

2   unconscious neck restraint in order, before you have them

3   handcuffed?

4   A.  Yes.

5   Q.  Why would you need to use an unconscious neck restraint

6   in order to handcuff someone?

7   A.  Sometimes if you're fighting with someone or they're

8   being combative and you can't get their hands behind their

9   back and no matter what you are trying, you can render them

10  unconscious and then try to get handcuffs on as quick as you

11  can.

12  Q.  And then why are recruits taught in the academy

13  information about the last sentence, avoiding unnecessary

14  injury?

15  A.  So you don't want somebody -- you want to stop using

16  that restraint once somebody passes out because it's

17  restricting their blood flow, and so you want to release

18  that so they don't stop breathing.

19  Q.  Okay.  But doesn't it say that somebody might wake up if

20  you release it too soon?

21  A.  Correct.

22  Q.  What's that too soon in relationship to, the handcuffing

23  or what?

24  A.  It's they might wake up as soon as you release it or may

25  take them a few seconds, but just be aware that they might

1  wake up.  So get the handcuffs on as soon as you can.

2  Generally we do this in partners.

3  Q.  In the training itself?

4  A.  Yes.

5  Q.  And so are the recruits in the academy practicing this

6  hands on?

7  A.  Yep.  They do it by themselves, and then they do it in

8  partners and sometimes more.

9  Q.  Why would the folks who are doing the training

10  particularly remind officers about these issues?

11  A.  Because it's really important for the person's overall

12  health and well-being and their care.

13  Q.  All right.  So let's move forward, I'm sorry, to page 6

14  of Government Exhibit 74.

15          Is this the lesson plan for October 10th, 2019?

16  A.  Yes.

17  Q.  And defensive tactics again?

18  A.  Correct.

19  Q.  And it looks like in the course description this is neck

20  restraints and live roles?

21  A.  Yes.

22  Q.  Just out of curiosity what is a "live roll"?

23  A.  The recruits practice rolling forwards and backwards.

24  If they are out on the street and they get into a fight and

25  someone pushes them backwards, they have to -- we try to

 1    help them land properly so they don't hurt themselves.

 2    Q.  Okay.  All right.  And so on this particular day what

 3    was the course length?

 4    A.  It looks like two and a half hours in the morning and

 5    two and a half hours in the afternoon, so five hours.

 6    Q.  All right.  I'm going to turn to page 8, and it looks

 7    like there were a couple kinds of neck restraints talked

 8    about or taught; is that right?

 9    A.  Yes.

10    Q.  The Figure 4 and the short arm?

11    A.  Yes.

12    Q.  Okay.  What I want to actually ask you about is below

13    that do you see where it says, Test of proportionality?

14    A.  Yes.

15    Q.  The first time, I guess, and what does it say about the

16    test of proportionality?

17    A.  It says, Neck restraints, conscious or unconscious

18    applications, shall only be used against subjects when lower

19    force options either failed or are likely to fail or too

20    dangerous to tempt.  The neck restraint shall not be used

21    against persons who are displaying passive resistance as

22    defined by the test of proportionality.

23    Q.  And why was this information about proportionality

24    included in the lesson plan for this particular class on

25    neck restraints?

1    A.  The cadets needed to know how to properly apply them,

2    and then they need to know the test of proportionality, the

3    force they're using proportional to what they have in front

4    of them.

5    Q.  I want to go down just a little bit here where the

6    second time it says test of proportionality.  Do you see

7    that?

8    A.  Yes.

9    Q.  What does it say below there?

10   A.  It says if unconsciousness occurs to request EMS

11   immediately by radio, loosen clothing and jewelry in the

12   subject's neck area, check their airway and breathing, start

13   CPR if needed.

14          After a neck restraint has been applied, you shall

15   keep them under close observation until they are released to

16   medical or other law enforcement personnel.

17   Q.  Why is this, I'll call it, aftercare information

18   included in the lesson plan related to neck restraints?

19   A.  So the recruits needed to know once they apply these

20   that they need to get medical first aid, how important it

21   is, and to monitor them constantly.

22   Q.  And so I think we talked about this before, but are

23   individuals in the academy taught that that unconscious neck

24   restraint, the person is going to go unconscious in that 6

25   to 15 seconds?

Elizabeth Stoughton - Resumed

1  A.  Yes.

2  Q.  And if someone, are they taught about what to do if

3  someone doesn't regain consciousness if there's a neck

4  restraint applied?

5  A.  Yes.

6  Q.  And is that what they're supposed to do here is call EMS

7  by radio?

8  A.  Yes.

9  Q.  Now it also talks about loosening clothing and jewelry

10  around the neck area.  Why are they taught to do that?

11  A.  Because if the person after you do it and they're not

12  waking up, we won't restrict their airway anymore.  So we

13  loosen up their clothing, and if there's a necklace we pull

14  it away from the neck area.

15  Q.  Okay.

16  A.  Because we don't want to affect the blood flow any more

17  than necessary.

18  Q.  And then why are recruits at the academy taught to check

19  an airway and breathing and start CPR if needed?

20  A.  So if the person doesn't wake up or become conscious

21  again, that's when we, you know, teach them to check their

22  airway, make sure they're breathing.  If they're not

23  breathing, to start performing CPR.

24  Q.  And then again in this lesson plan, is there information

25  taught to the recruits at the academy about what to do when

1    you transfer custody?

2    A.  Yes.

3    Q.  What does it say or what are they taught?

4    A.  So anybody you are transferring, the person into a

5    different custody, we're telling them the type of force we

6    used, if they have any injuries, if they need any medical

7    first aid or if they received any or we rendered any.

8    Q.  All right.  I want to turn to page 10 of Government

9    Exhibit 74, which is a lesson plan about a week later,

10   October 16th, 2019.

11           Do you see that?

12   A.  Yes.

13   Q.  And what was the course length for this?

14   A.  Same thing, two and a half hours in the morning, two and

15   a half hours in the afternoon, five hours total.

16   Q.  Is this another day when they're talking about neck

17   restraints and live roles?

18   A.  Yes.

19   Q.  And again I want to look at the third page of that

20   particular date, which would be the 12th page of Exhibit 74.

21   I highlighted the bottom portion.

22           Is that the same or similar to what we just went

23   over in terms of the test of proportionality, what to do in

24   aftercare and the transfer of custody?

25   A.  It is.

```
1    Q.  Why are recruits at the academy taught these things, you

2    know, again and again?

3    A.  It's to make it repetitive so that muscle memory kicks

4    in.  So especially when their adrenaline is up on the

5    street, if they're combative with somebody or somebody is

6    being combative with them that this is a natural instinct to

7    do these over and over again.

8    Q.  And then moving ahead -- whoops.  I'm sorry -- to the

9    lesson plan on October, lesson date October 22nd, 2019.  Do

10   you see that?

11   A.  Yes.

12   Q.  And it looks like this was a lesson plan actually about

13   striking; is that right?

14   A.  Yes.

15   Q.  And I want to ask you about one of the flows,

16   particularly flow number two, which is on page 17 of this

17   exhibit.

18           Does this flow have a mindset minute related to

19   vascular neck restraints?

20   A.  Yes, it does.

21   Q.  And is it actually the same or very similar to the

22   mindset minute we saw in the session back in September?

23   A.  Yes.

24   Q.  And again why are these things being reminded in

25   multiple trainings?
```

1   A.  To keep it repetitive, muscle memory.

2   Q.  All right.  Just, we'll just move through this quickly.

3   So Exhibit 74, page 24 -- did that wrong.  Yes.

4           Lesson plan at October 30th, 2019, is the lesson

5   date.

6   A.  Yes.

7   Q.  And again just moving through another flow, does this

8   have that same reminder being taught to cadets and recruits

9   at the academy about the vascular neck restraint and the

10  cautions?

11  A.  It does.

12  Q.  All right.  And then the last lesson plan that I want to

13  review with you, do you see the training date there as

14  November 7th, 2019?

15  A.  Yes.

16  Q.  I want to turn to page 31 of Exhibit 74.  Do you see

17  there discussion written about prone position and side

18  recovery position?

19  A.  I do.

20  Q.  And what's it say about, what are they teaching about

21  prone position in this lesson plan?

22  A.  So prone as it relates to the maximal restraint

23  technique, side recovery position or, excuse me.  So prone

24  is when they're laying down on their chest, and then we want

25  to put them in the side recovery position for, to reduce the

1    pressure on their chest again.

2    Q.  Okay.  It look like some of the policy and rules and

3    regulations are part of the lesson plan for this particular

4    day; is that right?

5    A.  It is.

6    Q.  And so would recruits and cadets have been taught then

7    about the policies with respect to the prone position and

8    the side recovery position?

9    A.  Yes.

10   Q.  And understanding that this is taught in the context of

11   the maximal restraint technique, are recruits at the academy

12   generally taught about the dangers of the prone position?

13   A.  Yes.

14   Q.  Why is that?

15            MR. GRAY:  Object to that as asked and answered,

16   Your Honor, before.

17            THE COURT:  Sustained.

18   BY MS. BELL:

19   Q.  So let's turn to page 32 of Exhibit 74.  Do you see

20   where it says, the second time it says test of

21   proportionality?

22   A.  Yes.

23   Q.  What does it say for number 1?

24   A.  Position:  Subject to recovery position as soon as

25   possible.

1   Q.  And again as part of this lesson plan, were aftercare

2   guidelines taught, as well as the transfer of custody

3   guidelines, taught to recruits in the academy about what to

4   do?

5   A.  Yes.

6   Q.  So how at the time that Officers Kueng and Lane were in

7   the academy, what, how do you pass the academy or graduate

8   from the academy?

9   A.  So there's certain tests that they need to take on the

10  policy procedure, generally weekly or bi-weekly.  They have

11  to perform these techniques and defensive techniques

12  properly, and then they have to do range weapons

13  qualifications they got to pass.

14          And then the biggest thing is the scenarios at the

15  end, the final eval week, they have to pass those.

16  Q.  Can you explain a little more about the final eval week

17  as it existed when Officers Kueng and Lane attended the

18  academy?

19  A.  Sure.  So it's about three days of scenarios that the

20  recruits will go through at the end.  Police officers are

21  generally evaluators, and then the scenarios, they walk

22  through different things.  And so there will be one on

23  specifically two defensive tactics, sometimes in pairs, and

24  then we work on twos, fours and even more.  So it might be a

25  health call, for instance.

Elizabeth Bⁱer-Resumed

```
 1              And then there will be other scenarios such as
 2      domestics, civil, civil matters.  They have got to work
 3      through different policies.  There will be a deadly force
 4      situation or a force, a situation that there might be no
 5      force necessary needed.
 6              They have to work through these and think
 7      independently and follow their policies and procedures.
 8      Q.  And so tell me how this scenario works?  Are there
 9      actors or people doing this?  Tell me physically what
10      happens.
11              MR. GRAY:  Judge, I object to this as lack of
12      foundation unless she's seen it.
13              THE COURT:  Well, that's a question.  Have you
14      seen it?
15              THE WITNESS:  I have, Your Honor.
16              THE COURT:  Then the objection is overruled.
17              MR. GRAY:  I wanted to make sure it was this
18      specific gradation class that she saw.
19              THE WITNESS:  Yes.
20      BY MS. BELL:
21      Q.  All right.  And so can you explain what the scenario
22      would actually look like to all of us in the room?
23      A.  Sure.  So the first scenario, that generally kicks off
24      as two officers that are responding to a fight or a shots
25      fired call.  So the first responding officers get add
```

1  remarks and some suspects' description, so they are

2  listening to the radio.  They are acknowledging what police

3  dispatch is saying.

4       They go out into the field where there's multiple

5  police officers that are not dressed as police officers.

6  They are role players, so they're dressed in red man suits,

7  which is pads.  The recruits will go out and respond, and

8  they realize rather quickly they need more backup.

9       So they will request backup, telling -- they're

10  working through that like they normally would as a police

11  officer.  So it's generally four officers that are going out

12  to the field, and there's five suspects that are in the

13  shots fired call.

14       When they get out in the field, they go hands on

15  really quickly, and pretty soon it's a help call because

16  there's more suspects than cops, and they need to

17  communicate with one another.  And so then generally more

18  officers will come, sometimes six to eight more cops.  These

19  are recruits that are getting evaluated.

20       So now they're fighting with each.  There's about

21  five suspects, so there's different groups, and the biggest

22  point of the scenario is for the recruits to communicate

23  with one another that as soon as they get a person in

24  custody, roll them over on their side and see if the other

25  recruits need help.

```
 1              And so they keep doing this until the scene is
 2    Code 4.
 3    Q.  Okay.  So they literally are like at the training
 4    center, whatever, and they get a call.  Is that right?
 5              MR. GRAY:  Object to that as leading, Your Honor.
 6              THE COURT:  It is, and I think we have just gone
 7    over a scenario that is not applicable to this case, so
 8    sustained.
 9              MS. BELL:  Well, Your Honor --
10    BY MS. BELL:
11    Q.  You said that as part of the academy there are written
12    tests and quizzes administered; is that right?
13    A.  Yes.
14    Q.  And I asked you yesterday about the policy about who is
15    in charge of a 911, a typical 911 call, when there's not a
16    supervisor on the scene.  Do you recall that?
17    A.  Yes.
18    Q.  Is that something that officers, a policy that they
19    could be tested on to test their knowledge?
20    A.  Yes.
21    Q.  I'd like to show you Government Exhibit 77, which is a
22    test from Officer Kueng, whose name is cut off at the top
23    there, but -- and specifically I'd like to show you page 2
24    of Exhibit 77.
25              Do you see that?
```

```
1    A.  I do.

2    Q.  Is this the kind of test or quiz, I guess, that might be

3    done, that was in fact done at the academy?

4    A.  Yes.

5    Q.  Okay.  And I want to ask you just about a couple of

6    questions that they were asked in this particular quiz.

7            MR. GRAY:  Object to that.  She says "they."

8    She's talking about Kueng, and this is important in this

9    case.  It's a separate trial.

10           MS. BELL:  I apologize, Your Honor.  I'll address

11   Officer Lane's quiz momentarily.

12           MR. GRAY:  Thank you.

13           THE COURT:  Proceed.

14   BY MS. BELL:

15   Q.  It's officer -- with respect to Officer Kueng in

16   question number 8, can you please ask or tell the jury what

17   question number 8 is?

18   A.  Question number 8 is, Employee shall truthfully answer

19   questions or render materials and relevant statements in a

20   departmental investigation so when directed consistent with

21   the constitutional rights of the employees, and he answered

22   true and was correct.

23   Q.  Okay.  Yeah.  Sorry.  And then question number 9, what

24   was that question?

25   A.  Who oversees a scene at a police incident if a superior,
```

```
1     higher ranking officer is absent, and he answered senior

2     officer of the first squad to arrive at the scene, which was

3     correct.

4     Q.  Now I'm going to turn to Officer Lane's test, so Exhibit

5     Number 78, and turn to the second page.

6               Were the same questions asked on the quiz for

7     Officer Lane?

8     A.  Yes.

9     Q.  And did he give the same answers that officer, the same

10    correct answers that Officer Kueng gave?

11    A.  Yes.

12    Q.  Did Officer Kueng pass or graduate from the academy?

13    A.  Yes.

14    Q.  And did Officer Lane graduate from the academy?

15    A.  Yes.

16    Q.  And so after the academy what would they have done?

17    A.  Then they went on to field training portion.

18    Q.  And so is this the graduation then after the academy

19    that you talked about where you get, actually get sworn in

20    and the badge and the gun and all that?

21    A.  Yes, it is.

22    Q.  Now I know we've talked about field training in that

23    program.  I'm not going to go over that again, so I'll move

24    on.

25               All right.  Are you aware of an incident that
```

```
 1     occurred on May 25th, 2020, involving the death of a

 2     Mr. George Floyd while in police custody?

 3     A.  I am.

 4     Q.  And have you watched video of that incident?

 5     A.  I have.

 6     Q.  Generally, what video have you watched?

 7     A.  I have watched the YouTube videos and the body-worn

 8     camera videos.

 9     Q.  And did you recognize the officers on scene?

10     A.  I did.

11     Q.  And who were they?

12     A.  Officer Chauvin, Officer Kueng, Officer Lane and Officer

13     Thao.

14     Q.  And so based on MPD policy, who was in charge of that

15     scene?

16     A.  Would have been the first squad that arrived, which was

17     Officer Lane and Kueng, and by seniority it would have been

18     Officer Lane.

19     Q.  Have you formed any opinions as to whether former

20     Officers Chauvin, Thao, Kueng and Lane acted consistently or

21     inconsistently with MPD policy and training during the

22     events of May 25th, 2020?

23     A.  Yes.

24     Q.  And what is that opinion?

25               MR. GRAY:  Object to that as lack of foundation.
```

1  It's combines all four of these officers.

2          THE COURT:  Sustained as to the latter portion.

3  BY MS. BELL:

4  Q.  Well, let's walk through first the use of force policy.

5          Do you have an opinion about whether the actions

6  of Officers Chauvin, Kueng and Lane were consistent or

7  inconsistent with the use of force policy in particular?

8          MR. GRAY:  Same objection.

9          THE COURT:  Sustained.

10          MS. BELL:  Okay.

11  BY MS. BELL:

12  Q.  Do you have an opinion with about whether the actions of

13  Officer Chauvin was consistent or inconsistent with the use

14  of force policy?

15          MR. ROBERT PAULE:  Objection.  Relevance.

16          THE COURT:  Overruled.

17  BY MS. BELL:

18  Q.  You can answer.  Do you have an opinion about whether

19  the actions of Officer Chauvin were consistent or

20  inconsistent with the use of force policy in particular?

21  A.  Yes, they're inconsistent.

22  Q.  Do you have an opinion about whether the actions of

23  Officer Kueng were consistent or inconsistent with the use

24  of force policy?

25  A.  Inconsistent.

1   Q.  And do you have an opinion about whether the actions of

2   Officer Lane were consistent or inconsistent with the use of

3   force policy?

4   A.  Inconsistent.

5   Q.  Now, in reaching those conclusions, did you consider the

6   perspective of each individual officer and not all the

7   officers collectively?

8   A.  I did.

9   Q.  All right.  Before I get into the policy and the

10  information about how you reached your opinion --

11          THE COURT:  Counsel, I'm sorry.  I did not hear

12  the latter portion of that statement.

13          MS. BELL:  I'm sorry, Your Honor.  Before I get

14  into the explanation of her opinion, I wanted to ask her one

15  additional introductory topic.

16          THE COURT:  Okay.  Proceed.

17  BY MS. BELL:

18  Q.  All right.  I'd like to show you what's been marked for

19  identification purposes only as a demonstrative Government

20  Exhibit 17B, which is a still image from the Darnella

21  Frazier video, which is Government Exhibit 17.

22          And I want to ask you is -- first of all, what do

23  you see in the picture?

24  A.  It's Officer Chauvin on the neck of George Floyd.

25  Q.  And how is it that he's on the neck of George Floyd?

```
 1    A.  With his knee.

 2    Q.  Is this action, what you observed Officer Chauvin doing,

 3    is that a trained technique?

 4    A.  No, it's not.

 5    Q.  Has it ever been?

 6    A.  No.

 7    Q.  Now, the -- we've heard you testify that the neck

 8    restraint policy does say leg; is that right?

 9    A.  Yes.

10    Q.  That you can use your leg?

11    A.  Yes.

12    Q.  Is this what a leg use of the neck restraint would be?

13              MR. PLUNKETT:  I object to this, Your Honor, on

14    relevance grounds.  Neither Kueng or Lane could see this

15    angle at any time.

16              MR. GRAY:  I join in that objection, Your Honor,

17    on behalf of Officer Lane.

18              THE COURT:  Counsel, you're going to have a

19    sidebar here.

20         (At sidebar)

21              THE COURT:  First of all, I, my exhibit list I do

22    not show Exhibit 17B.  So I don't know that there's 17B

23    that's in evidence or not.

24              MS. BELL:  Your Honor, the court ruled that we

25    could use still pictures from the main exhibit, which is 17,
```

1    as demonstrative exhibits, and that's what I am doing.  So

2    this is a still picture from Exhibit 17 for demonstrative

3    purposes marked for identification as Exhibit 17B.

4              THE COURT:  Okay.  I lost the demonstrative

5    purpose in that segment.

6              MS. BELL:  That's okay.

7              THE COURT:  The second part is, counsel, whether

8    it's, what it is, but I'm having difficulty hearing you, and

9    I really did not hear the question that was asked.

10             MS. BELL:  I apologize, Your Honor.  I'm not --

11   usually I'm too loud.  I will endeavor to be louder.

12             The question was whether or not, I think I was

13   asking whether or not this was a trained technique.

14             THE COURT:  Okay.  Now, the objection?

15             MR. GRAY:  Your Honor --

16             Do you want to go first?

17             MR. PLUNKETT:  Go ahead.

18             MR. GRAY:  Your Honor, I object because there's

19   not been any evidence in this case, as you can see from this

20   photo, there's been no evidence in this case that my client

21   saw the position of Mr. Chauvin's knee on Floyd's neck at

22   that viewing.

23             As you can see in the viewing, it's a dark viewing

24   in the first place, and if the court -- my client was back

25   by feet.  How he could have seen this, there's no way he

```
 1    could have seen it.  In fact, the witnesses that did see

 2    this, the photo filmmakers, said that they didn't even see

 3    my client when they were doing this.  They didn't see Kueng,

 4    either.

 5              THE COURT:  Okay.  I've got that objection.

 6              The other objection?

 7              MR. GRAY:  Was Plunkett.

 8              MR. PLUNKETT:  Thank you, Your Honor.  That was my

 9    objection that Earl adopted, and my objection was relevance.

10    Neither Kueng nor Lane were ever able to see this angle,

11    something to that effect.

12              MS. BELL:  Your Honor, Officer Thao was able to

13    see this angle, and that's not the question or what I'm even

14    representing with this witness.  I'm merely asking her if

15    this is a trained technique so that we can understand what

16    the trained neck restraints are and what the not the trained

17    neck restraints are.

18              I understand it's Mr. Gray and Mr. Plunkett's

19    argument that their clients didn't see this neck restraint,

20    but the government's argument will be that looking at the

21    body cameras and looking at all of the cameras that show

22    them turning their heads and what they saw that in fact they

23    did see these restraints.

24              And so that's for argument, Your Honor.  What this

25    purpose --
```

```
1            THE COURT:  Counsel, that is argument, but that
2    does not necessarily mean that there's a foundation laid for
3    it.  In the meantime, though, I think this particular
4    question I'm going to overrule the objection.  For
5    demonstrative purposes only 17B will be used.
6            Proceed.
7            MS. BELL:  Thank you, Your Honor.
8            MR. GRAY:  Excuse me, Your Honor.  Could it also
9    be pointed out that it's, apparently according to her, it's
10   only against Officer Thao, so --
11           MS. BELL:  This isn't -- I'm not purporting this
12   to be against any defendant.  I am simply asking the witness
13   if this is a trained technique or not.
14           THE COURT:  We'll leave it at that.
15        (In open court)
16           THE COURT:  17B as a demonstrative exhibit will be
17   used, and again, members of the jury, I remind you that this
18   is only a demonstrative exhibit, and the actual Exhibit 17
19   is the one that is the exhibit in the case.
20           And this question, maybe it's easiest if you could
21   just simply repeat the question for the witness and the
22   court.
23   BY MS. BELL:
24   Q.  My question with respect to this was whether or not what
25   we see in Demonstrative Exhibit 17B is a trained technique.
```

1    A.  No, it's not.

2    Q.  And what would be -- I know we've talked about this.

3    What would be the training and policy of what you do if you

4    apply an unconscious neck restraint.  What would you do

5    after the policy and training?

6    A.  Roll them to the side recovery position.

7    Q.  And why is that?

8    A.  Make sure that they can breathe adequately.

9    Q.  All right.  So I want to talk about the use of force

10   policy and your opinion about the consistency or

11   inconsistency about the actions with respect to use of force

12   policy.  I am now going to -- well let me ask you this

13   first:

14          When we're talking about use of force, we're

15   talking about that proportional force that you talked about

16   several times?

17   A.  Yes.

18   Q.  Okay.  All right.  I am going to pull up Government

19   Exhibit 5, which is the body-worn camera that's been

20   admitted into evidence from Officer Lane.  And what I'd like

21   to do, I know that you've seen this, but what I'd like to do

22   is play a few small portions of it?

23          And specifically I'm going to start at the point

24   where the officers are taking Mr. Floyd out of the squad

25   car.  Okay?

1    A.  Okay.

2    Q.  And just give me a minute to get this in the right

3    place.

4              And for the record, Your Honor -- I'm sorry.  I

5    meant to put that on.  I'm starting Exhibit 5 at 20:18, and

6    I think I started it at 46 seconds.

7    (Video recording played)

8    Q.  And I have stopped Government Exhibit 5 at 20:19 and

9    41 seconds.

10              Can you please describe, from what you just

11   observed, Mr. Floyd's level of resistance during the segment

12   that was just played?

13   A.  So coming out of the squad, you kind of bounce between

14   active resistance and a portion of active aggression.  He

15   was showing aggression by kicking.  Then he came back down.

16   As soon as they got him down on the ground out on the floor

17   here, now he's starting to get into the active resistance

18   and starting to just not do anything, so --

19   Q.  Okay.  I want to play just a little bit more, so we're

20   going to start at 20:19:41 and then proceed -- let me ask

21   you this:  You just said you saw some active resistance and

22   active aggression.

23   A.  Yes.

24   Q.  So what would be options or tools that are authorized by

25   that force continuum that proportional force?

1   A.  So when he's kicking, you can use your taser.  You can

2   use chemical aerosols.  You can use the neck restraint, and

3   then when he's going down and to just actively resisting,

4   now you can start to use just distraction techniques, which

5   is an open hand slap, a kick.  You can use takedown.

6           He already went down to the ground, so now he's

7   going to that lower level.

8   Q.  All right.  So now I'm going to play from 20:19:41, and

9   I plan to stop at 20:20:29.

10      (Video recording played)

11  Q.  All right.  During the second portion that I just showed

12  you, so for a minute, 20:19:41 to 20:20:29, did there come a

13  time where the actions of Officer Chauvin were inconsistent

14  with the MPD policy and training regarding use of force?

15  A.  Just maybe becomes, Mr. Floyd becomes passive resistant,

16  and the way he's holding his hand is kind of a pain

17  technique that we can use for compliance.

18  Q.  And so my question --

19           MR. GRAY:  Your Honor, can we have a clarification

20  as to who is holding whose hand and not just he's holding

21  his hand, for the record?  This is a separate trial from my

22  client.

23           MS. BELL:  Sure.

24           THE COURT:  Would you lay that foundation?

25           MS. BELL:  Sure.

1   BY MS. BELL:

2   Q.  Can you describe what you saw in the video with regard

3   to the hand holding?

4   A.  Yeah.  So Officer Chauvin was holding his hand in a

5   position that's used for pain compliance, and then he also

6   has his knee on his neck.

7   Q.  And so you said that, I think as I understood it, you

8   said that Mr. Floyd's level of resistance went down.  Is

9   that what you said?

10   A.  Correct.

11   Q.  How would you describe his level of resistance in that

12   second segment that I played?

13   A.  So now he's starting to come down to that passive

14   resistance, where he's not fighting but he's not quite

15   complying.  He's just kind of moving around.

16   Q.  And as we've seen, is a neck restraint appropriate if

17   there's passive resistance?

18   A.  No, it's not.

19   Q.  What, according to MPD policy and training, would be the

20   appropriate thing to do if someone is handcuffed and no

21   longer resisting at all?

22   A.  Roll them on their side recovery.  Roll them on their

23   side for the side recovery position.

24   Q.  And in your review of the video, did there come a time

25   when you observed Mr. Floyd cease resisting.

Bowrer - Jackson - Redirect

1    A.  He is starting to right now.

2    Q.  And so you said he's starting to right now.  Did he

3    eventually cease resisting?

4    A.  Yes.

5    Q.  About how long, do you remember how long after kind of

6    right where we are here?

7              MR. GRAY:  Object to that as leading, Your Honor.

8              THE COURT:  Well, she just simply asked if she

9    remembered how long.

10             THE WITNESS:  I don't remember the exact time.

11   Relatively quickly.

12   BY MS. BELL:

13   Q.  Okay.  And what did you observe Officer Chauvin doing

14   that was consistent or inconsistent?  You talked about the

15   pain technique.

16             I want to come back to that.  What's a pain

17   technique?

18   A.  It's a, it's a control technique that we use.  Usually

19   when someone's standing up or even in the prone position,

20   we're trying to get them handcuffed.  If they're not

21   complying, it's just a pressure point or a pressure

22   technique.  We can, if you took your hand and did this

23   (indicating), it is just a little bit of pressure.

24             It produces a little pain while you are giving

25   them commands to do what you need them to do, so it causes

Direct - Cross-Redirect Examination

1    pain.

2    Q.  And so you while you're doing that, you're supposed to

3    be giving them commands.  Why is that?

4    A.  You should be telling them to put their hands behind

5    their back so you can get them cuffed or what you want them

6    to do.

7    Q.  And so if someone is already handcuffed, would you be

8    using that pain compliance technique?

9    A.  You can if they're being combative.

10   Q.  If they've stopped resisting, would that be appropriate

11   to continue to use a pain compliance technique?

12   A.  No.  That's what you are trying to gain is compliance,

13   so that's when you would stop that.

14   Q.  So you said you observed Officer Chauvin using that pain

15   compliance technique and then also holding the knee on the

16   neck; is that right?

17   A.  Yes.

18   Q.  Separate from whether it's a trained technique or not,

19   was using the knee on the neck appropriate or consistent or

20   inconsistent with MPD policy, I guess is the question, as we

21   got to the end of the second segment of that video?

22   A.  It was inconsistent with training.

23   Q.  And why is that?

24   A.  We don't train that putting the knee on the neck.

25   Q.  Separate from, you know, the fact that the knee on the

1   neck itself is not trained, is the restraint generally by

2   Officer Chauvin consistent or inconsistent with MPD policy

3   and training?

4   A.  It's inconsistent with both.

5   Q.  And why is that?

6   A.  Once they -- sometimes when you're doing, when you're

7   bringing, you're performing force on somebody, you can get

8   in the wrong position, and they're trained to immediately

9   remove themselves from that position.  And then as they move

10   on, their force has to be appropriate and proportionate with

11   what the subject's doing.

12          And so in this case, George Floyd is starting to

13   become passive resistance, which is the low, lower level, so

14   you need to bring it down lower level.

15   Q.  What would be the lower level when you say bring it

16   down?  What do you mean?

17   A.  So lower level would just be basically you are going to

18   control the head, no neck restraint, anything, that lowest

19   level.

20          MR. ROBERT PAULE:  Objection.  Violation of

21   pretrial order.

22          THE COURT:  We have to use this (indicating).

23      **(At sidebar)**

24          THE COURT:  Counsel, I have too many pretrial

25   orders for me to remember just exactly what I have got out

 1    there.  So you are going to have to --

 2          MR. ROBERT PAULE:  Yes, Your Honor.  I was

 3    referring to the order that you filed on January 11th of

 4    2022, page 3 of 10.  It referred to Defendant Kueng's motion

 5    to prevent speculative testimony, and the court's order was

 6    speculation regarding what another officer might have done

 7    when confronted with the situation as improper.

 8          Even though they're not using the term "another

 9    officer," this is exactly what they're doing.  It's in clear

10    violation of the court's order.

11          I would also note on a side note, I am trying to

12    keep my voice down.  I noticed that the jurors were looking

13    at Ms. Bell during the last sidebar, and I would just

14    caution -- I know she's not doing anything improper.  I'm

15    not alleging it, but just to keep her voice down.

16          Thank you.

17          THE COURT:  Okay.  I'm going to overrule the

18    objection.  I am not -- this witness I don't think is

19    speculating, but rather is talking about the training of the

20    officers as to the particular condition that is being used.

21          So proceed, Ms. Bell.

22          And, oh, by the way, I think there is a problem

23    with jurors being able to overhear this over this noise.

24          Sorry.  I was just saying I think there is a

25    problem with jurors being able to overhear this noise.  The

Direct Examination - Redirect Examined

```
 1    reality is, I don't think we have any other way to deal with

 2    it, so we are just going to have to do the best we can.

 3              Thank you.

 4         (In open court)

 5              THE COURT:  The witness may answer.

 6              MS. BELL:  Ms. Rogge, I don't remember the

 7    question.  Is there any way you can read it back?

 8              COURT REPORTER:  There was a question and an

 9    answer.  Do you want me to read the question and the answer?

10              "Question:  What would be the lower level when you

11    say bring it down?  What do you mean?

12              "Answer:  So lower level would just be basically

13    you are going to control the head, no neck restraint,

14    anything, that lowest level."

15              THE COURT:  Proceed.

16              MS. BELL:  Thank you.

17    BY MS. BELL:

18    Q.  All right.  So at the point that Mr. Floyd was no longer

19    resisting, what would be the appropriate level of force

20    with -- per MPD policy and training?

21    A.  There wouldn't be if he stopped resisting.

22    Q.  What do you mean?

23    A.  So if he stopped resisting, that's when we train and per

24    policy to start medical or side recovery position and check

25    for medical observation.
```

```
 1              MS. BELL:  Your Honor, I'm going to switch topics

 2     just a little bit.  Do you want to break for lunch now or

 3     not sure?

 4              THE COURT:  Yeah, we can.

 5              MS. BELL:  Okay.

 6              THE COURT:  That's fine.

 7              Members of the jury, we're going to take a break

 8     at this time for lunch.  I would caution you again not to

 9     discuss the case during the course of the recess.

10              And we are in recess for our lunch break.  The

11     jury may be excused.

12     (12:24 p.m.)

13                          IN OPEN COURT

14                       (JURY NOT PRESENT)

15              THE COURT:  Ms. Bell, I stayed on.  Do you have

16     any idea how much longer you have with this witness?

17              MS. BELL:  I have -- I have probably a little more

18     video to play.  So half hour --

19              THE COURT:  Okay.

20              MS. BELL:  -- or so, 40 minutes maybe.

21              THE COURT:  Okay.  I also raise another question

22     with you.  There's going to come a time when video playing

23     is just becoming simply too repetitious and it ends up

24     becoming prejudicial, and when your witnesses know full well

25     what's on the video, I'm going to caution you that you need
```

1    to be careful about how much video you play.

2              MS. BELL:  Your Honor, I have actually been

3    specifically keeping track of how much video that has been

4    played, and I can tell the court that we have played

5    Exhibit 5 in its full all of one time, and we have played

6    snippets of it I believe one other time.  And so it's

7    important --

8              THE COURT:  You can keep on keeping track of it.

9              MS. BELL:  I will.

10             THE COURT:  But I'm just cautioning, and I'm not

11   saying that I'm at that sustaining point.

12             MS. BELL:  I understand.

13             THE COURT:  I'm just saying that we can get to

14   that sustaining point.  You have to be conscious that --

15             Mr. Gray?

16             MR. GRAY:  Your Honor, for the record, she hasn't

17   played the entire Exhibit 5 video.  Part of it was cut off,

18   and in addition to that, the video was played without a

19   transcript.  So it's -- if she doesn't, because if it isn't

20   played by the government, we surely intend to play it.

21             THE COURT:  Okay.  Very well.  You can try your

22   lawsuit, too, when the time comes.

23             Okay.  We're in recess.

24   (Recess taken at 12:26 p.m.)

25                              *  *  *  *  *

Direct - Cross - Redirect - Recross

```
 1      (1:59 p.m.)

 2                           IN OPEN COURT

 3                          (JURY PRESENT)

 4              THE COURT:  Proceed, please.

 5              MS. BELL:  Thank you.

 6      BY MS. BELL:

 7      Q.  Before we left off for lunch, I realized I did have a

 8      couple more things on the same topic related to Officer

 9      Chauvin.

10              You mentioned head control.  What did you mean by

11      "head control"?

12      A.  So in training we teach officers, when you control the

13      head you can control the body, so maintaining holding their

14      head if they need to so they don't injure themselves by

15      banging it on the ground.  Generally when you control them,

16      and the other officers work together to grab limbs, whether

17      it's legs or arms, to effectively get them into handcuffs.

18      Q.  I see.  And so that's a process you would use to get

19      someone into handcuffs?

20      A.  Correct.

21      Q.  And how would you, what is head control?  What does that

22      physically look like?

23      A.  It's just an officer holding someone's head in place

24      while the other officers work on getting them handcuffed.

25      Q.  How do they hold it I guess is what I'm asking, actually
```

```
 1   mechanics.

 2   A.  They take their hands on each side of the head and just

 3   hold their head in place.

 4   Q.  Okay.  I thought something more complicated.

 5   A.  No.

 6   Q.  Okay.  All right.  And then I asked you about whether or

 7   not that Exhibit 17B, that view of Officer Chauvin that I

 8   showed you, do you remember that?

 9   A.  Yes.

10   Q.  I asked you if that was a train technique, and you said

11   no; is that right?

12   A.  Correct.

13   Q.  Can you explain why that is not a neck restraint under

14   the policy?

15   A.  Because the policy says you can use hands or legs, but

16   it also says do what you are trained, and we train using the

17   arms.

18   Q.  Okay.  Aside from that it's using not the arms, is there

19   anything else about that technique that isn't a neck

20   restraint under the definition of that, that you talked

21   about that artery compression?

22   A.  With the blood flow?

23   Q.  Yes.

24   A.  So, yes, it's using one or both sides of the neck, but

25   it's also, you can only use it when someone's actively
```

1    resisting.

2    Q.  And how -- I'm not sure if you said this or not.  How

3    quickly would you expect someone to come to or what would

4    you hope they come to in terms of consciousness if you used

5    an unconscious neck restraint?

6    A.  Within seconds.

7    Q.  And so if that doesn't happen, what do you do?

8    A.  That's when you do their Gerber slap on the lower back,

9    and if that doesn't work, you need to check their, the

10   airway, see if they have airway, if they're breathing, if

11   they have a pulse.  If they do not, that's when you would

12   start CPR.

13   Q.  Okay.  I want to turn back to the videos now.  One of

14   the things that you talked about was a scenario that

15   involved multiple officers having to go to a scene and work

16   with different subjects.

17          Do you remember talking about that?

18   A.  Yes.

19   Q.  How, if at all, does that scenario relate to what you

20   saw in the video here?

21   A.  So in the scenario when we train officers, we're

22   training them to do pairs or more because generally when you

23   are working together sometimes if, you know, in the past,

24   especially, officers wouldn't communicate with one another,

25   and you would use more force than necessary.

Cross-Examination - Redirect Examination

```
1        So those scenarios are meant for somebody to take

2   charge or at least communicate with one another who has one

3   arm, one leg or is controlling the head.  Once they get

4   handcuffs on, they are communicating with one another that

5   they're handcuffed and they are continuing to give --

6   they're communicating with one another.

7        Okay.  Now on side recovery or upright so that

8   they don't use excessive or an inappropriate amount of

9   force.

10  Q.  And so in connection with what you observed on the video

11  with respect to this idea of communication, would what you

12  observed be consistent or inconsistent where MPD policy and

13  training?

14  A.  Inconsistent.

15  Q.  In what way?

16  A.  They're not really communicating with one another what

17  we're doing next.  So the next thing that they're trained to

18  do is when the person becomes compliant is, we roll that

19  side recovery or upright.

20       And also when George Floyd goes unconscious,

21  they're supposed to render medical first aid.

22  Q.  Okay.  All right.  So I'm want to talk specifically.  We

23  talked about Officer Chauvin.

24       MR. ROBERT PAULE:  Excuse me.  I didn't mean to

25  interrupt you.
```

```
 1              I would object and ask that the last portion of

 2      the answer be stricken as nonresponsive and not relevant to

 3      the exhibit in question.

 4              THE COURT:  Counsel, I try to be careful, but I

 5      was inattentive.  You are going to have to give me a minute.

 6              I'll overrule the answer.  The answer will stand.

 7      BY MS. BELL:

 8      Q.  All right.  All right.  So I want to go back to the

 9      videos and ask you, What did you observe Officer Kueng doing

10      in the video once -- and I'm talking about the period of

11      time once the officers pulled George Floyd out of the squad

12      car?

13      A.  Looks like he was in the middle portion of George Floyd

14      and placed his knee on the back, lower back.

15      Q.  And what does MPD policy and training instruct are the

16      risks of kneeling on a handcuffed person laying on the

17      ground?

18      A.  Positional asphyxia.

19      Q.  And were Officer Kueng's actions putting his knees on

20      Mr. Floyd's -- I'm not sure what you called that.  I forgot.

21      A.  The lower back.

22      Q.  -- lower back area, was that consistent or inconsistent

23      with the MPD policy and training on use of force once

24      Mr. Floyd stopped resisting?

25      A.  It's inconsistent.
```

```
1    Q.  Why?

2    A.  So he would be allowed to put his knee on the back of

3    the neck or, excuse me, back of the lower back.  That's not

4    unauthorized.  At some point when George Floyd stops

5    resisting is when he needs to move because the dangers of

6    positional asphyxia and start with the side recovery

7    position.

8    Q.  What did you observe Officer Lane doing in the video,

9    and again I'm talking about once they're kind of out of that

10   squad car?

11              MR. GRAY:  What point?

12              MS. BELL:  They are out of the squad car.

13              MR. GRAY:  Thank you.

14              THE WITNESS:  He was restraining his legs.

15   BY MS. BELL:

16   Q.  And is that something that can be appropriate?

17   A.  Yes.

18   Q.  Once Mr. Floyd stopped resisting, was the Defendant

19   Lane's holding his hands on Mr. Floyd's legs consist or

20   inconsistent with MPD policy and training?

21              MR. GRAY:  Judge, I object to that because the

22   evidence doesn't support what she just said.

23              THE COURT:  Sustained.  Sustained.  Sustained.

24   BY MS. BELL:

25   Q.  Would -- what does MPD policy and training instruct on
```

1    the risks of keeping a handcuffed person in the prone

2    position?

3    A.  The dangers of positional asphyxia, difficulty

4    breathing.

5    Q.  Now, did you hear in your review of the video Officer

6    Lane ask, Should we roll him on his side?

7    A.  I did.

8    Q.  And would rolling George Floyd on his side been

9    something that would have been consistent with MPD policy

10   and training?

11   A.  Yes.

12   Q.  Did you see anyone roll George Floyd on his side?

13   A.  No.

14   Q.  Did there come a time in your review of the video that

15   you observed that Mr. Floyd stopped speaking?

16   A.  Yes.

17   Q.  What significance, if any, did you give Mr. Floyd's

18   ceasing to speak in fashioning your opinion about whether

19   the continued restraint of Mr. Floyd was consistent or

20   inconsistent with MPD policy and training?

21   A.  I'm going to try to answer.  I was that confused about

22   your question a little bit.

23   Q.  Okay.  Let me break it down.

24         So at some point did you see Mr. Floyd stop

25   speaking in the video?

1   A.  I did.

2   Q.  Okay.  And so was that significant to you in forming

3   your opinion about whether or not the officers were

4   consistent or inconsistent with policy the fact that George

5   Floyd stopped speaking?

6   A.  It's a concern that he stopped speaking, yes.

7   Q.  Why is that a concern?

8   A.  What does, you know, if he was developing problems

9   breathing through the positional asphyxia.

10  Q.  So it would be an indicator, I guess is what you are

11  saying, or a red flag?

12  A.  Yes.

13  Q.  Okay.  Did there come a time in the video that you

14  reviewed that Mr. Floyd appeared to go unconscious?

15  A.  I did.

16  Q.  And again same question:  What significance, if any, did

17  you give to the fact that Mr. Floyd became unconscious when

18  you were determining whether or not the officers acted

19  consistent or inconsistent with policy?

20  A.  So it's at that point it's inconsistent with training

21  and policy because now you have an unconscious person and

22  now you must perform medical first aid or side recovery

23  position and monitor and reassess on the scene.

24  Q.  And so if someone is unconscious, let me ask you this:

25  When Mr. Floyd was unconscious, was he resisting at all?

1    A.  No.

2    Q.  Would, understand MPD policy and training, would any

3    restraint be appropriate then if Mr. Floyd was unconscious

4    and unresisting?

5    A.  No.

6    Q.  Did there come a point in time in your review of the

7    video that you heard officers, particularly Chauvin, Lane

8    and Kueng, discuss that Mr. Floyd did not have a pulse?

9    A.  Yes.

10   Q.  And did that have significance to you in forming your

11   opinion about whether this was consistent or inconsistent

12   with policy and training?

13   A.  Yes.  It was inconsistent with training and policy.  Now

14   they must perform medical first aid.

15   Q.  And what about the continued use of force?  Did you see

16   that in the video even after Mr. Floyd had no pulse?

17   A.  Yes.

18   Q.  And would --

19        MR. GRAY:  Your Honor, I object to that question

20   as vague.  Who was continuing the use of force if she

21   actually saw it, a vague question.

22        THE COURT:  I'm going to overrule.  I think it's

23   clear enough.

24        THE WITNESS:  Sorry.

25

```
 1    BY MS. BELL:

 2    Q.  My question is, If officers continued to use force after

 3    Mr. Floyd was unconscious, would that be consistent or

 4    inconsistent with MPD policy and training?

 5    A.  Inconsistent.

 6    Q.  Why?

 7    A.  Because they're --

 8                THE COURT:  Counsel, I think we should clarify

 9    which officer.

10                MS. BELL:  I'm asking if any officer under policy

11    and training --

12                THE COURT:  I asked which officer.

13                MS. BELL:  Oh, okay.  So let's start with Officer

14    Chauvin.

15    BY MS. BELL:

16    Q.  Did you observe him using force after Mr. Floyd was

17    unconscious?

18    A.  Yes.

19    Q.  And under MPD policy and training, would continuing to

20    use force after someone is unconscious be consistent or

21    inconsistent with that policy and training?

22    A.  Inconsistent.

23    Q.  And with respect to Officer Kueng, did you observe him

24    continue to use force after Mr. Floyd was unconscious?

25    A.  Yes.
```

1    Q.  And same question:  After Mr. Floyd was unconscious,

2    would that continued use of force be consistent or

3    inconsistent with MPD policy and training?

4    A.  Inconsistent.

5    Q.  And did you observe in the video that Officer Lane at

6    some point in the video stopped holding onto Mr. Floyd's

7    legs?

8    A.  Yes.

9    Q.  All right.  I want to talk about another part of that

10   broad use of force policy, but specifically the duty to

11   intervene policy.

12           Can you remind us again what the MPD policy and

13   training requires if an officer observes another officer use

14   force that is inappropriate or no longer necessary?

15   A.  So officers are obligated to intervene when they see an

16   inappropriate level of force being used.

17   Q.  And what does it mean to intervene?

18   A.  Through physical or verbal ways, so physically getting,

19   moving the person, moving the cop or just basically

20   intervening in some way to stop that inappropriate level of

21   force.

22   Q.  And so are officers required to continue intervention

23   until that force is stopped?

24   A.  Yes.

25   Q.  Have you formed an opinion on whether the actions of

1    Officer Thao were consistent or inconsistent with respect to

2    that MPD policy and training for the duty to intervene?

3    A.  It's inconsistent.

4    Q.  And what about with respect to Officer Kueng?  Have you

5    formed an opinion about whether his actions were consistent

6    or inconsistent with duty to intervene?

7    A.  It's inconsistent.

8    Q.  And what about Officer Lane?  Have you formed an opinion

9    as to whether his actions were consistent or inconsistent

10   with the duty to intervene?

11            MR. GRAY:  Your Honor, I object to that as, what

12   actions?  Don't you have to be more specific than that?

13            THE COURT:  I'm going to overrule.

14            You may answer.

15            THE WITNESS:  It's inconsistent.

16   BY MS. BELL:

17   Q.  Okay.  What did you observe?  What, if anything, did you

18   observe Officer Thao do to comply with the MPD policy and

19   training on duty to intervene as you reviewed the video or

20   videos?

21   A.  I didn't see any part of duty to intervene on the video.

22   Q.  Did you see anything in the video that you watched that

23   would have prevented Officer Thao from complying with the

24   MPD policy and training on duty to intervene?

25   A.  I did not.

```
1    Q.  Did you observe people gathering on the sidewalk nearby

2    during some point in the incident?

3    A.  I did.

4    Q.  Couldn't there be circumstances where the actions of a

5    crowd could impede an officer's ability to intervene?

6    A.  So any crowd is dangerous or has the potential to be

7    dangerous, but gauging on the crowd, when officers are

8    telling you to get back and they're complying, they're

9    staying on the sidewalk and they're following your orders,

10   at that point they weren't the immediate threat.

11          So even when you think of the critical

12   decision-making model, what was your immediate threat, there

13   wasn't an immediate threat at hand.

14   Q.  Okay.  So based on your training and experience --

15          Well, let me ask you this:  So with respect to

16   this incident, the bystanders that were on the sidewalk, did

17   you observe anything that would have prevented Defendant

18   Thao from complying with the policy and training on duty to

19   intervene?

20   A.  I did not.

21   Q.  I'd like to show you Government Exhibit 27.  I'll get it

22   set up here and get us all oriented.  All right.

23          For the record, Your Honor, Exhibit 27 is the, one

24   of the side-by-side videos.  It is the Milestone camera and

25   Officer Thao's body-worn camera.
```

 1          And I'm going to start playing at 20:19:13.  And,

 2     Inspector Blackwell, I'd like you to just watch until I

 3     pause it.  Particularly, please pay attention to Officer

 4     Thao's activities with the crowd.

 5        (Video recording played)

 6     Q.  All right.  I paused the video at 20:23:00, so 8:23 p.m.

 7     In the last I played just short of four minutes of the

 8     video.

 9          What, if any, significant interactions did you see

10     Officer Thao have with any of the folks walking by up to

11     this point?

12     A.  There appears to be none.

13     Q.  And can you generally -- what, if anything, did you see

14     about Officer Thao's position with respect to the other

15     three officers and Mr. Floyd?

16     A.  He's looking right at them.

17     Q.  And in your review of the video, did you observe Officer

18     Thao eventually start to have interaction with the

19     bystanders?

20     A.  Yes.

21     Q.  And would the interaction that he had with the

22     bystanders based on MPD policy and training have interfered

23     with his ability to intervene?

24          THE COURT:  Counsel, I am sorry.  I just did not

25     hear that question.

```
 1                   MS. BELL:  I'm sorry.

 2      BY MS. BELL:

 3      Q.  Would Officer Thao, did you see anything about Officer

 4      Thao's, when he did start to have intersections with the

 5      bystanders, did you see anything about that that would have

 6      prevented him from following the MPD policy with respect to

 7      the duty to intervene?

 8                   MR. ROBERT PAULE:  Your Honor, I would object that

 9      that calls for speculation.

10                   THE COURT:  It does and I sustain.

11      BY MS. BELL:

12      Q.  What are the options available to an officer who feels

13      that people observing pose a threat?

14      A.  They can start to communicate to the crowd to get back.

15      They can call for other officers to the scene.  They can

16      start working on George Floyd, getting him on the side

17      recovery.  If he starts being combative again, they can put

18      him back down and use a maximum restraint technique.

19      Q.  You said they could call other officers to the scene, is

20      that often called calling for backup?

21      A.  Yes.

22      Q.  In your review of the video, did you hear anybody call

23      for backup?

24      A.  I did not.

25      Q.  Could officers also ask for help for their -- from their
```

1    fellow officers on scene if they were concerned about the

2    crowd?

3    A.  Yes.

4                MR. ROBERT PAULE:  Your Honor, objection.  That

5    violates the pretrial ruling.

6                THE COURT:  Sustained.  It's speculative.

7    BY MS. BELL:

8    Q.  Based on MPD policy and training, what are the -- is it

9    an option under policy and training, specifically, to ask

10   other officers to assist you who might be on the scene?

11               MR. PLUNKETT:  Objection.  Leading.

12               THE COURT:  You are.  Sustained.

13   BY MS. BELL:

14   Q.  Under MPD policy and training, what are the options

15   available to an officer who feels that they need assistance

16   in dealing with bystanders or other issues?

17   A.  Just like in scenarios, they have the option to start

18   communicating with one another to help each other out,

19   especially when there's more than one or two officers on

20   scene.

21   Q.  All right.  With respect to Officer Kueng, in your

22   review of any of the videos that you saw, did you observe

23   Officer Kueng take any steps to comply with the MPD policy

24   on the -- and training on the duty to intervene?

25   A.  I did not.

EXCERPT - Screen Reader Names

1    MR. PLUNKETT:  Your Honor, once again these

2    questions are leading, and I want a standing objection to

3    this pattern.

4    THE COURT:  That is a leading question, but I'm

5    going to overrule because you are introducing a new subject,

6    moving from one officer to the other.

7    BY MS. BELL:

8    Q.  What, if anything, did you observe in the video that you

9    watched that would have prevented or could have prevented

10   Mr. Kueng from complying with the MPD policy and training on

11   the duty to intervene?

12   A.  Nothing.

13   Q.  And I think I had asked you this, that you had heard

14   Officer Lane's questions about rolling Mr. Floyd onto his

15   side.

16   Would those type of questions under MPD policy and

17   training satisfy an officer's duty to intervene?

18   A.  No, it wouldn't.

19   Q.  Why not?

20   A.  It wouldn't be because we teach that you have the

21   obligation for duty to intervene, so you must, just like in

22   the academy when we train, as well as in-service, to go to

23   those defensive tactics type scenarios to communicate with

24   one another.

25   So in other words you must perform the action and

 1    not just simply ask questions.  You have to --

 2              MR. GRAY:  Your Honor, I object to the --

 3              THE COURT:  I sustain.

 4              MR. GRAY:  Move it be stricken about the scenario

 5    part.

 6              THE COURT:  I sustain.  That just is not

 7    appropriate, and I sustain the objection.

 8    BY MS. BELL:

 9    Q.  And then last, what types of force, restraints, the

10    whole list of force, has to be reported to a supervisor?  I

11    think we heard a tiny bit about it, but what are the types

12    of force that has to be reported?

13    A.  So anytime it involves pain or, excuse me, not pain,

14    injury, alleged or real, you must notify a supervisor.

15    Anytime the maximal restraint technique is used, anytime

16    neck restraint is used, those types of situations would

17    require a supervisor to come to the scene to do a use of

18    force report.

19              MS. BELL:  Can I have one moment, Your Honor?

20              THE COURT:  Yes.

21              MS. BELL:  I have no further questions, Your

22    Honor.

23              THE COURT:  Thank you.

24              Mr. Plunkett.

25              MR. PLUNKETT:  Thank you, Your Honor.  I

```
 1    apologize.  I'm just going to take a moment to get this
 2    thing set up.
 3                THE COURT:  Sure.
 4                MR. PLUNKETT:  Thank you, Your Honor.
 5                      CROSS-EXAMINATION
 6    BY MR. PLUNKETT:
 7    Q.  Good afternoon, Inspector Blackwell.
 8    A.  Good afternoon, sir.
 9    Q.  I don't think, I don't think we've met before.
10    A.  I don't think so.
11    Q.  I don't think so.
12    A.  Yeah.
13    Q.  Would you agree with that?
14    A.  Yes.
15    Q.  Okay.  I think we spoke on the phone once very, very
16    briefly.  I think you just called to acknowledge a subpoena;
17    is that right?
18    A.  Yes.
19    Q.  Alls we talked about was, I have got a private
20    investigator, and I confirmed your phone number.  Agree?
21    A.  Yes.
22    Q.  Other than that, why you've never met with me or anyone
23    from my office for that matter?
24    A.  Correct.
25    Q.  You would have to agree with me that the cadre of senior
```

```
 1    leadership establishes the culture for the entire
 2    organization, and that's especially true of training,
 3    correct?
 4    A.  I would actually disagree with that.
 5    Q.  You don't think that the cadre and the training
 6    establishes the culture for an organization, is that your
 7    testimony?
 8    A.  They establish the culture part of the training
 9    division.
10    Q.  I think the way you said it when you testified in this
11    case earlier is that you want the -- to have the recruits
12    mirror what they learn in training in the field or on the
13    street.  I think you actually said "field."
14    A.  Yes, I did.
15    Q.  You also told us that you, the Minneapolis Police
16    Department, considers a person a recruit, is not a sworn
17    officer until they graduate the academy.  That's what you
18    told us; isn't that correct?
19    A.  Correct.
20    Q.  In the eyes of your office of your department.  And a
21    recruit and FTO is expected to call all officers "sir";
22    isn't that correct?
23    A.  Sir or ma'am.
24    Q.  Thank you for that correction.  In fact, you know what a
25    ROPE form is.  We talked about them.  On the ROPE form, the
```

1    form that goes over training, the signature block is for a

2    recruit officer, not an officer in training and not an

3    officer?

4    A.  Correct.

5    Q.  Now you spent several hours over the last few days

6    reading policies to us on direct examination.  How many

7    pages are there in that policy manual?

8    A.  Hundreds.

9    Q.  It's probably over 500, wouldn't you agree?

10   A.  Sounds right.

11   Q.  Might be 537, but who is going to split hairs.  Fair?

12   A.  Fair.

13   Q.  And what you do is, you have people sign a piece of

14   paper to acknowledge that they're familiar with all of the

15   policies in those 500-plus page manual; isn't that correct?

16   A.  Correct.

17   Q.  Incorrect?

18   A.  That's correct.  They sign it.

19   Q.  Okay.  The fact that you sign a page and put it in your

20   permanent record doesn't mean that you actually know the

21   entire manual; isn't that correct?

22   A.  There's -- when they sign it, they're acknowledging that

23   they understand the policies and procedures.

24   Q.  Well, really what it just says is it something you put

25   in their file.  They don't annually test anybody on the

1    policies; isn't that correct?

2    A.  Correct.

3    Q.  Testing is a good metric to test knowledge and

4    understanding, isn't it?

5    A.  Yes.

6    Q.  So in spite of all the training that you do, there's not

7    a written test on core proficiencies or core knowledge;

8    isn't that correct?

9    A.  On some things there are.

10   Q.  Policy manual?

11   A.  On some things, like Taser or different parts.

12   Q.  Well, those are parts of a pieces of use of force

13   training.  There's that Taser training is part of use of

14   force, do you agree?

15   A.  Yes.

16   Q.  So that would be specific to Tasers, correct?

17   A.  Correct.

18   Q.  All right.  You know, you talked about the neck

19   restraint, the unconscious neck restraint, on direct

20   examination, and the example you gave is that it was a good

21   technique if somebody was drowning to put them unconscious?

22   A.  That was a technique.  Just an example of a lifesaving,

23   one of many.

24   Q.  Do you really train people to make people unconscious

25   when you are trying to get them out of the water?

```
 1    A.  No.

 2    Q.  Okay.  EMS, emergency medical services?

 3    A.  Yes.

 4    Q.  Okay.  When an officer wants EMS, they have a radio

 5    somewhere on their body, and they say Squad 330 EMS Code 2.

 6            That's how you do it, right?

 7    A.  Correct.

 8    Q.  Sometimes it sounds like you say incorrect.  I'm sorry.

 9    A.  I'll be more clear.

10    Q.  Okay.

11    A.  Always.

12    Q.  I'm not trying to push you around.  I just want to make

13    sure that I have it right.

14            You are also trained to keep your radio

15    communications brief because there's a lot going on on those

16    radios; isn't that correct?

17    A.  Yes.

18    Q.  Now, Inspector Blackwell, not to be redundant.  You're

19    on inspector, correct?

20    A.  Yes.

21    Q.  We've already established that, that there's only I

22    think three ranks above you in the entire police department,

23    not three persons, three ranks, correct?

24    A.  Correct.

25    Q.  That would be deputy, chief, assistant chief and chief.
```

1    A.  Correct.

2    Q.  And currently as an inspector, I believe you're assigned

3    to a precinct; is that correct?

4    A.  Yes.  The Fifth Precinct.

5    Q.  The Fifth Precinct, and that's southwest Minneapolis?

6    A.  Yes.

7    Q.  Over to the Edina border?

8    A.  Yes.

9    Q.  Okay.  You were in charge of training as an inspector

10   until January 31st, 2021; isn't that correct?

11   A.  I was in charge of the training division as a commander

12   until then.

13   Q.  Is a commander different than an inspector?

14   A.  Yes.

15   Q.  Okay.  You were moved out of training at that time;

16   isn't that correct?

17   A.  Correct.

18   Q.  And about two and a half months later on April 21st,

19   2021, the Attorney General of the United States of America

20   announced a patterns and practices investigation of your

21   department; isn't that correct?

22   A.  Yes.

23   Q.  And that patterns and practices investigation from the

24   United States, the Attorney General for the United States of

25   America, among other things, is focusing on officer training

```
 1    and deficiency in officer training; isn't that correct?

 2    A.  Yes.

 3    Q.  And that would be the area you were in charge of,

 4    correct?

 5    A.  Yes.

 6    Q.  You've met with the U.S. Attorney, the ones over here,

 7    not the Attorney General in DC, and the FBI and prosecutors

 8    on this case multiple times; isn't that correct?

 9    A.  I have.

10    Q.  And you've had telephone conferences with the

11    investigators for sure, possibly with the prosecutors; isn't

12    that correct?

13    A.  With these?

14    Q.  These people here.

15    A.  Yes.

16    Q.  Okay.  And when I say "these people," it's not just the

17    four sitting here.  It could be the other two in the back,

18    prosecuting attorneys, or could be some other prosecuting

19    attorneys; is that right?

20    A.  Yes.

21    Q.  Okay.  Now, a private investigator from my office, Susan

22    Johnson, has called you three times:  Friday, January 21st,

23    2022; on Saturday, January 22nd, 2022; and on Monday,

24    January 24th, 2022.

25              Isn't that correct?
```

1   A.  I believe it was somewhere from your office.  I'm not

2   quite sure.

3   Q.  Okay.  But you've never returned her phone call.

4   A.  Correct.  I receive a lot of phone calls that I don't

5   know the validity of who they are, and I'm not obligated to

6   answer that phone call.

7   Q.  But the only time we spoke, which was very briefly, I

8   think the only thing I told you is that I've got a private

9   investigator, and I confirmed your phone number, correct?

10  A.  Probably.

11  Q.  Now you've known Mr. Derek Chauvin for quite some time?

12  A.  I have.

13  Q.  You, the two of you went through the hiring process

14  together, would you agree?  At the same time I should say.

15  A.  Around the same time.

16  Q.  Okay.  You don't just fill out a piece of paper and turn

17  it in to the City to apply to be a police officer.  There's

18  a little more to it than that.  Fair?

19  A.  Yes.

20  Q.  Okay.  Part of the hiring or application process, as it

21  probably should be called, there is testing and evaluations,

22  true?

23  A.  Yes.

24  Q.  There's a backgrounding process?

25  A.  Yes.

```
1    Q.  Could you tell us what backgrounding is?  It's probably
2    something that not everyone understands.
3    A.  Sure.  So the background process lasts about six to
4    eight months depending on each class, and you're meeting
5    with, it starts with your whole background of every place
6    that you've ever lived, worked, went to school.
7          And you continue on like with any criminal history
8    that you might have.  You have to basically say everything
9    about yourself, and then the backgrounders get it.  They
10   will, the candidate will have interviews with that
11   backgrounder to go through that background to verify
12   everything.
13         They'll look at, you know, recommendations from
14   other people or references.  So it's a pretty extensive
15   background.
16   Q.  And you use the term "backgrounder."  That's a person?
17   A.  Correct.  It's a police officer that's doing that
18   background investigation on the candidate.
19   Q.  It's probably a detective or sergeant, something like
20   that?
21   A.  Yes.
22   Q.  Somebody with a lot of experience doing checks and using
23   resources available; isn't that correct?
24   A.  Yeah.  Sometimes it's an officer.  Sometimes it's a
25   sergeant, but generally one that's more experienced.
```

1    Q.  Okay.  And they'd actually go out and talk to people or

2    at least call them up on the phone and talk to them about

3    you as a candidate to be a police officer; isn't that

4    correct?

5    A.  Correct.

6    Q.  They fill all this out and be part of your application

7    packet; isn't that correct?

8    A.  Yes.

9    Q.  There's physical evaluations and psychological

10   evaluations or testing as well as part of the application

11   process?

12   A.  Yes.

13   Q.  And all of this information is maintained as part of

14   your, I guess we'll just call it, a permanent file at the

15   police department?

16   A.  Yes.

17   Q.  You probably call it a personnel file?

18   A.  Correct.

19   Q.  Permanent file is a like grade school.  So we'll call it

20   personnel file, not the permanent record.

21          But like I said, I think we talked about this.

22   You've known Derek Chauvin for quite a while.  You were CSOs

23   or community service officers together?

24   A.  Yes.

25   Q.  And that was in the same precinct?

1    A.  No, we were not in the same precinct, just both

2    community service officers at the same time.  We were

3    assigned to different precincts or assignments.

4    Q.  Had interactions with him?

5    A.  Yes.

6    Q.  And at some point then you must have gone to the same

7    academy class with him?

8    A.  He was in the academy class just before mine, I believe.

9    Q.  Okay.  But you had one right before you?

10   A.  Yes.

11   Q.  And so you probably had interactions with him from time

12   to time during that process, I'm guessing?

13   A.  From time to time.

14   Q.  And then you actually selected Derek Chauvin to be an

15   FTO; isn't that correct?

16   A.  Yes.  It was a big process, but yes.  There are many

17   FTOs.

18   Q.  I'm sorry.  I stepped on you.  What did you say?

19   A.  There was many FTOs when I took over that FTO program.

20   Q.  And you selected him to be one of your FTOs after you

21   took over that program, apparently?

22   A.  Correct.

23   Q.  And in 2018 when you did the, I think you call it the

24   reset?

25   A.  Yes.

```
 1   Q.  You kept him on as an FTO; isn't that correct?

 2   A.  Yes.

 3   Q.  And you testified that you want people with I think good

 4   communication, good verbal skills, as FTOs?

 5   A.  Yes.

 6   Q.  People who are good with people, good teachers, that

 7   sort of thing?

 8   A.  Yes.

 9   Q.  But his prehire psychological evaluation says that his

10   ability to be --

11               MS. BELL:  Objection, Your Honor.  Objection.

12   Lack of foundation as to whether this witness has ever seen

13   such a thing.

14               THE COURT:  Maybe you should lay that foundation,

15   counsel.

16   BY MR. PLUNKETT:

17   Q.  Well, everyone takes a prehire psychological

18   examination, don't they?

19   A.  Yes, they have got to pass it to get on the police

20   department.

21   Q.  And then they make recommendations and observations

22   about you, don't they, the psychological evaluation?

23   A.  They do, but I haven't even seen mine own, so --

24   Q.  So you are telling me that when this application to be

25   an FTO went up to, through you and up to IA or personnel
```

1    that no one looked at his psychological evaluation?

2    A.  We're not privy to that information.

3    Q.  You're in charge of training, aren't you?  Weren't you?

4    A.  Yes, I am.

5    Q.  You're able to make changes in the process, aren't you?

6    A.  Not that kind of change.  That would be a human resource

7    or much bigger than me change.

8    Q.  And so no one ever looked at this in deciding whether or

9    not he should train young officers.  Is that what you are

10   telling us?

11   A.  That's correct.

12   Q.  At one of the times when you were meeting with the U.S.

13   attorneys, I think you met with five prosecutors, Ms. Bell,

14   Ms. Sertich, Mr. Slaughter, two of them from the civil

15   rights division, Ms. Trepel and a Ms. Allison -- I think

16   they might even all be in the courtroom today -- do you

17   remember that meeting?

18   A.  Yes.

19   Q.  December 30th, 2021.

20   A.  Yes.

21   Q.  Okay.  One of the things you told them is that in your

22   restructuring of the academy that you --

23              MS. BELL:  Objection.  Hearsay, Your Honor.

24              THE COURT:  I'm sorry.  Objection is overruled.

25

1    BY MR. PLUNKETT:

2    Q.  You told them that or that the structure, the

3    paramilitary structure was removed from the academy.  That's

4    one of the things you said?

5    A.  Yes.  We were going away, completely away from

6    paramilitary.

7    Q.  I'm showing you what's been marked as an Exhibit K, as

8    in kilo, dash alpha.  K is for Kueng.  A is for the first

9    exhibit.  That's the MPD academy manual.  I think you've

10   already looked at it as a government exhibit.

11            Do you recognize that?

12   A.  I do.

13   Q.  I'm going to back up just one step here.

14            So you said that the paramilitary structure was

15   removed, and I'm just reestablishing that, but one of the

16   things that you produced is the academy class hours for the,

17   for the class or the academy; isn't that correct?

18   A.  Yes.

19   Q.  And you probably know then that physical training

20   consists of 46 hours; isn't that correct?

21   A.  Yes, roughly.

22   Q.  Physical training is pushups, situps, running, maybe

23   some burpies, all kinds of things?

24   A.  Yes.

25   Q.  And that's 46 hours.  Scenario training is 56 hours;

 1   isn't that correct?

 2   A.  Sounds right.

 3   Q.  So you are doing as much, ten hours less physical

 4   training than the scenario, the meat and potatoes of this

 5   class; isn't that correct?

 6   A.  Yes.  Physical physicalness is important for officers

 7   not to get injured.

 8   Q.  Officers don't do physical fitness once they're out of

 9   the academy, do they?

10   A.  Some do.  Some don't.

11   Q.  Some do.  Some don't, but it's not required?

12   A.  It's not required, no.

13   Q.  Also as part of the academy, you do drill and ceremony

14   training, correct?

15   A.  Correct.

16   Q.  And you do two full hours of drill and ceremony

17   training?

18   A.  Yes.

19   Q.  Now drill and ceremony training is teaching people to

20   march in formation.  Would you agree with that?

21   A.  Yes.

22   Q.  It would be teaching them preparatory commands and

23   commands of execution while walking; isn't that correct?

24   A.  Yes.

25   Q.  Preparatory command, if you want someone to turn left

1    would be come left.  Command of execution would be march,

2    fair?

3    A.  Yes.

4    Q.  And then on the next left, time your left foot hits the

5    ground, you are supposed to pivot, right?

6    A.  Correct.

7    Q.  It's train them to stand at the position of attention,

8    correct?

9    A.  Yes.

10   Q.  And the preparatory command for that would be attend.

11   And then the command of execution would be shun, correct?

12   A.  Correct.

13   Q.  Stand at ease, correct?

14   A.  Yes.

15   Q.  Now this is the position of attention, more or less?

16   A.  Yes.

17   Q.  And this is stand at ease?

18   A.  Parade rest.

19   Q.  Parade rest.  So the preparatory command would be

20   parade, and then the command of execution would be rest?

21   A.  Correct.

22   Q.  Parade rest.  Stand at ease would be a slightly less

23   formal version of the same thing, fair?

24   A.  Yes.

25   Q.  You might spread your legs a little bit farther apart,

```
 1    and you study that for two hours in this program, correct?

 2    A.  Yes, it's important for a lot of reasons.

 3    Q.  I'm sure it is, but it's also something that sounds kind

 4    of military to me.  Wouldn't you agree with that?

 5    A.  Yes, the military does do that, too.

 6    Q.  Boy Scouts don't do that.

 7    A.  I don't know.  I've never been a Boy Scout.

 8    Q.  Cub Scouts, either.

 9    A.  Okay.

10    Q.  You have three full hours of inspections; isn't that

11    correct?

12    A.  Yes.

13    Q.  Inspections you can get, according to this manual, you

14    can get merits and gigs during inspections, correct?

15    A.  Correct.

16    Q.  I think I understand a merit, but would you tell me what

17    a gig is?

18    A.  A gig is if something is out of place in your uniform,

19    you are not looking professional, then they can get a gig to

20    make sure their uniform looks proper.

21    Q.  And there's something called a gig line?

22    A.  Yes.

23    Q.  And why don't you tell us what a gig line is.

24    A.  So a gig line is making sure that your uniform shirt

25    matches that of your pants.
```

1    Q.  As well as your belt?

2    A.  Correct.  It goes all the way down in the line to a

3    level of professionalism.

4    Q.  And if you are slightly akilter with your gig line, that

5    would be a gig, fair?

6    A.  Correct.

7    Q.  Now we can talk about your recruit manual.

8            Your Honor, I'm offering this, if I haven't

9    already, Exhibit K-A?

10           THE COURT:  I think it was received as Exhibit 130

11   before, was it not?

12           MR. PLUNKETT:  It was, Your Honor, but this is --

13           THE COURT:  Okay.

14           MR. PLUNKETT:  -- took my exhibit and turned it

15   into their exhibit, and I want to make sure they're both in

16   there.

17           THE COURT:  That's all right.  Okay.  Anyway it's

18   received.

19           MR. PLUNKETT:  All right.  Thank you, Your Honor.

20   BY MR. PLUNKETT:

21   Q.  This is kind of the bible for the police academy.  Would

22   you agree with that, for the trainees at least?

23   A.  It's a manual, yes.

24   Q.  They are called recruits.  So you've already talked

25   about some of the matters in here.  I want to talk about

1     some more.  Here we are on page 16 of Exhibit K-A, and one

2     of the matters on this page, one of the items is, orders

3     given by staff members.  I'm going to zoom that in a little

4     bit for you.

5              Do you see that?

6     A.  I do.

7     Q.  This is how a recruit is supposed to respond to an order

8     given by a staff member, correct?

9     A.  Correct.

10    Q.  And among other things, it tells us that instant,

11    unquestioned obedience is demanded; isn't that correct?

12    A.  Yes.  This does not supersede policy manual, either,

13    though.

14    Q.  This is the recruit manual.  This is what recruits are

15    taught?

16    A.  Yes.

17    Q.  And they are taught that they must show instant and

18    unquestioned obedience, correct?

19    A.  Yes.

20    Q.  On the next page, page 17, we have academy office, the

21    policy for when you enter the academy office.  Do you

22    recognize that?

23    A.  I do.

24    Q.  I believe you testified about this particular portion of

25    the recruit manual on direct, didn't you?

1   A.  Correct.  Correct.

2   Q.  This is how you -- you talked about the sir and ma'am

3   portion of this, and sir, ma'am, may I speak with Cadre

4   Officer Smith, sir or ma'am.  That's what it says here.

5   A.  Yes.

6   Q.  And what you told us on direct is that this is in here

7   because you want muscle memory.  This is how you want

8   officers to act in public; isn't that correct?

9   A.  Yes, we want them to use customs and courtesies.

10  Q.  And it also says here, custom and courtesies, that you

11  said this is how we want them to behave in public, no

12  recruit will enter the office before being acknowledged;

13  isn't that correct?

14  A.  Correct.

15  Q.  It says that you will position yourself at attention in

16  front of the door, knock on the doorjamb and announce your

17  business.  Isn't that what it says?

18  A.  Yes.

19  Q.  And in practice that means you come to that a position

20  attention that we talked about, you'd hit the doorjamb three

21  times?

22  A.  Yes.

23  Q.  And you would say, sir, Recruit Plunkett, request

24  permission to enter?

25  A.  Yes.

1    Q.  And it says that you will not look around, but you will

2    look straight ahead as if at inspection, correct?

3    A.  Correct.

4    Q.  And inspection is where you go to have somebody look

5    over your uniform in very close detail to make sure that

6    it's looking good, and then you will speak in a normal tone

7    of voice and say the sir or ma'am.

8            It goes on to say that recruits will not stand or

9    loiter around any academy office when they are not speaking

10   to a staff member, correct?

11   A.  Correct.

12   Q.  And no recruit will enter the academy staff office

13   without a staff member being present or authorization,

14   correct?

15   A.  Correct.

16   Q.  And just confirming that this is the section that you

17   said you want to mirror that on the -- in the field,

18   correct?

19   A.  Customs and courtesies, yes, in the field.

20   Q.  Addressing officers:  I think we kind of went over this

21   already, but sir or ma'am, and that's not addressing staff

22   or cadre.

23           That's all officers of the Minneapolis Police

24   Department, correct?

25   A.  Yes.

1   Q.  We have a section in here on classroom conduct.  It's

2   actually fairly long.  Here it is, No. 9 on page 17, and it

3   runs into page 18.  Would you review that?

4   A.  Yes.

5   Q.  The OD, that's the officer of the day?

6   A.  Correct.

7   Q.  I think you said that everybody is OD for a week?

8   A.  About a week and then they rotate throughout the

9   academy.

10  Q.  And you said that that's to build confidence and ability

11  to lead, right?

12  A.  Yes.

13  Q.  And the officer of the day will get the recruits on

14  their feet and await further instructions.  That's what it

15  tells you, the recruits, to do, correct?

16  A.  Yes.

17  Q.  And you do that by yelling "on your feet," correct?

18  A.  Yes.

19  Q.  All capital letters.  And so the way in practice that

20  would work is, any officer or anybody, really, that's not a

21  recruit, walks in that room.  The officer of the day is

22  probably in a position to observe, and he stands up and

23  they, he or she, yells on your feet, right?

24  A.  Yes.

25  Q.  Now I just did that in a conversational tone.  I didn't

1    use my military voice.  I'm assuming that the recruit uses a

2    military voice when they do that?

3    A.  Yes.

4    Q.  Supposed to?

5    A.  Well, a loud voice, yes.

6    Q.  We don't want to scare the children, so I'll just not

7    use that voice.

8            When the instructor enters the room, you are

9    supposed to greet them, good morning, and I think at some

10   point you are supposed to yell "take seats," right?

11   A.  Yes.

12   Q.  And when you yell "take seats," that's a preparatory

13   command and a command of execution, everybody sits down at

14   the same time; isn't that correct?

15   A.  Yes.

16   Q.  The recruits are taught that no officer will enter into

17   an argument with an instructor over a point made; isn't that

18   correct?

19   A.  Yes.

20   Q.  If a recruit feels there is a disagreement, the recruit

21   will not argue with the instructor but will call it to their

22   attention?

23   A.  Correct.

24   Q.  It says in the manual that when you are walking in the

25   hallways, and I think we're on page 18 now, that if you see

1    a sworn officer, a civilian, Marine Corps or a Navy, I mean

2    why are we leaving out the Army?

3    A.  So this was a -- this hadn't been removed yet.  I had

4    gotten rid of this element from the academy, and there was

5    Marine Corps, Navy, because the academy used to be at Fort

6    Snelling where the Navy and the Marines were at.

7         Fort Snelling is right on the border of

8    Minneapolis and St. Paul.

9    Q.  On recognized territory.  So did you know that they are

10   still making them do this during that academy?

11   A.  I know that they were, and I made them stop because

12   there was no purpose for it.  We wanted them to have

13   discipline by acknowledging and respecting someone, but I

14   didn't want them jumping out of the way at parade rest in

15   the hallway for people.

16        We were starting to make these changes, several

17   changes and modifications, throughout the academy.  And this

18   was one that we got rid of, and sometimes we, I would have a

19   recruit stop in the hallway at parade rest, and I would stop

20   them saying that's no longer a rule.

21        And I would go back and tell the cadre to remind

22   the recruits or cadets to stop doing that.

23   Q.  But the officers who showed up at the academy expected

24   the recruits to do it anyhow?

25   A.  Okay.  We're trying to get rid of it but --

1    Q.  Well, old habits die hard sometimes, don't they?

2    A.  Sometimes.

3    Q.  Sometimes it takes more than a quick reset to take,

4    change the entire culture, doesn't it?

5    A.  With some things, yes.

6    Q.  The field training officer program is discussed on

7    page 23, and it's No. 33.  And what it tells us, tells the

8    recruit, is that among other things that their FTO or their

9    field training officer is both an instructor and an

10   evaluator; isn't that right?

11   A.  Yes.

12   Q.  And it lets them know that any kind of unsatisfactory

13   performance will be grounds for dismissal; isn't that

14   correct?

15   A.  Yes.  If they didn't pass something, then, yes, it could

16   be grounds for dismissal.

17   Q.  Essentially the FTO could throw them out of the

18   department?

19   A.  Not that --

20   Q.  Not the FTO.  They'd have to go to the FTS, field

21   training sergeant, and ultimately the recruit could be

22   thrown out of the academy?

23   A.  There would be a lot before they were thrown out of the

24   academy, but yes.

25   Q.  At the recommendation of their FTO.  Correct?

1    A.  Correct.

2    Q.  They're told that they're on probation.  This is page 24

3    still.

4         And failure to attain a satisfactory rating in

5    either the police academy, the FTO program, or probationary

6    period may result in your termination of your employment

7    with the City, correct?

8    A.  Correct.  You must pass the field training officer

9    program and your probationary period.

10   Q.  Puts a lot of the power in the officers, the senior

11   officers around you.  If they don't like you, if they don't

12   think you are up to their standard, you might be gone; isn't

13   that correct?

14   A.  You wouldn't be gone from one field trainer or field

15   training supervisor.  The field training officer is the one

16   that evaluates you.  The field training supervisor generally

17   meets with them weekly.  Field training coordinator meets

18   with them monthly.

19        And they have, they're constantly looking at those

20   evaluation forms to make sure that they have to pass.  So if

21   there comes a point where they're not up to the grade, then

22   we as trainers must do everything within our power.

23   Q.  If your FTO perceives a deficiency, it could be the end

24   of the show for you; isn't that correct?

25   A.  It's not correct.

```
 1     Q.  Okay.

 2     A.  If they have a deficiency when to say you're done, there

 3     would be multiple things that -- they have to pass, but they

 4     have to make sure that they're getting within their scores.

 5     Q.  I'm sorry.  It all starts with their FTO not being as

 6     happy with your performance, correct?

 7     A.  Not happy.  They have to make sure that they're still

 8     grading within the matrix.

 9     Q.  People get terminated from the department because the

10     FTO is not satisfied with their performance; isn't that

11     correct?

12     A.  Not solely because the FTO.  We would, we will intervene

13     as trainers to make sure we review body-worn camera, the

14     ROPE forms and then identify if there is a deficiency that

15     we can help further train them.  So that's why we --

16             Field training officers are trainers not

17     terminators.  So it's ultimately the training division

18     commander and myself that will take everything into

19     consideration.

20     Q.  Would it surprise you to find out that the recruits see

21     that otherwise, that they see their FTOs as terminators?

22     Would that surprise you?

23             MS. BELL:  Objection.  Calls for speculation.

24             THE COURT:  Overruled.  It's cross-examination.

25             THE WITNESS:  That would surprise me.
```

1    BY MR. PLUNKETT:

2    Q.  Okay.  Your manual, pardon me, your academy training

3    manual talks about choke holds here on page 63 and on

4    page 64 neck restraints; isn't that correct?

5    A.  Yes.

6    Q.  And at those points it refers you to the policy 5-311,

7    correct?

8    A.  Yes.

9    Q.  And just for clarification, this is use of force

10   definitions, and when we look at that policy --

11           MS. BELL:  Mr. Plunkett, this exhibit is not in

12   evidence.

13           MR. PLUNKETT:  I thought this was a use of force

14   exhibit that you referenced.

15           MS. BELL:  This is not the exhibit.  The exhibit

16   is -- let me find it for you.

17           MR. PLUNKETT:  I'm going to fix that so you don't

18   have to worry about it.

19           If I may, Your Honor.

20           I'm showing you a copy of the 5-300, which is the

21   use of force policy.  Do you recognize that?

22           THE WITNESS:  Yes.

23           MR. PLUNKETT:  And it's also been marked as

24   Exhibit K-I, K for Kueng, I for exhibit number.

25           Your Honor, at this time I'm offering Exhibit K-I.

1    MS. BELL:  May I have one moment, Your Honor?

2    THE COURT:  You may.

3    MS. BELL:  I have no objection.  I'm sorry.  I

4    have no objection.

5    THE COURT:  Okay.  K dash, what, I is received.

6    MR. PLUNKETT:  Yes, I as in India.

7    THE COURT:  Proceed.

8    MR. PLUNKETT:  Thank you, Your Honor.

9    BY MR. PLUNKETT:

10   Q.  We're looking at what's been marked and now received as

11   Exhibit K-I, and it is something you recognize as a use of

12   force policy; isn't that correct?

13   A.  Yes.

14   Q.  And in the use of force policy, it talks about the neck

15   restraint; isn't that correct?

16   A.  Yes.

17   Q.  And one of the things it talks about is that there's two

18   kinds of neck restraints, conscious and unconscious,

19   correct?

20   A.  Yes.

21   Q.  And that you can do or perform a neck restraint with

22   many things, including your leg.  Isn't that what the policy

23   is?

24   A.  Part of the policy.

25   Q.  It's a long policy, isn't it?

1    A.  Yes, it is.

2    Q.  That's what this part says, right?

3    A.  Yes.

4    Q.  All right.  And it explains how you do that, but you've

5    told us, and I understand, that they don't train the leg

6    restraint; isn't that correct?

7    A.  Correct.

8    Q.  It's not demonstrated.  It's just in the policy as

9    something that can happen; isn't that correct?

10   A.  Correct.

11   Q.  And what it also tells the recruit or the, or the

12   recruit is that only, only sworn officers who have received

13   training from the MPD training unit are authorized to use

14   the neck restraint; isn't that correct?

15   A.  Correct.

16   Q.  Now recruits don't know what every officer in the

17   department has or has not been trained on; isn't that

18   correct?

19   A.  I suppose they wouldn't, no.

20   Q.  Be impossible, wouldn't it?

21   A.  Yes.

22   Q.  Even yourself, you couldn't look at some random officer

23   and tell me what all random training they've had without

24   looking at their work force director, would you?

25   A.  No, I would not.

1    Q.  600 officers?

2    A.  Right.

3    Q.  Okay.  So the recruit knows that it's in the policy but

4    doesn't know what to look for; isn't that correct?

5    A.  What do you mean?  I guess I don't understand

6    the "doesn't know what to look for."

7    Q.  I'll withdraw the question.  And choke holds were not

8    trained, either; is that correct?

9    A.  Just discussion, not an actual physical, correct.

10   Q.  Okay.  Actually it's my understanding from reading

11   statements from some of your trainers that these things are

12   trained with more advanced use of force training?

13             MS. BELL:  Objection, Your Honor, to reference to

14   statements outside of court.  I don't have an objection to

15   asking the question.

16             THE COURT:  Well, the --

17             MR. PLUNKETT:  I'm going to withdraw the question.

18             THE COURT:  Okay.

19   BY MR. PLUNKETT:

20   Q.  The duty to intervene is discussed in your manual; isn't

21   that correct?

22   A.  Yes.

23   Q.  At 5-303.  And what the -- you've told us what you

24   believe the policy to be, but this is what the policy

25   actually is:  Sworn employees have an obligation to protect

1    the public and other employees.  It shall be the duty of

2    every sworn employee present at any scene where physical

3    force is being applied to either stop or attempt to stop

4    another sworn employee when using force, when force is being

5    applied inappropriately, applied or is no longer necessary;

6    isn't that correct?

7    A.  Yes.

8    Q.  And the word that you left out was this one when you've

9    talked about what the policy is, the word "attempt" in your

10   direct examination, correct?

11   A.  Okay.

12   Q.  In fact, throughout the entire academy, you have use of

13   force training, right?

14   A.  Yes.

15   Q.  But there are scenarios used in use of force training,

16   many, correct?

17   A.  Yes.

18   Q.  There is or at least was no intervention scenario; isn't

19   that correct?

20   A.  It's not specifically called intervention scenario.  We

21   teach the recruits the defensive tactics and how to

22   communicate with one another so that an inappropriate amount

23   of force is not used.

24   Q.  There's no intervention scenario; isn't that correct?

25   A.  Not one exactly for intervention or called that.

1    Q.  You testified on direct examination about Government

2    Exhibit 74.  This is a 33-page exhibit.  Do you remember

3    talking about this?

4    A.  Not sure which one you are referring to.

5    Q.  It's Government 74.  It's the lesson plan for academy

6    defensive tactics.

7    A.  Okay.  I don't see anything.

8    Q.  I will put it back on the screen for you.  My apologies.

9            Does that make it easier?

10   A.  Yes.

11   Q.  Again my apologies.  This is in a PDF and when we do a

12   word find for the word "intervention," it says no matches

13   were found.  So the word "intervention" appears nowhere in

14   your academy defensive tactics lesson plan; isn't that

15   correct?

16           MS. BELL:  Objection, Your Honor.  Misstates the

17   record.  The exhibit is a selection of lesson plans.

18           THE COURT:  That's overruled.

19   BY MR. PLUNKETT:

20   Q.  Isn't that correct?

21   A.  The term "intervention" is not on this lesson plan, no.

22   Q.  And this is a lesson plan that is used by the

23   instructors.  This is what tells the instructors what to

24   teach; isn't that correct?

25   A.  Yes, with comments on there.  If there's a PowerPoint

1    included, that would include that.

2    Q.  So what you are going to say is that the PowerPoint, the

3    use of defensive tactics PowerPoint, is where the word

4    "intervention" used?

5    A.  The duty to intervene.

6    Q.  I think it says intervention, what is it, is that right,

7    on the PowerPoint?

8    A.  Okay.  Yeah.  That sounds right.

9    Q.  Okay.  But nowhere in the use of force lesson plan does

10   the word appear.  This is a lesson plan, though; isn't that

11   correct?

12   A.  Yes.

13   Q.  This is what the instructor has; isn't that correct?

14   A.  Yes.

15   Q.  This is not what the recruit has; isn't that correct?

16   A.  Correct.

17   Q.  So when you went through this and the United States of

18   America went and highlighted all that information, that's

19   what your instructors look at, not the recruit, correct?

20   A.  Yes, this is just the quick summary of the actual

21   training.

22   Q.  Okay.  Now just a moment ago you talked about the

23   PowerPoint, and I'm showing you now -- I don't recall what

24   the exhibit number is -- is it Exhibit 73?

25           Government Exhibit 73, do you recognize that?

```
 1    A.  Yes.

 2    Q.  All right.  On page 13 it talks about the duty to

 3    intervene.  Do you see that?

 4    A.  I do.

 5    Q.  Duty to intervene, what does this mean?  That is the

 6    PowerPoint training, correct?

 7    A.  Correct.

 8    Q.  And you have a link to a video, but there's no video

 9    available on that; isn't that correct?

10    A.  Not anymore.

11    Q.  So we can't know what video the recruits are shown to

12    determine and learn about the duty to intervene; isn't that

13    correct?

14    A.  Correct.

15    Q.  And repeatedly we've learned that the only thing that

16    happens here is, somebody reads the policy to the recruit

17    verbatim and gives a couple of examples, and then they move

18    on.

19    A.  Usually in the cadets or recruit classes, there are

20    questions for discussions.  This mirrors 2019 in-service

21    pretty closely with more verbiage on the screen, and the

22    purpose of the cadet and recruit class is to have that

23    discussion about these things that they're asking.

24    Q.  Would it surprise you to find out that the discussion is

25    nothing more than an instructor reading the policy and
```

1   saying, if you see somebody beating a prisoner, you got to

2   stop them, and that's it?  Would that surprise you?

3   A.  That would surprise me.

4   Q.  Is the purpose of the academy to teach the recruit that

5   you live in an "us versus them" environment, cops versus the

6   world?

7   A.  Would that surprise me if they had that mentality?

8   Q.  I am asking you.  That is not the, from what you

9   testified to, it sounds like that is not the purpose or the

10  point of your academy?

11  A.  Correct.

12  Q.  That you're telling us that the use of force training

13  and all these different things, that you are specifically

14  trying to prevent that mentality, correct?

15  A.  Correct.

16  Q.  And this is your, your, department's, approved by you,

17  sent up to the chief, approved by the chief training

18  PowerPoint on use of force; isn't that correct?

19  A.  Correct.

20  Q.  And on the question slide, there's another video.

21      (Video recording played)

22  Q.  That is one of the embedded videos that you teach to the

23  officers in use of force training; isn't that correct?

24  A.  I don't remember that, but obviously it's in there.

25  Q.  One of the things that you told us on direct is that you

1    personally attended the defensive tactics trainings for

2    these two guys Kueng and Lane; isn't that correct?

3    A.  Scenarios.

4    Q.  Scenarios?

5    A.  I walked through from time to time through the -- to

6    different defensive tactics so I can see what they're doing,

7    but it's the scenarios in I believe eval week that I walk

8    through and make sure what's going on.

9    Q.  What's the red suit?  You say they're in a red suit.

10   A.  The role players.  The role players can be in a red suit

11   depending on the scenario.

12   Q.  But a red suit is not red like it's my tie.  What is

13   that?

14   A.  It's pads that the role players will wear from time to

15   time.

16   Q.  Put on like a pad around your head, and it's so that if

17   somebody hits you, it doesn't hurt so much?

18   A.  Correct.

19   Q.  And that's what you observed when you attended this

20   scenarios in 2019?  That's what you testified to?

21   A.  Yes.

22          THE COURT:  Counsel, I wonder if this wouldn't be

23   a good time to break for an afternoon break.

24          MR. PLUNKETT:  I think it would, Your Honor.

25          THE COURT:  Okay.  Let's stand in recess for an

 1    afternoon break.

 2              Members of the jury, again, please don't discuss

 3    the case during the course of the recess, and we are in

 4    recess.

 5    (Recess taken at 3:19 p.m.)

 6                        * * * * *

 7              THE COURT:  You may be seated.

 8              Continue, Mr. Plunkett.

 9              MR. PLUNKETT:  Your Honor, may we have a sidebar?

10    (Side-bar discussion.)

11              MR. PLUNKETT:  Tom Plunkett speaking, Your Honor.

12    We've got this issue that hasn't been resolved that LeeAnn

13    has an objection to the Survey Monkey.  She sent you her

14    position in an email this morning, along with the exhibits.

15              I would say that my position is a little different

16    than was outlined in the email.  What the Survey Monkey is,

17    it's a survey that was done by this witness, created by this

18    witness, as part of her examination of the FTO program, and

19    it outlines a lot of the problems that are in the FTO

20    program.

21              The document really is a business record that she

22    created herself and is, was maintained in the records of the

23    department.  Ms. Bell says that, you know, to the extent

24    that it is hearsay.

25              MS. BELL:  Your Honor, Your Honor --

1          Tom, can you turn your mic off.  Everyone can hear

2     you.

3          MR. PLUNKETT:  My mic is off, Your Honor.

4          MS. BELL:  Okay.  They can hear you over there

5     (indicating).

6          Okay.

7          MR. PLUNKETT:  I'm going to turn my head then.

8          To the extent that it is hearsay, it's a business

9     record, and it also is the present sense impression or the

10    information she relied on.  We can't, you know, she's talked

11    about her reset and how, you know, she removed the military

12    structure and how they've done all these other things.

13         But I don't think it's fair to not be able to

14    cross-examine her about the depth, and the jury needs to

15    understand the depth of these problems.  So I don't know

16    that it is for the truth of the matter asserted.

17         Ms. Bell seems to think that because I'm talking

18    about, you know, this is what she, what people told her, and

19    it shows the problems of the FTO program that it is for the

20    truth of the matter asserted, but I don't think that's

21    neither here nor there because it is a business record, and

22    clearly that would be an exception to the hearsay rule.

23         MS. BELL:  Your Honor --

24         MR. PLUNKETT:  If it is for the truth of the

25    matter asserted.

Bell - Cross

1        MS. BELL:  A business record does not overcome the

2    second piece of the hearsay, which is that this is

3    statements from about, I don't know, I haven't counted, but

4    over 50 folks that are obviously not testifying or not

5    subject to cross-examination.

6        And Mr. Plunkett has made very clear that he

7    intends to use this to show the truth of the matter

8    asserted.  Specifically he wants to be able to argue that

9    whatever complaints or issues are raised in varies portions

10   of this survey are truthful claims about issues.

11       I don't think that it's relevant.  If it's not

12   offered for the truth, it's not relevant, and it is clearly

13   hearsay.  The business record exception does not overcome

14   the hearsay within the record after that point.

15       And so, Your Honor, I don't think there's any

16   relevance whatsoever if it is not offered for the truth, and

17   I think that Mr. Plunkett intends to argue that it in fact

18   shows problems and that these particular problems are true

19   as reported by these anonymous people in a Survey Monkey.

20       And so if Mr. Plunkett would like to inquire, I

21   don't have any objection to him inquiring about what changes

22   she wanted to make and why she wanted to make them to a

23   limited extent, but the fact of the matter is, these changes

24   were made before Officer Kueng, his client, was in the field

25   training program.

1    And so the relevance is somewhat limited anyway in

2    any event.

3    MR. PLUNKETT:  Also Tom Plunkett again.  There's a

4    confrontation issue.  This witness testified rather

5    extensively that, you know, they've done a reset and that to

6    hear her talk, you'd think that the academy and the FTO

7    program is tantamount to a scouting jamboree and it is very

8    interactive and that all the FTOs are very well-trained and

9    that they're carefully screened and all these other things.

10    And the whole point is that we need to confront

11    those statements.  She's a very persuasive witness.  I take

12    great exception to the veracity of several things she said,

13    but we need to let the jury fully appreciate that by letting

14    them see these kinds of exhibits.

15    MS. BELL:  And as I explained, these are

16    statements that were made about the program before it was

17    changed and before it was ever attended by Officers Kueng or

18    Lane, and she has testified about the academy that they

19    attended.

20    And the, this Survey Monkey does not address the

21    academy directly.  This is about the FTO program, as I

22    understand it, and so neither -- but in any event, this is

23    all things that predated Mr. Lane and Mr. Kueng's

24    participation in either the academy or the FTO program.

25    And so aside from the fact that it is just

1    patently hearsay and not admissible, it is also of very

2    limited relevance.

3              MR. PLUNKETT:  That's not entirely accurate, Your

4    Honor.  First of all, I'll just confirm that this has to do

5    with FTO, and FTO is what I'm about to start asking her

6    about.  It's the same principles from the academy that are

7    into the FTO.

8              She's already told us that bad habits die hard.

9    There's a lot of bad habits, and she's acting like she did a

10   reset and gave them a 40-hour class and now there's nothing

11   for anyone to worry about.  The jury is left with that

12   unconfronted proposition.

13             MS. BELL:  Well, this survey doesn't answer, Your

14   Honor, whether there's anything left to worry about or not.

15   It's from 2018.

16             THE COURT:  Counsel I, think we've heard enough.

17   We've taken enough time on this.  The court has that

18   opportunity to review the objection, and I do believe it is

19   in fact a business record, and as a business record it's an

20   exception to the hearsay rule.

21             And the balance will be subject to any foundation

22   that I anticipate that can be laid, and therefore you can

23   anticipate that it will be received.

24             MR. PLUNKETT:  Thank you, Your Honor.

25        **(In open court)**

1    MR. PLUNKETT:  May I proceed, Your Honor?

2    THE COURT:  Proceed.

3    MR. PLUNKETT:  Thank you.

4  BY MR. PLUNKETT:

5  Q.  We're back.

6  A.  Yes, sir.

7  Q.  I think when we took a break we just finished the video

8  from the academy which ended with explaining that the wolf

9  or the police officer is not well liked, and now we're going

10  to transition from that to talking about the FTO program.

11    Okay?

12  A.  Okay.

13  Q.  I just outline that so you kind of know where we're at,

14  get oriented before we get to that.

15    The FTO program is something that you oversaw;

16  isn't that correct?

17  A.  Yes.

18  Q.  And FTO is field training officer program, right?

19  A.  Yes.

20  Q.  A field training officer is a, an experienced police

21  officer that works with a recruit and shows them the ropes;

22  isn't that correct?

23  A.  Correct.

24  Q.  Now, in the field training officer program that kind of

25  outlines who and what, when, you'll have certain FTOs.  You

1    are supposed to start in one precinct and maybe move to

2    another precinct, that sort of thing; isn't that correct?

3    A.  Yes.  Not for FTOs, but the recruit, officer in training

4    and field training.

5    Q.  That's a fair correction.

6         You testified at a prior hearing that the FTO is

7    the closest thing to a supervisor a young recruit has; isn't

8    that correct?

9    A.  Yes.

10   Q.  You still agree with that statement?

11   A.  Pretty close, yeah.

12   Q.  Okay.  You specifically said that the recruit --

13        MS. BELL:  Objection.  Hearsay.  That's a reading

14   the out-of-court statement.

15        MR. PLUNKETT:  It's her statement.

16        MS. BELL:  It's out of court.

17        MR. PLUNKETT:  It's her sworn statement.

18        THE COURT:  Yeah, I'm going to overrule.  I'm not

19   sure that we're hitting it quite the right way, but go

20   ahead.

21   BY MR. PLUNKETT:

22   Q.  Now, in two of those phases, Officer Chauvin was

23   Mr. Kueng's FTO; isn't that correct?

24   A.  Yes.

25   Q.  Now I want it talk about what you I think have called

 1    the restructure, fair?

 2    A.  Yes.

 3            MR. PLUNKETT:  Your Honor, may I approach?

 4            THE COURT:  You may.

 5    BY MR. PLUNKETT:

 6    Q.  I've just handed you a folder, it's an exhibit that's

 7    marked as Exhibit K-F.  It's in the lower right-hand corner.

 8            Do you see that?

 9    A.  Yes.

10    Q.  Okay.  Exhibit K-F, can you tell me what Exhibit K-F is?

11    A.  So this is a field training program Survey Monkey that I

12    put out when I was a lieutenant in 2018.

13    Q.  Correct.  And so you certainly recognize this.  You

14    created it, and you relied on it; is that correct?

15    A.  Yes.

16    Q.  And then ultimately it's stored somewhere in the

17    Minneapolis police records; isn't that correct?

18    A.  Yes.

19            MR. PLUNKETT:  Your Honor, I'd offer Exhibit K-F.

20            THE COURT:  Continuing objection?

21            MS. BELL:  Continuing objection.

22            THE COURT:  It's overruled, and the Exhibit K-F is

23    received.

24            MR. PLUNKETT:  May I publish the exhibit, Your

25    Honor?

1           THE COURT:  You may.

2           MR. PLUNKETT:  You are certainly welcome to look

3    at that book, but I've got a digital exhibit.

4           THE WITNESS:  Okay.

5    BY MR. PLUNKETT:

6    Q.  That was just for our convenience.

7    A.  Okay.

8    Q.  Fair?

9    A.  Yes.

10   Q.  There we go.

11          Your Honor, for some reason the computer is not

12   displaying what I thought it would be.  There we go.

13          Okay.  Sorry for that.  K-F is your Survey Monkey;

14   isn't that correct?

15   A.  Correct.

16   Q.  And when we look on page 3 of this Survey Monkey, what

17   we find is your test of the survey, correct?

18   A.  Yes.

19   Q.  You are running a test to make sure that I guess your

20   Survey Monkey works.  And this is, when you are trying to

21   figure out what you should do about your program, you ran

22   this to try to find what the depth and areas of difficulty

23   were; isn't that correct?

24   A.  Yes.

25   Q.  And everyone was quite -- now this is a confidential

1   Survey Monkey.  You don't know who wrote what.  You just

2   know it is people who are FTOs?

3   A.  Correct.

4   Q.  All right.  And on page 1 of Exhibit K-F, one of the

5   problems that an FTO had was what's the biggest challenge,

6   what's the biggest challenge you have as an FTO.  That was

7   the question.

8            And this particular person indicated that it was

9   having a recruit that doesn't perform well and spending the

10  extra time and effort to bring them up to speed.  Also to

11  watch other FTOs that suck at their job, train a recruit who

12  will now pass and suck at their job.

13           That was a concern, correct?

14  A.  Yes.

15  Q.  In a nutshell, they are saying that the FTOs are not

16  consistently training; isn't that correct?

17  A.  Correct.

18  Q.  And another complaint is that, do you think all FTOs are

19  grading consistently, why or why not?  The answer is:

20  Absolutely not.  What is acceptable to me is much different

21  than what's acceptable to other people.

22           Isn't that correct?

23  A.  Correct.

24  Q.  And so they're identifying a problem with

25  standardization of training; isn't that correct?

1    A.  Yes.

2    Q.  And the same person felt that they needed to identify a

3    stricter process so that not everyone is an FTO; isn't that

4    correct?

5    A.  Correct.

6    Q.  Then on page 5 of this exhibit somebody explained

7    that -- there we go.

8           It said, Do you have a good understanding of

9    expectations during each phase of the FTO program?  And they

10   said, I know what my expectations are, but the department,

11   but does the department have a different expectation?

12           Isn't that what they said?

13   A.  Yes.

14   Q.  You know, we could go through this at great length, but

15   a lot of the comments are quite similar, phrased

16   differently; isn't that correct?

17   A.  Yes.

18   Q.  And to your credit in response to this, you developed

19   the 40-hour training program for all FTOs?

20   A.  I did.

21   Q.  And you've already told us once that old problems

22   sometimes die hard; isn't that correct?

23   A.  At times, yes.

24   Q.  And I'm not, I don't want to be overly critical, but

25   what you did was put together a 40-hour class.  I think you

1    call it the train the trainer class or --

2    A.  The FTO leadership course.

3    Q.  That's right.  The purpose of the FTO leadership course

4    is to train the trainers, correct?

5    A.  Yes.

6    Q.  It's to address problems that have been identified;

7    isn't that correct?

8    A.  Correct.

9    Q.  But you'd have to agree that the problems based on that

10   Survey Monkey were systemic and deep; isn't that correct?

11   A.  Some were, yes.

12   Q.  Your 40-hour class has a PowerPoint that you created;

13   isn't that correct?

14   A.  Yes.

15   Q.  And for the purpose of identification, I'm showing you

16   what's been marked as Exhibit K-K or Kueng, letter K as in

17   kilo.

18           Do you recognize that?

19   A.  I do.

20   Q.  And that is your PowerPoint from the class; isn't that

21   correct?

22   A.  Correct.

23   Q.  You did use of force training, some, as part of this

24   class; isn't that correct?

25   A.  We did.

1    Q.  But nowhere in here does it say that there was a

2    specific intervention scenario for the FTOs; isn't that

3    correct?

4    A.  I don't remember if there was or not.

5    Q.  Again, you teach that the FTO is the closest thing to a

6    supervisor that a young recruit officer has; isn't that

7    correct?

8    A.  Correct.

9    Q.  And the goal is supposed to be to help the FTOs

10   understand what is taught at the academy.  That's part of

11   what the purpose of this is; isn't that correct?

12   A.  Yes.

13   Q.  But at no point during your 40-hour class did you take

14   FTOs out to the academy; isn't that correct?

15   A.  Correct.  Not during this course, no.

16   Q.  Many of these FTOs hadn't been at the academy for

17   20 years, correct?

18   A.  Correct.

19   Q.  In the case of Mr. Derek Chauvin, I think he was a

20   19-year veteran, so he was 19 years out of the academy;

21   isn't that correct?

22   A.  Correct.

23   Q.  Could you agree with me that a lot changes in training,

24   culture and environment in 19 years?

25   A.  Yes.

1    Q.  Prior to this, prior to this 40-hour class, Mr. Chauvin

2    had been an FTO for how many years?

3    A.  Prior to me taking over, I'm not sure.

4    Q.  Is eight, eight sounds about right?

5    A.  I would have to take your word for it.

6    Q.  Okay.  You don't doubt it.

7            But he never had an FTO training class before

8    that, did he?

9    A.  I don't know because I took it over this year and

10   started this course.

11   Q.  Well, I mean, the Survey Monkey talks about the whole

12   idea that there isn't any FTO training, there isn't any

13   consistency in training, that different FTOs train different

14   things?

15           And we could go back to it and go through it, but

16   I think we all agree on that; isn't that right?

17   A.  Yes.

18   Q.  In your 40-hour class, the FTOs are actually not graded

19   or tested; isn't that correct?

20   A.  Correct.

21   Q.  There's no test.  I went through all of the lesson

22   plans, and there's no way you can ever fail the scenarios;

23   isn't that correct?

24   A.  Not pass or fail, no.  Just through my observation from

25   the class when I saw them they interacted.

1    Q.  A participant in the 40-hour FTO program can't be put on

2    a pause so they can go back and get more training; isn't

3    that correct?

4    A.  I'm confused by your question, I guess.

5    Q.  Well, in the FTO, the student in the FTO can get a

6    training pause.  I think that's what you called it, to get

7    more training; isn't that correct?

8    A.  Yes.  Yes.

9    Q.  But the FTO in this only 40 hours of class with no

10   testing, there's no opportunity to go back and get more

11   testing.  In fact there's not even any conscious -- well,

12   there is not even any, there's not really a metric of

13   learning, is there, a test?

14   A.  No.  Just a check on learning in class.

15   Q.  You know what?  I'm going to apologize because I gave

16   you an untruth there.  There's actually one test or quiz in

17   the entire 40-hour class, and I apologize for that, and

18   that's on the Fourth Amendment section.

19            That's the section that a lawyer teaches; isn't

20   that right?

21   A.  Correct.

22   Q.  So the only test comes from some lawyer, not from you or

23   the other instructors in that class; isn't that correct?

24   A.  Correct.

25   Q.  If an officer leaves the training and they cannot

 1   implement the lesson, would you agree that the training has

 2   failed?

 3   A.  I wouldn't say the training's failed.  I think they

 4   would need some followup.

 5   Q.  If they can't implement the lesson, is the class

 6   successful?

 7   A.  I wouldn't base one person off the whole entire class,

 8   but --

 9   Q.  So for that person the training has failed?

10   A.  Probably for that person.  I wouldn't say all the

11   training.  A segment of it.

12   Q.  In the course of this investigation, many of the

13   officers, not field training officers, real officers on the

14   street, they didn't even know that there was an intervention

15   policy.

16           Are you aware of that?

17           MS. BELL:  Objection.  Calls for hearsay, Your

18   Honor, and speculation.

19           THE COURT:  She can answer what she knows.

20           MR. PLUNKETT:  Are you aware of that?

21           THE WITNESS:  I was not aware of that.

22   BY MR. PLUNKETT:

23   Q.  A lot of them didn't even know what the policy was --

24           MS. BELL:  Objection, Your Honor.  Lack of

25   foundation as to further questioning on this.

1          THE COURT:  Overruled.

2          MR. PLUNKETT:  A lot of the officers didn't even

3    know who was in charge at the scene, in terms of the -- I

4    think you, by policy, it's the senior officer in the first

5    car to arrive.

6          That's your policy, correct?

7          THE WITNESS:  Correct.

8    BY MR. PLUNKETT:

9    Q.  A lot of your officers don't know that, did you know

10   that?

11   A.  I wouldn't know that.

12   Q.  There's no final examination for people who are in your

13   FTO program, isn't that correct, your 40-hour program?

14   A.  There's no?

15   Q.  Final examination?

16   A.  No, there's not.

17   Q.  I'm showing you a document that's been mark as

18   Exhibit K-J, and you might recall this as Exhibit 53 from

19   the government.

20          Do you recognize that?

21   A.  Yes.

22   Q.  All right.  So K-J is Exhibit 53.  They're the same

23   thing, just so everyone is clear on that.

24          And I'm moving for admission of Exhibit K-J.

25          MS. BELL:  No objection, Your Honor.

```
 1              THE COURT:  Received.

 2   BY MR. PLUNKETT:

 3   Q.  In reviewing this Minneapolis police field training

 4   officer handbook, now this is the handbook that FTOs are

 5   supposed to use; isn't that correct?

 6   A.  Correct.

 7   Q.  And this is the handbook that, that they're supposed to

 8   rely on in determining how and what they should teach their

 9   recruits, correct?

10   A.  Correct.

11   Q.  Nothing in this whole handbook talks about the duty to

12   intervene, isn't that correct, in terms of the duty to

13   intervene, correct?

14   A.  Correct.

15   Q.  It only says that before you intervene, before you

16   intervene with the OIT, before you intervene with the OIT --

17   now, that's the officer in training.  That's what you would

18   call a recruit, correct?

19   A.  Yes.

20   Q.  Is it the OIT performing incorrectly or merely

21   differently than I would?  That's what you talk about in

22   terms of the duty to intervene or intervention, because

23   that's clearly not the duty to intervene.

24   A.  Correct.

25   Q.  Nowhere in this manual and nowhere in the lesson plans
```

1    does it talk about informing the FTO that a recruit should

2    be encouraged to intervene and discussing that point; isn't

3    that correct?

4    A.  Correct.

5    Q.  On page 8 of this document, we see an outline of the

6    training phases; isn't that correct?

7    A.  Yes.

8    Q.  Looking at phase one, this is tantamount to an

9    introductory phase; isn't that correct?

10   A.  Yes.

11   Q.  And when the FTO is out with the officer, they're what

12   you've already defined as an able car; isn't that correct?

13   A.  Yes.

14   Q.  That's a one-person car, correct?

15   A.  Correct.

16   Q.  And the FTO, the real police officer, is pretty much

17   doing all the work; isn't that correct?

18   A.  Doing the majority.  They're primary, but they want the

19   officer in training to do as much as they can, whether it's

20   reports or things of that nature.

21   Q.  After their primary phase, they're supposed to be

22   transferred, and I'm going to go back here.

23           Even in the orientation phase you have a primary

24   FTO; isn't that correct?

25   A.  Yes.

Blackwell - Cross

```
 1   Q.  Now, we all understand that from time to time there
 2   might be scheduling issues, and for a night a substitute FTO
 3   might stand in; isn't that correct?
 4   A.  Yes.
 5   Q.  Not uncommon.  And that's true of every phase, but
 6   there's supposed to be a primary FTO, and that's when you
 7   say, assigned to a one FTO, it's the primary FTO we're
 8   talking about, correct?
 9   A.  Yes.
10   Q.  Able cars are really, might handle different kinds of
11   calls than a two-person car, correct?
12   A.  Correct.
13   Q.  They're probably, you don't want to have the able car be
14   the first person in at a thing that a lot of people that's
15   going on, correct?
16   A.  Not without backup.
17   Q.  Might be better if the able car maybe did traffic
18   control.  Instead of pulled in, they would go to car
19   accidents, something like, that's correct?  Correct?
20   A.  Generally speaking, yes.
21   Q.  Now in phase two, according to this manual, they're
22   supposed to transfer to another precinct and a different
23   shift.  Well, transferring to another precinct means that
24   they are going to be a new FTO, correct?
25   A.  Yes.
```

1    Q.  And although in phase two the OIT or recruit is a

2    primary or so it says, that's only if that recruit is

3    performing well enough to do work as a two-person squad;

4    isn't that correct?

5    A.  Correct.

6    Q.  Now, in -- so the point of that is that although you're

7    asking to be a two-person squad, sometimes depending on the

8    individual, they're going to be a one-person squad, an able

9    car; isn't that correct?

10   A.  Usually briefly, yeah.

11   Q.  That's why I said, I said from time to time.  Now in

12   phase three, it's the same precinct but a brand new FTO,

13   correct?

14   A.  Yes.

15   Q.  And again I don't want to beat this dead horse.  It

16   might be, you might have a stand-in FTO, but you have a

17   primary FTO that's really in charge of your training; isn't

18   that correct?

19   A.  Yes.

20   Q.  It says that the OIT is primary but assisted by the FTO

21   in that the OIT and FTO should initially work as a

22   two-person car; isn't that correct?

23   A.  Yes.

24   Q.  But the OIT or recruit should transition to taking on

25   all responsibilities they are capable of and perform as an

1    able car with the FTO mentoring and guiding the OIT when

2    necessary.

3              So we're trying to get them to get to the point

4    that they can perform as an able car once again here in

5    phase three.  Isn't that what the handbook says?

6    A.  Correct.

7    Q.  And that's the one-person car?

8    A.  Yes.

9    Q.  Now in the phase four, it's in the same precinct with a

10   different FTO on the same shift.  So if you were with one

11   FTO on mid watch, now in phase four, the final phase, you

12   are supposed to go to a new FTO on mid watch?

13   A.  Yes.

14   Q.  That's the policy.  That's the training.  That's the

15   handbook; isn't that correct?

16   A.  Yes, when possible.

17   Q.  The first part of phase four, the -- through ROPE 52,

18   once again, the recruit is operating as an able car, a

19   one-person car; isn't that correct?

20   A.  Yes.

21   Q.  I'm sorry.  I didn't quite get that highlighted at the

22   time.

23              And then after ROPE 53 begins the ten-day

24   evaluation; isn't that correct?

25   A.  Yes.  If we believe that they're ready to start on that,

1    that day.

2    Q.  They could get a pause?

3    A.  Correct.

4    Q.  Now once they're on their ten-day and being evaluated

5    with a -- I've heard somebody say the FTO was supposed to be

6    a bag of sand or something like that.  They're not supposed

7    to interact.  They're supposed to evaluate.

8    A.  Supposed to evaluate unless they see something that's

9    not right or they're violating policy or something.

10   Q.  Well, it kind of depends on the depth of the problem.

11   It might be something that you just debrief later, correct?

12   A.  Yes.

13   Q.  But once again during this final phase, during this

14   ten-day period, they're working as an able car again; isn't

15   that correct?

16   A.  Correct.

17   Q.  FTO riding along in full uniform and intervening only

18   when necessary, correct?

19   A.  Yes.

20   Q.  And in this phase, with a new FTO from phase three, you

21   are supposed to have your student during the ten-day, it

22   specifically says that placed with a new, placed -- should

23   not be placed with a new FTO during their ten-day unless

24   there are no other options.

25           Now, if that happens, you are supposed to notify

1    the shift FTS and training unit FTO program sergeant in that

2    event; isn't that correct?

3    A.  Correct.

4    Q.  They're supposed to do all ten shifts with their primary

5    FTO?

6    A.  Yes.

7    Q.  In the case of Mr. Kueng in phase three and four, he had

8    Mr. Chauvin to be his FTO for both of those; isn't that

9    correct?

10   A.  Yes.

11   Q.  And in fact, unless I'm mistaken, and I often am, he

12   actually had stand-ins FTOs from time to time during his

13   ten-day because there was a pause during that; isn't that

14   correct?

15   A.  I would have to look at his background, but quite

16   possible.  It happens.

17   Q.  Little unfair because you haven't memorized 100 percent

18   of the ROPEs or 100 percent of the recruits, have you?

19   A.  Correct.

20   Q.  All right.  That's fair.

21           This is a policy on how you conduct FTO; isn't

22   that correct?

23   A.  It's the manual and the guide, yes.

24   Q.  Well, the manual reflects the policy?

25   A.  There's -- well, it's not, it's not the Minneapolis

1    police policies.  It is how the FTO manual, how we want it

2    to be done.  So I'm --

3    Q.  You're in charge of training.  If you say this is how

4    it's supposed to be done, I would hope this is how it gets

5    done.

6    A.  I would hope so, too.

7    Q.  Okay.  Now, ROPE is an acronym; isn't that correct?

8    A.  Correct.

9    Q.  On direct examination, I think you called it a recruit

10   observation performance evaluation; isn't that correct?

11   A.  I believe that's the correct acronym.

12   Q.  More accurately, it's actually the recruit officer

13   performance evaluation; isn't that correct?

14   A.  Sounds right.

15   Q.  I mean, that is what you call people on FTO.  You call

16   them recruits; isn't that correct?

17   A.  That's the old way of thinking, but we were trying to

18   change it to officer in training.

19   Q.  Well, that might be the case, but even the signature

20   block on the ROPE form says recruit officer.  It doesn't say

21   OIT.

22   A.  Correct.

23   Q.  And here on this exhibit, it says on page 9 it's the

24   recruit officer performance evaluation; isn't that correct?

25   A.  Yes.

1    Q.  It's not just an observation period.  This is an

2    evaluation; isn't that correct?

3    A.  Correct.

4    Q.  Coming back to the PowerPoint that you created, this is

5    Exhibit K-K.  This talks also about the phases of training.

6         It says that phase one is an orientation page.

7    It's supposed to be an able car, correct?

8    A.  Correct.  I don't know if you're -- you meant to have

9    that up on the screen or not but --

10   Q.  Oh, I did.  Thank you.

11        That's what it says, correct?

12   A.  Yes.

13   Q.  It talks about recruit, phase two.  Recruit is

14   transferred to another precinct.  This is with right out of

15   your PowerPoint, the new FTO.

16        Recruit is primary.  The recruit is basically an

17   able car in phase four; isn't that correct?

18   A.  Correct.

19        THE COURT:  Counsel, unless I missed it, this

20   exhibit has not been offered.

21        MR. PLUNKETT:  At this time I'm offering

22   Exhibit K-K.  I thought I offered it before, Your Honor.

23        THE COURT:  I don't know.  I did not mark it

24   anyway.

25        Is there an objection to K-K?

```
 1              MS. BELL:  No, Your Honor.

 2              THE COURT:  Received.

 3     BY MR. PLUNKETT:

 4     Q.  I don't want to be too hard on you, but this says phase

 5     five.  Honestly, this just breaks phase four into two

 6     different phases.  That's all that happened here, right?

 7     A.  I might have made this before we added that orientation

 8     period on the front or -- we make modifications.  We were

 9     making a lot of modifications in 2018 to 2019.

10     Q.  But this is the PowerPoint you are still using to train

11     FTOs in your FTO 40-hour course, isn't it?

12     A.  I haven't trained them since -- the FTO is in 2018.  I

13     might have helped out in the class in 2019.

14     Q.  So you haven't done the 40-hour class since 2018?

15     A.  No.  The training lieutenant that got promoted into that

16     and the sergeant, the FTO sergeant coordinator that took

17     over.

18     Q.  So once you were removed and moved to a precinct, they

19     may have changed it?

20     A.  I moved up to commander, yes.

21     Q.  Okay.  It used to be that there was also an eight-day

22     evaluation prior to your ten-day; isn't that correct?

23     A.  Yes.

24     Q.  And Survey Monkey makes some complaints about that

25     change; isn't that correct?
```

1    A.  Yes.

2    Q.  The FTOs are not entirely pleased with the fact that

3    there's no longer an eight-day program; isn't that correct?

4    A.  Correct.

5    Q.  But here's the point of this is, this whole FTO program

6    with the exception of phase two where if they're able or if

7    they have the skills, they can operate as a two-person car,

8    it's almost all being an able car for the entire FTO period.

9         Isn't that what the -- what it says?

10   A.  The goal is to get them to learn from their FTO as much

11   as possible and then progress over time and start

12   transitioning and getting them ready for that ten-day so

13   that they understand things faster to work as an able car

14   when they graduate their ten-day.

15   Q.  But during the ten-day, they are not working as a

16   two-person car.  They are working as an able car?

17   A.  Correct.  And that's the progression we are trying to

18   get them to, to make sure that when we are testing them out

19   on that final ten days that they can fully -- they know the

20   city ordinances, state statutes and can perform the

21   functions of the job.

22   Q.  But the function of the job is to work with other

23   officers, isn't it?

24   A.  Yes.

25   Q.  And this -- they're always working as an able car during

1  their FTO?

2  A.  A lot of it, but with the notion behind it that they

3  need to know when to call back up, they need to know safety.

4  Q.  When they're finished their FTO program and now they're

5  no longer called a recruit, they're now called a rookie on

6  day one after FTO, that's when they start working as a

7  two-person car, largely for the first time in their police

8  career, correct?

9  A.  Yes, after FTO.

10 Q.  That's what I meant, after FTO.

11 A.  Yeah.

12 Q.  When we don't call them a recruit, we don't call them an

13 officer.  We call them a rookie, but that's when they start

14 working together; isn't that correct?

15 A.  Yes.  They have some of that experience in FTO.

16 Q.  After FTO?

17 A.  Correct.

18 Q.  And in this case, Mr. Kueng and Mr. Lane, fresh out of

19 FTO, never having worked as a two-person car, were put in a

20 car together; isn't that correct?

21 A.  I wouldn't know.

22 Q.  Okay.  I want to review some, revisit some things that,

23 that I think you talked about.  You talked an awful lot --

24 and I shouldn't say you talked an awful lot.

25            You were questioned an awful lot.  Is that more

1    fair?

2    A.  Yes.

3    Q.  Okay.  You were questioned an awful lot about this MRT,

4    maximal restraint technique.

5    A.  Correct.

6    Q.  And the maximal restraint technique never became clear

7    to me.  So I want to clear this up.

8           The hobble is actually two cords; isn't that

9    correct?

10   A.  Correct.  Well, it's -- yeah.

11   Q.  So you take one, and you put it around the feet?

12   A.  Yes.

13   Q.  And you take something else, and you put it around the

14   waist, kind of like my belt, right?

15   A.  Correct.

16   Q.  And you attach the feet to the belt, and then you pull

17   it tight?

18   A.  In the front yes.

19   Q.  In the front.  So you've got your hands behind your

20   back, and your feet are basically pulled up to your waist;

21   isn't that correct?

22   A.  Yes.

23   Q.  So once the hobble is on, you're going to look something

24   like this (indicating), correct?

25   A.  Yes.

1    Q.  And you made a big deal out of the idea that you got to

2    put them in the side recovery position because you don't

3    want them to be on their chest?

4    A.  Correct.

5    Q.  But that's actually impossible; isn't that correct

6    (indicating)?

7    A.  If you put them in the maximal restraint technique?

8    Q.  Yeah.

9    A.  They could be on their chest, but if -- I see what you

10   are saying.  So, yeah, if they're in the prone, you put them

11   in the MRT and put them in the side recovery when they are

12   there.

13   Q.  There is no other position they could possibly be in

14   except on their back?

15   A.  Some other people can get on their face or chest, so the

16   important part --

17   Q.  Get on their chest?  I mean, how am I going to get on my

18   chest?  I'm not going to do it because I'll put a big mark

19   on my face.

20   A.  Okay.

21   Q.  I'd fall over on my side, right?

22   A.  I've seen people do things in hobbles and MRTs that I've

23   never seen before so --

24   Q.  I'm sure with the nature of your work and your tenure of

25   your employment, you've seen a lot of things I've never seen

1    before.

2              But coming back to the MRT, the whole idea that

3    you have to put them on the side recovery position, that's

4    kind of where they land.

5              Also, you talked about Officer Lane by policy was

6    in charge of this whole scene; isn't that correct?

7    A.  By policy, yes.

8    Q.  And so he's in charge of Officer Kueng, and this guy

9    three times says, Shouldn't we roll him over?  Shouldn't we

10   put him on his side?

11             Three times; isn't that correct?

12   A.  Yes.

13   Q.  Officer Chauvin didn't listen to him.  He told him no.

14   Leave him where he is; isn't that correct?

15   A.  Yes.

16   Q.  To the extent he tried to take charge, he was denied

17   that opportunity by a 19-year veteran who had been

18   Mr. Kueng's FTO just three shifts prior, correct?

19   A.  Correct.

20   Q.  Another thing I want to talk to you about, when you were

21   looking at Exhibit No. 5, and Exhibit No. 5 is the Lane

22   body-worn camera.  Okay?

23   A.  Yes.

24   Q.  In Exhibit No. 5, you said that Mr. Kueng had his knee

25   on his lower back, on Mr. Floyd's lower back, correct?

1    A.  That area, yes.  It appeared that way in the video.

2    Q.  Have you ever seen somebody wear two pairs of pants?

3    A.  I have.

4    Q.  I'm not going to ask you why it is, but on a day where

5    it's 95 degrees, you've got to say it's a little strange to

6    have two pairs of pants on; isn't that correct?

7    A.  Correct.

8    Q.  This pair of pants has gone all the way down to the

9    bottom of his derriére, of Mr. Floyd's derriére.  So

10   Mr. Kueng here has his knee on the base of his gluteus.

11   A.  Okay.

12   Q.  Not on his mid back.  In other versions of this, and I'm

13   not going to try to find it, but there might be other times

14   where he transitioned.

15           But he didn't have his knee on his back for this

16   entire encounter; isn't that correct?

17   A.  Correct.

18           MR. PLUNKETT:  Thank you.

19           THE WITNESS:  Thanks.

20           MS. BELL:  Judge, I believe --

21           THE COURT:  Well, I'm sure there's other

22   cross-examination.

23           MS. BELL:  Yes.  I think it will take longer than

24   six minutes.  I don't know if the court, given it was

25   Friday, planned on ending at 4:30 or what.

1    THE COURT:  Well, first of all, we're going to

2    find out whether or not Mr. Paule or Mr. Gray has any

3    cross-examination, but we're not even going to bother to do

4    that because that will take more than six minutes, and so,

5    members of the jury, we have to smile about it.  Bottom line

6    is everybody here is tired, and let's call it a day.

7    Now, this is going to be a weekend, and while I

8    harped and harped and harped about not talking with other

9    persons about the case, not carrying out personal

10   investigations, not discussing the case amongst yourselves,

11   not reading or listening to either media accounts or other

12   electronic means of information, on a weekend the temptation

13   gets even stronger.

14   Don't fall to temptation.  Just keep your own

15   counsel with respect to the case.  Keep an open mind with

16   respect to the case, and above all, have a good weekend.

17   And I hope those football games are as good as last weekend.

18   We will stand in recess.  We'll be back at 9:30 on

19   Monday.

20   (Court adjourned at 4:24 p.m., 01-28-2022.)

21   *   *   *

22   I, Renee A. Rogge, certify that the foregoing is a

23   correct transcript from the record of proceedings in the

24   above-entitled matter.

25   Certified by:  /s/Renee A. Rogge
                    Renee A. Rogge, RMR-CRR