UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-108(3) (PAM/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S POSITION WITH** |
| v. | ) | **RESPECT TO SENTENCING** |
| | ) | |
| J. ALEXANDER KUENG, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through undersigned counsel, hereby submits its position with respect to the sentencing of J. Alexander Kueng (the "Defendant"). The Government recommends a sentence that reflects both the gravity of Defendant's crime and his relative culpability compared to his codefendants. More specifically, the Government requests a sentence that is less than codefendant Derek Chauvin's sentence, which has not yet been ordered but pursuant to a Rule 11(c)(1)(C) agreement will fall between 240 to 300 months' imprisonment, but significantly more than the Guidelines range applicable to codefendant Thomas Lane, which is a range of 63 to 78 months' imprisonment. Such a sentence is sufficient, but not greater than necessary, to comply with the goals 18 U.S.C. § 3553(a).

Several factors weigh heavily in favor of a lengthy prison sentence and against a further, sizeable downward variance from the Guidelines range recommended above: first, the gravity of the offense itself—Defendant's abuse of state powers to cause the death of George Floyd, a man in his custody and care; second, Defendant's lack of acceptance of

responsibility, including his (at-times obstructive and incredible) trial testimony; third, the need to promote respect for the law and deter other police officers from standing by as their fellow officers inflict abuses on unresisting arrestees; and fourth, the need for consistency with respect to other cases in which officers have been convicted of failing to intervene to protect an arrestee or inmate from abuse.[1]

## PROCEDURAL HISTORY

Defendant Kueng went to trial on two counts of Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242.  Count Two charged Defendant with willfully depriving Mr. Floyd of the right, secured by the United States Constitution, to be free from the unreasonable force of a police officer, by failing to intervene to stop Chauvin's use of unreasonable force on Mr. Floyd.  Count Three charged Defendant with willfully depriving Mr. Floyd of the right, secured by the United States Constitution, to be free from a police officer's deliberate indifference to his serious medical needs, by seeing Mr. Floyd lying on the ground in clear need of medical care and willfully failing to aid him.  On February 24, 2022, following a trial that lasted more than a month, a jury returned guilty verdicts as to both counts, and additionally found that Defendant's offenses resulted in Mr. Floyd's death.

The Presentence Investigation Report ("PSR") calculated Defendant's total offense level to be 43 (reduced per the Guidelines from 46) and his criminal history category to be

---

[1] In the case most analogous to Defendant's—a conviction by a jury for a failure to intervene that resulted in death—a sentence of 360 months' imprisonment was imposed. *See United States v. Pagan-Ferrer*, 736 F.3d 573 (1st Cir. 2013).

I, resulting in a Sentencing Guidelines range of life imprisonment.  PSR ¶¶ 65, 68, 110. The United States believes a 2-level upward adjustment for obstructing or impeding justice should be applied based on Defendant's perjury during trial testimony, but otherwise agrees with the Guidelines calculation contained in the PSR.  To remain consistent with the treatment of codefendants, the United States also asks that the Court include a summary of Defendant's trial testimony in the PSR.  *See* PSR at A.2-A.3.  Otherwise, the United States asks that the Court adopt the factual findings contained in the PSR as its own.

## ARGUMENT

The Court must determine what constitutes an appropriate sentence as guided by the factors of 18 U.S.C. § 3553(a).  In doing so, the Court must first determine the applicable Sentencing Guidelines.  Although the Guidelines are advisory, the Court must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

In addition to considering the Guidelines, the Court must also analyze a number of factors under Section 3553(a), including the history and characteristics of the defendant, the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and promote just punishment for the offense, the need for adequate deterrence, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities.  Here, analysis of the Section 3553(a) factors makes clear that a sentence less than codefendant Chauvin's sentence of 20 to 25 years, but significantly more than codefendant Lane's Guidelines range of 63 to

78 months, is sufficient but not greater than necessary to accomplish the purposes of criminal sentencing as set forth in Section 3553.

## I.      Sentencing Guidelines Considerations.

The PSR's Guidelines calculations are driven by the Guidelines for Count 2, which are calculated to have a base offense level of 38. The calculation begins with a reference to U.S.S.G. § 2H1.1, which requires a cross reference to the closest underlying offense— in this case, Second Degree Murder (U.S.S.G. § 2A1.2), which carries a base offense level of 38. Second Degree Murder is the appropriate cross reference because: (1) Defendant unlawfully killed Mr. Floyd, or aided and abetted the killing; and (2) Defendant acted with malice aforethought. *See United States v. Cottier*, 908 F.3d 1141, 1146 (8th Cir. 2018).[2] The PSR then correctly applied a 6-level upward adjustment because Defendant committed the offense under color of law (U.S.S.G. § 2H1.1(b)(1)) and a 2-level upward adjustment because Mr. Floyd was physically restrained during the course of the offense (U.S.S.G. § 3A1.3).

Defendant raises several objections to the PSR. First, he claims that instead of applying a base offense level using the cross reference for Second Degree Murder, the

---

[2] Malice may be shown "by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that [the factfinder] is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." *Id.* (citing *United States v. French*, 719 F.3d 1002, 1008 (8th Cir. 2013) (additional internal citation omitted)). "An aiding and abetting conviction requires the government to prove a defendant took an affirmative act to further the underlying criminal offense, with the intent of facilitating the offense." *Id.* (quoting *United States v. Borders*, 829 F.3d 558, 565 (8th Cir. 2016) (additional internal citations omitted)).

Court should use the same Guidelines cross reference—U.S.S.G. § 2A1.4 (Involuntary Manslaughter)—for both Counts 2 and 3 given that they arose from a "single course of conduct." ECF No. 354 at 4. Defendant's argument is legally unsound. Second, he argues he should receive a 4- or 3-level downward adjustment as a minimal participant in the offense. ECF No. 354 at 4. This argument is unsupported by the law and the facts of the case. Third, he argues that the application of the color-of-law enhancement is "absurd" and results in double counting because every violation of Section 242 would qualify for the increase. ECF No. 354 at 5. Section 242 caselaw makes clear that Defendant is wrong. The United States will discuss each of these arguments, along with its argument for an obstruction enhancement, individually.

A. The Base Offense Level Is 38.

Defendant's argument that the cross reference must be the same for both Count 2 and Count 3 ignores that Count 2 and Count 3 are two different crimes with two different sets of elements. It is often the case that two or more criminal charges result from a "single course of conduct" where the same Guidelines section is used; nonetheless, each crime requires the satisfaction of different elements, and the application of the Guidelines results in a different adjusted offense level. For example, a defendant can be charged with both receipt and possession of child pornography from a single course of conduct committed in a matter of minutes—the defendant downloads child pornography to a device and then possesses that material on his device. The Guidelines section for both crimes is the same— Section 2G2.2—but the base offense level is different for possession of child pornography

5

(18) than it is for receipt of child pornography (22). The Guidelines are calculated separately and then grouped.

Similarly, here, Defendant committed two separate crimes—failure to intervene and deliberate indifference—over the course of minutes. While generally Defendant's conduct can be described as a single course of conduct, his separate civil rights violations—failing to stop or attempt to stop Chauvin from using excessive force and failing to provide Mr. Floyd with obviously needed medical care—constitute two crimes with different elements. These crimes apply the same Guideline, Section 2H1.1, but are assigned different base offense levels within that Guideline and then grouped.

Nothing about this calculation is irrational, as suggested by Defendant. The use of two different cross-references in the PSR for the two different offenses alleged in Counts 2 and 3 comports with logic. The crime of violating a victim's civil rights through deliberate indifference does not require any excessive use of force, and therefore does not require a cross-reference to the Guideline that applies to a use of force. The crime of violating a victim's civil rights through a failure to intervene *does* require a use of force, and therefore invokes the more serious cross reference. The fact that the base offense level is higher for failure to intervene is appropriate and provides a necessary distinction for defendants like codefendant Lane, who was charged only with, and convicted only of, the deliberate indifference violation charged in Count 3.

For these reasons, the base offense level in this case is properly determined to be level 38.

B.  A Mitigating/Minor Role Adjustment Should Not Be Applied.

The mitigating role adjustment applies to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity."  U.S.S.G. § 3B1.2 cmt. n.3(A).  "[M]erely showing the defendant was less culpable than other participants is not enough to entitle the defendant to the adjustment if the defendant was deeply involved in the offense."  *United States v. Jones*, 25 F.4th 1077, 1079 (8th Cir. 2022) (quoting *United States v. Cubillos*, 474 F.3d 1114, 1120 (8th Cir. 2007)).

While the Government views Defendant as less culpable than codefendant Chauvin (and is recommending a sentence lower than Chauvin's to reflect their relative culpability),[3] and acknowledges Chauvin had recently been one of Defendant's field training officers, Defendant does not qualify for the adjustment because he was deeply involved in the offense.  Defendant participated in holding down Mr. Floyd for more than eight minutes as Mr. Floyd was killed.  He directed a helpful firefighter away from Mr. Floyd and rebuffed Lane's questions about whether Mr. Floyd should be rolled on his side.  He personally assessed that Mr. Floyd did not have a pulse, and then did nothing about it.

Defendant is also not substantially less culpable than the average participant in the failure to intervene and deliberate indifference crimes.  Defendant and Thao were both charged with failure to intervene and were independently and equally required to intervene in Chauvin's use of excessive force.  Similarly, all four defendants independently and

---

[3] The Government believes that on different bases, the Court should order comparable sentences for Defendant and codefendant Thao.

equally had a duty to render aid to Mr. Floyd, who died in their joint custody.  According to the expert medical testimony at trial: (1) Mr. Floyd would not have died without Chauvin's restraint; and (2) had any one of the defendants repositioned Mr. Floyd onto his side when he was still conscious, Mr. Floyd would have lived.  Had any defendant performed CPR during the initial minutes after Mr. Floyd lost a pulse, it may also have saved his life.  Defendant is not substantially less culpable than Thao for his failure to intervene, nor is he substantially less culpable for his failure to render medical aid than the other defendants.  Defendant was as well-placed as the others to intervene and render aid and had as much responsibility to do so.

For all of these reasons, Defendant should not receive a 3- or 4-level decrease for being a minimal or minor participant in the offense.

C.  The Enhancement for Committing the Offense Under Color of Law Does Not Result in Improper Double Counting and Should Be Applied.

Section 242 caselaw makes clear that Defendant's acting under color of law is not accounted for in his base offense level.  The base offense Guideline, § 2H1.1(a), applies both to offenses committed under color of law and offenses such as hate crimes, where the defendant acts in a private capacity.  *See* § 2H1.1 Stat. Provisions (including § 242 and federal hate crime statutes 18 U.S.C. §§ 245(b), 247, 249 & 42 U.S.C. § 3631, among the statutes that correspond to this guideline).  Similarly, the Guideline for the underlying offenses (Second Degree Murder for Count 2 and Involuntary Manslaughter for Count 3) applies equally to homicides not committed under color of law.  Thus, the aggravating factor of the defendant's abuse of his official authority is not accounted for in the base

offense levels.  The abuse of authority does not enhance the sentence until the offense level is adjusted under § 2H1.1(b)(1).  *See United States v. Volpe*, 224 F.3d 72, 77 (2d Cir. 2000) (no double counting when the guideline calculations for an officer convicted of an 18 U.S.C. § 242 violation included both an adjustment under § 2H1.1(b)(1)(B) because the defendant acted under color of law and § 2A3.1(b)(3)(A) because the victim was in the custody, care, or control of the defendant); *United States v. Hickman*, 766 F. App'x 240, 250-51 (6th Cir. 2019) (affirming the sentence in a § 242 deliberate indifference and excessive force prosecution and holding that there was no double counting where the defendant received a color-of-law adjustment under § 2H1.1(b)(1) because without it, his base offense level would not reflect that he had acted under color of law); *see also United States v. Webb*, 214 F.3d 962, 965 (8th Cir. 2000) (no double counting when the Guidelines calculations for an officer convicted of an 18 U.S.C. § 242 violation included a color of law adjustment under § 2H1.1(b)(1)(B) because the § 2H1.1 adjustment can be independently justified on the basis that the defendant-officer was a public official at the time of the offense).

The 6-level enhancement should be applied.

D. <u>The Enhancement for Obstruction Should Be Applied</u>.

The PSR does not include a 2-level increase for obstructing or impeding the administration of justice pursuant to U.S.S.G. § 3C1.1.  *See* PSR ¶¶ 45, 57, 63.  The United States objects.

Pursuant to U.S.S.G. § 3C1.1, a 2-level enhancement is applied if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of

justice with respect to the prosecution or sentencing of the instant offense of conviction. Application Note 4 to U.S.S.G. § 3C1.1 sets forth examples of conduct that trigger the enhancement, which include committing perjury.

"A witness commits perjury when he testifies falsely under oath about a material matter with a willful intent to deceive the fact finder." *United States v. Molina*, 172 F.3d 1048, 1058 (8th Cir. 1999). "Committing perjury at trial constitutes an obstruction of justice within the meaning of § 3C1.1." *United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004). The enhancement cannot be imposed by a district court "simply because a defendant testifies on his own behalf and the jury disbelieves him." *Id.* (quoting *United States v. Washington*, 318 F.3d 845, 861 (8th Cir.2003)). "[T]he sentencing court must itself conduct an independent evaluation and determine whether the defendant committed perjury." *Id.*

As the Court is aware, Defendant took the stand and testified at trial. Some of Defendant's testimony directly and obviously conflicted with other, irrefutable evidence presented at trial, and some of his testimony on cross examination conflicted with his testimony on direct or redirect examination. Defendant's false testimony was material to the elements the United States was required to prove and it was willful, in that it was clearly meant to undermine state-of-mind elements the Government was required to prove. For example:

- At trial, the Government had the burden of proving, as to Count 3, that Defendant actually knew Mr. Floyd had a serious medical need. *See* ECF No. 278 at 25-26. Remarkably, despite video evidence showing that Lane observed out loud that Mr. Floyd had lost consciousness and that Defendant himself reported he could not find Mr. Floyd's pulse, Defendant perjured himself and said he did not know Mr. Floyd

was suffering from a serious medical need until defendant Lane came back from the ambulance.  TT 3494-3495, 3571.

On cross examination, Defendant stated he suspected Mr. Floyd could be suffering from excited delirium, which he knew from his training was a potentially dangerous medical problem, that Mr. Floyd was saying he could not breathe, that Mr. Floyd's speech was slowing, that Mr. Floyd completely stopped talking, that he heard Lane say Mr. Floyd was passing out and that Mr. Floyd "slipped into unconsciousness," and that he couldn't find a pulse.  TT 3571-74.

Defendant also testified he heard Mr. Floyd say he couldn't breathe more times in the squad vehicle than when Mr. Floyd was restrained on the ground (TT 3572)— even though Mr. Floyd said he couldn't breathe five times in the squad, but more than twenty times on the ground.  This testimony, along with his testimony regarding his lack of knowledge that Mr. Floyd could not breathe, constitute perjury that was intended to obstruct by trying to convince the jury that he did not have knowledge of Mr. Floyd's serious medical need.

- At trial, the Government had the burden of proving, as to Count 3, that Defendant disregarded Mr. Floyd's medical need by failing to take reasonable measures to address it.  *See* ECF No. 278 at 26.  Defendant attempted to convince the jury that the continued restraint of Mr. Floyd over the course of nine and a half minutes was reasonable, in part, because of a belief that Mr. Floyd may be suffering from excited delirium, which at times requires restraint for a subject's safety.  Defendant testified that one of the reasons he believed Mr. Floyd may be suffering from excited delirium was because Mr. Floyd demonstrated an attraction to glass, one of the symptoms of excited delirium.  As evidence, Defendant pointed to Mr. Floyd twice hitting his face against the plexiglass in the back seat of the squad vehicle.  TT 3465-66, 3537-38.  Defendant's testimony contradicts the video evidence, which makes very clear: (1) Mr. Floyd did not want to be anywhere near the plexiglass in the back of the squad vehicle; and (2) Mr. Floyd did not demonstrate an attraction to any of the other, much larger, sheets of glass throughout the incident.  When asked on cross examination, "And we all know he didn't want to get in the vehicle, right?" Defendant himself admitted, "Very much not, ma'am."  TT 3541.

Similarly, Defendant testified he suspected excited delirium because Mr. Floyd exhibited another symptom, that Mr. Floyd was not "registering pain."  TT 3465-66.  According to Defendant, while walking Mr. Floyd across the street to the squad vehicle, Mr. Floyd did not respond to pain from an escort hold he employed on Mr. Floyd's wrist, even when Mr. Floyd dropped to the ground, which would have "activate[d]" the wrist lock.  *Id.*  Again, this contradicts the video evidence presented at trial, which showed Mr. Floyd repeatedly complaining of pain to his wrists, as well as to other parts of his body, including his neck, face, and knee.  *See* Gov't Ex. 7A at 7, 8, 9, 10, 11, 13, 14, 17, 18, 19.  On the one occasion that Mr. Floyd appeared

11

to stumble and get closer to the ground while being escorted to the squad car, he did express pain. *See* Gov't Exs. 7 at 20:14:43, 7A at 8. Defendant's testimony that, at the time, he considered these to be potential signs of excited delirium, was in fact an attempt to, in hindsight, justify his lack of a reasonable response to Mr. Floyd's medical needs.

- As previously noted, the Government had to prove beyond a reasonable doubt that Defendant actually knew Mr. Floyd had a serious medical need, and the Government demonstrated Defendant's knowledge, in part, by showing that Defendant could hear the descriptions of Mr. Floyd's medical condition that were verbally provided by bystanders to the killing. Defendant testified, "My recollection is I had a lot of kind of difficulty hearings things, a lot of difficulty kind of seeing the big picture. I had a lot of tunnel vision going on. . . . My understanding is that's pretty normal in high stress situations, something you get called auditory exclusion and then tunnel vision, as I mentioned." TT 3469.

  The video evidence presented in the case demonstrates that Defendant could hear the bystanders. First, the bystanders' pleas are clearly audible on Defendant's body worn camera footage. *See* Gov't Ex. 7. Additionally, when firefighter G.H. arrived on the scene and she and bystander D.W. began pleading for the officers to check Mr. Floyd's pulse, Defendant immediately checked for Mr. Floyd's pulse, indicating that he heard them. But he testified on direct examination he could "never make out what [the voices] were saying," and when asked on cross examination whether he could hear the words of the bystanders, he responded, "I heard some expletives." *Id.* at 3476, 3584. This testimony is not credible, but it is both material and another attempt by Defendant to justify to the jury his lack of a response to Mr. Floyd's serious medical needs.

- Defendant testified that after Mr. Floyd stopped struggling on the ground, his "only concern was that his situation could deteriorate and that if the paramedics showed up they'd want to treat him quickly, so we wanted to give them quick access." TT 3493-95. This testimony was also a lie. The video evidence shows Defendant did nothing to provide the paramedics with quick access to treat Mr. Floyd quickly—when paramedics arrived, Mr. Floyd was, as known to Defendant, unconscious and handcuffed in the prone position with a knee on his neck. Defendant did not even move out of the way after paramedics arrived and impeded paramedics from getting Mr. Floyd onto the stretcher quickly—he had to be told to get out of the way. *See* TT 3574-75. And none of the defendants, including Kueng, informed the paramedics of the type or duration of force employed on Mr. Floyd, as they are required to do by MPD policy. Defendant's statement regarding his "only concern" for treatment of Mr. Floyd is undermined by his actions.

For all these reasons, the Government believes that a 2-level increase for obstruction of justice, pursuant to Section 3C1.1, should be applied in this case.

II.   **The Section 3553(a) Factors Support a Sentence Within the Range Recommended by the Government.**

A. History and Characteristics of Defendant.

Section 3553(a)(1) states that a sentencing court must first consider "the history and characteristics of the defendant."  Unlike many individuals who appear before this Court for sentencing, Defendant lived what many would view as a life of considerable stability and opportunity.  PSR ¶¶ 78, 81-82, 91-95.

Any further significant downward variance below the Government's recommendation based on the history and characteristics of Defendant would be unwarranted.  While Defendant served as a police officer for a short period of time, he testified about his lengthy training as a police officer and his understanding about concepts that are core to this case:  "in your custody, in your care," the sanctity of life, positional asphyxia, and proportional force.[4]  He acknowledged having used the side recovery position on subjects in his custody in the past.  Defendant's most striking characteristic is that he was a recently trained and knowledgeable, CPR- and EMR-certified police officer, who was sworn to protect and serve people.  He knew right from wrong.  But Defendant

---

[4] Defendant objects to the summary of his training as set forth in the PSR because it does not differentiate the training received by each of the defendants.  ECF No. 365 at 1 (referencing PSR ¶ 12).  However, Defendant does not identify a single aspect of the summarized training that he did not receive.

chose to do the wrong thing.  He has expressed no remorse for his actions and inaction, even though Mr. Floyd died as a result.

Numerous courts have held that crimes committed by law enforcement officers are ones that courts should treat more seriously, not less seriously, than other types of criminal acts.  *See United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) ("A defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by a police officer constitutes an abuse of a public position.").

In this case, Defendant's position as an officer not only aggravated the crime but made it possible.  If he and his fellow defendants had been private citizens, they would have lacked the authority to hold back civilian bystanders desperate to step in to provide the assistance Mr. Floyd so direly needed.

B.  The Nature and Seriousness of the Offense.

The second factor a sentencing court must consider is "the need for the sentence imposed — to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A).  This requirement extends beyond, but also overlaps to some extent with, the "nature and circumstances of the offense" component of Section 3553(a)(1).  The Section 3553(a)(2)(A) consideration carries the need to make the punishment fit the crime, and the need not just to punish, but to punish justly.  "[I]t is another way of saying that the sentence should reflect the gravity of the defendant's conduct."  Committee on the Judiciary, Report No. 98-225, 98 Cong. 1st Sess. 1983, p. 75.

14

Few crimes are more serious than the crime Chauvin committed—the murder of an individual by an agent of the state.  The severity and unlawfulness of Chauvin's conduct was never seriously questioned; Defendant's own expert witness on the use of force and medical aid as it pertains to police officers, Steve Ijames, testified that the obviousness of Chauvin's unreasonable force was obvious "beyond question"—that he had never seen anything like it.  TT 3676-77.  Yet for more than nine minutes, Defendant, who admitted during his testimony that he saw Chauvin's knee on Mr. Floyd's neck (TT 3474, 3543-44), crouched shoulder-to shoulder with Chauvin, while the collective pressure[5] applied by the two officers slowly killed a person suspected of passing a $20 counterfeit bill.

Defendant knew, from his own observations and the observations of the bystanders and codefendant Lane, that Mr. Floyd was having trouble breathing, that Mr. Floyd then stopped talking and moving, and lost consciousness.  As noted by Dr. Systrom, Defendant had a front row seat to, and physical contact with, Mr. Floyd as he deteriorated.  *See* TT 1771.  Each of these points of deterioration was specifically called out by the bystanders to the crime—including several teenagers, a sixty-one-year-old man, and an off-duty Minneapolis firefighter, all of whom repeatedly begged the officers to get off Mr. Floyd or to check his pulse.[6]

---

[5] As noted by Dr. David Systrom, a pulmonologist and critical care physician who testified as an expert at trial, the pressure Defendant applied to Mr. Floyd's left wrist, which had the effect of pressing Mr. Floyd's forearm into his back and diaphragm, contributed to Mr. Floyd's inability to breathe.

[6] Defendant objects to the portion of the PSR indicating that the defendants did not allow the firefighter to approach to evaluate or treat Mr. Floyd because only Thao engaged in that

During the restraint, Mr. Floyd repeatedly expressed pain and his inability to breathe; while on the ground, he told the officers more than twenty times that he could not breathe.   During one of those pleas, Chauvin joked with Defendant that Mr. Floyd's vocalization "takes a heck of a lot of oxygen," and Defendant laughed in response. Defendant admitted during cross examination that the fact that Mr. Floyd stopped talking was a "red flag" to "reassess for," but that he didn't change anything he was doing with respect to Mr. Floyd.   TT 3526.

Defendant rebuffed and then ignored codefendant Lane's questions about whether the defendants should perform the appropriate medical care—rolling Mr. Floyd onto his side.[7]  Defendant himself twice checked for and reported to Chauvin and Lane that he could not locate Mr. Floyd's pulse, a recognizable emergency to anyone, with or without any medical training.

Part of the severity of this crime lies in two factors: (1) the unnecessariness of the conduct; (2) and the ease with which Mr. Floyd's death could have been avoided.   No witness was able to explain why an unconscious and then pulseless person required the type of restraint employed by (and/or allowed by) the defendants in this case, let alone any

---

conduct.  ECF No. 354 at 3.  This is incorrect.  Each of the defendants, including Defendant Kueng, individually ordered this witness onto the curb and away from Mr. Floyd.  *See* Gov't Ex. 7A at 23.

[7] Defendant objects to the PSR's recitation of this evidence, arguing that his comments "are not clearly audible."  However, his comments are clearly audible on his body worn camera footage, as reflected in the transcript stipulated to by Defendant himself.  *See* Gov't Ex. 7A at 21.

restraint at all.  And it was fully within Defendant's duties and power to cure both of these problems, to intervene to stop Chauvin's excessive force and to provide simple medical care that would have saved Mr. Floyd's life.[8]  Defendant was not forced to make any split-second, life-or-death decisions.  The fact that Chauvin's conduct was so egregious and the ease with which Defendant could have saved a human life in his custody, make Defendant's crimes of failing to act even more serious.  The worldwide attention to the case was in part because Chauvin's conduct was so shocking, and in part because it was so shocking that the other officers stood by and did nothing, while preventing the civilian witnesses from intervening to save Mr. Floyd's life.

The seriousness of Defendant's crime is compounded by his actions after paramedics removed Mr. Floyd from the scene.  During his interviews with Sergeant Pleoger and Lieutenant Zimmerman, Defendant did not report that Chauvin had restrained Mr. Floyd by grinding his knee into Mr. Floyd's neck; that Mr. Floyd had been held in the prone position for nearly nine and a half minutes; that Mr. Floyd had repeatedly complained he couldn't breathe; that Mr. Floyd had stopped talking and moving entirely; that Mr. Floyd had fallen unconscious; and that the officers had known for several minutes that Mr. Floyd did not have a pulse.[9]  Defendant admitted during his testimony that his report to Sergeant

---

[8] Expert witness and emergency room and medical toxicology physician Dr. Vikhyat Bebarta testified that Mr. Floyd would not have died if he had been rolled onto his side before he was rendered unconscious, and that the best chance at saving Mr. Floyd after he lost consciousness would have been for the defendants to perform CPR.

[9] Defendant objects to the PSR's characterization of this interview, arguing that the defendants' statements to Sergeant Pleoger "complied with the scope of information required in the MPD policy" and that the fact that Lieutenant Zimmerman even interviewed

Pleoger was not true in that he told Sergeant Pleoger that Mr. Floyd stopped moving after EMS arrived.  TT 3596-97.

Defendant's crimes are also serious because they undoubtedly undermine public trust in other law enforcement officers.  As stated by one court, civil rights crimes committed by law enforcement officers are severe by their very nature:

> Our system works well with murders, rapes, robberies, and most other crimes.  When someone kills or rapes, the criminal justice system knows how to take care of the crime.  When a law enforcement officer commits a crime, however, the system has failed, because the very people whom we have entrusted to protect the citizenship from crime are subjecting citizens to crime.  A law enforcement officer's violation of the law is not comparable to an ordinary criminal's violation.  Civil rights crimes go to the core of our system and endanger the entire structure of our government and are a threat to the republic, not just one or two violations.

*United States v. Rodella*, No. CR 14-2783 JB, 2015 WL 711941, at *50 (D.N.M. Feb. 5, 2015).

Mr. Floyd paid the ultimate price for Defendant's crime—his life.  He died a slow and agonizing death.  His family and loved ones will never get him back and will carry the horror of what happened to Mr. Floyd with them for the rest of their lives.  The punishment must fit the crime.  Defendant's crimes demand a lengthy term of imprisonment.

---

Kueng and Lane was in violation of MPD policy.  ECF No. 354 at 3.  These arguments are contradicted by the laundry list of omitted detail regarding the force used on Mr. Floyd and the MPD policy regarding truthfulness that prohibits omissions of pertinent information.  Further, it was never established at trial that Lieutenant Zimmerman's interview of Kueng and Lane violated MPD policy.

C.  <u>The Need for Deterrence</u>.

Section 3553(a)(2)(B) instructs that a criminal sentence needs "to afford adequate deterrence to criminal conduct."  A criminal sentence should take into account specific deterrence with respect to the particular defendant and general deterrence with respect to potential future criminals.  *See United States v. Peterson*, 887 F.3d 343, 349 (8th Cir. 2018). As it is unlikely Defendant will serve as a law enforcement officer in the future, the need for specific deterrence is less at issue here than the need for general deterrence.

But more importantly, the Court is in a position to send a strong message to law enforcement officers who would allow their colleagues and partners to engage in civil rights violations that have monumental consequences.  *See United States v. Carpenter*, 576 F. App'x 610, 614 (7th Cir. 2014) (upholding sentence for police officer in part because of the need to "deter similar derelictions of duty and promote respect for the law" in a troubled metropolitan community); *United States v. Boone*, 110 F. Supp. 3d 909, 919 (S.D. Iowa 2015) (noting general deterrence was "particularly important" in an excessive force case because such sentence "will make explicit that the excessive use of force by law enforcement is a serious civil rights violation that simply will not be tolerated"); *United States v. Hooper*, 566 F. App'x 771, 773 (11th Cir. 2014) (finding a probationary sentence for excessive force substantively unreasonable in part because "the court expressly declined to consider the need for [defendant]'s sentence to adequately deter other police officers from using excessive force").

D. <u>Avoidance of Unwarranted Disparities</u>.

Section 3553(a)(6) notes that a sentencing court must address "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 242 sentences involving officers' failures to intervene or deliberate indifference are driven by the specific facts of each case and do not always yield ready comparisons.

In the most similar case to Defendant's, a law enforcement officer stood by and watched while other officers kicked a handcuffed suspect in the head and upper body and punched him in the face, ultimately resulting in the suspect's death. *Pagan-Ferrer*, 736 F.3d 573. Following convictions at trial for failing to intervene, making false statements, and engaging in obstruction, the officer was sentenced to 360 months' imprisonment. The officer's sentence is appropriately higher than the sentence the Government seeks for Defendant because that officer was the supervisor of the officers who engaged in the excessive force.

Other cases for comparison involve a failure to intervene where the excessive force resulted in bodily injury only; Defendant's sentence should not come close to the shorter sentences in those cases because death resulted here. For example, in related cases *United States v. Broussard*, 882 F.3d 104 (5th Cir. 2018) and *United States v. Hatley*, 717 F. App'x 457 (5th Cir. 2018), two corrections officers failed to intervene when other officers beat, kicked, and punched an inmate for about ten minutes. Following guilty pleas, Broussard was sentenced to 54 months' imprisonment, and Hatley was sentenced to 36 months' imprisonment. The Fifth Circuit upheld the sentences, emphasizing in *Broussard* that the

officer was criminally liable for the underlying excessive force—in that case, the aggravated assault—and that he was not a minor participant simply because his crime was one of omission. Similarly, in *United States v. Daniels*, 281 F.3d 168 (5th Cir. 2002), an officer who failed to intervene when fellow officers kicked, punched, and struck a restrained inmate in the head, resulting in the inmate's bodily injury, was sentenced to 87 months' imprisonment.

A recent excessive force case in this District is also instructive. In *United States v. Palkowitsch*, -- F.4th --, 2022 WL 2080162 (8th Cir. Jun. 10, 2022), a law enforcement officer was sentenced to 72 months' imprisonment after he was convicted at trial of violating 18 U.S.C. § 242 for kicking a man three times as the man was being bitten and held by a police canine. The man sustained serious injuries.

Because the jury concluded that Defendant's crimes resulted in Mr. Floyd's death, Defendant's sentence should not be anywhere near as low as any of these sentences—54, 36, 72, or 87 months of imprisonment—where the crime resulted solely in bodily injury. Considering the Section 3553(a) factors, his conduct is more in line with the *Pagan-Ferrer* case.

## **CONCLUSION**

The United States respectfully submits that a sentence significantly higher than codefendant Lane's Guidelines range of 63-78 month's imprisonment but less than Chauvin's agreed upon sentencing range of 240 to 300 months' imprisonment is sufficient,

but not greater than necessary, after consideration of all of the relevant sentencing factors set forth in 18 U.S.C. § 3553(a).  This would be a fair and just sentence.

Dated:  June 29, 2022                            Respectfully submitted,

ANDREW M. LUGER                          KRISTEN CLARKE
United States Attorney                        Assistant Attorney General
                                              Civil Rights Division

*/s/ Manda M. Sertich*                          */s/ Samantha Trepel*
BY:  MANDA M. SERTICH                   BY:  SAMANTHA TREPEL
Assistant U.S. Attorney                       Special Litigation Counsel
Attorney ID No. 4289039 NY               Attorney ID No. 992377 DC